RECORD NO. 14-1259

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

In re: Highland Construction Management Services, LP,

*Debtor*

_____

# HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP,

*Plaintiff-Appellant,*

v.

# WELLS FARGO BANK, N. A., for the use and benefit of Jerome Guyant IRA,

*Defendant-Appellee.*

_____

JOINT APPENDIX
_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

James P. Campbell
**CAMPBELL FLANNERY PC**
One Village Plaza
1602 Village Market Boulevard
Suite 220
Leesburg, Virginia 20175-0000
(703) 771-8344 (Telephone)
jcampbell@campbellflannery.com

Counsel for Plaintiff-Appellant

Neil D. Goldman
**GOLDMAN & VAN BEEK, PC**
510 King Street, Suite 416
Alexandria, Virginia 22314-0000
(703) 684-3260 (Telephone)
ngoldman@goldmanvanbeek.com

Counsel for Defendant-Appellee

# TABLE OF CONTENTS

Docket Entries ................................................................ 1

Debtor's Objection to Proof of Claim filed 10-23-12
  with Exhibits A through E ......................................................... 5

Jerome Guyant Ira's Memorandum in Opposition to High-
  land Construction 's Objection to Proof of Claim
    filed 12-12-12 ................................................................ 29

Jerome Guyant Ira's Opposition to Highland Construction's
  Objection to Proof of Claim filed 12-12-12 ........................... 39

Reply to Guyant's Opposition to Debtor's Objection to
  Proof of Claim filed 12-17-12 .................................................. 104

Transcript of Proceedings Heard on 12-18-12 Before
  the Hon. Robert G. Mayer, Bankruptcy Judge.......................... 114

Memorandum in Support of Debtor's Objection to Proof
  of Claim filed 1-14-13 ................................................... 155

Jerome Guyant Ira's Amended Supplemental Memorandum
  in Opposition to Highland Construction's Objections to
    Proof of Claim filed 1-15-13 ........................................ 163

Memorandum Opinion entered 3-29-13 .................................. 174

Order entered 3-29-13 .................................................. 183

Jerome Guyant Ira's Motion for Reconsideration of Order
  Sustaining Highland Construction's Objection to Proof
    of Claim filed 4-12-13 .................................................... 185

Objection to Jerome Guyant Ira's Motion for Reconsideration
  of Order Sustaining Highland Construction's Objection to
    Proof of Claim filed 5-21-13 ........................................... 192

Table of Contents – Page 2 – Continued

Jerome Guyant Ira's Reply to Debtor's Objection to Motion
  for Reconsideration of Order Sustaining Highland Constru-
  ction's Objection to Proof of Claim filed 5-26-13 ........................    199

Memorandum Opinion entered 7-30-13 ......................................    205

Order entered 7-30-13 .....................................................    227

Notice of Appeal filed 8-12-13 ...........................................    229

Order of U. S. District Court for the Eastern District
  of Virginia, Alexandria Division filed 2-21-14 .............................    232

Notice of Appeal filed 3-23-14 ...........................................    235

APPEAL,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:13-cv-01244-CMH-TRJ

Highland Construction Management Services, LP v. Wells
Fargo, NA
Assigned to: District Judge Claude M. Hilton
Referred to: Magistrate Judge Thomas Rawles Jones, Jr
Case in other court:  USBC EDVA, 11-11413-RGM
               4th Circuit, 14-01259
Cause: 28:1334 Bankruptcy Appeal

Date Filed: 10/07/2013
Date Terminated: 02/21/2014
Jury Demand: None
Nature of Suit: 422 Bankruptcy Appeal
(801)
Jurisdiction: Federal Question

**Debtor**

**Highland Construction Management
Services, LP**

**Appellant**

**Highland Construction Management
Services, LP**

        represented by     **James P. Campbell**
Campbell Flannery PC
1602 Village Market Blvd
Suite 220
Leesburg, VA 20175
(703) 771-8344
Email:
jcampbell@campbellflannery.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Appellee**

**Wells Fargo, NA**
*for the use and benefit of*
Jerome Guyant IRA

        represented by     **John J. Brennan , III**
Brennan Law LLC
510 King Street
Suite 416
Alexandria, VA 22314
703-548-1620
Fax: 703-548-4742
Email: jjbrennaniii@brennanlawdc.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Philip Van Beek**
Goldman & Van Beek PC
510 King St

Suite 416
Alexandria, VA 22314
(703) 684-3260
Fax: (703) 548-4742 .
Email:
jvanbeek@goldmanvanbeek.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Neil David Goldman**
Goldman & Van Beek PC
510 King St
Suite 416
Alexandria, VA 22314
(703) 684-3260
Email: ngoldman@ygvb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**USBC-Alexandria (United States**
**Bankruptcy Court)**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/07/2013 | 1 | Notice of APPEAL FROM BANKRUPTCY COURT, filed by Highland Construction Management Services, LP. Bankruptcy Court case number 11-11413-RGM. (Attachments: # 1 Record on Appeal 1, # 2 Record on Appeal 2, # 3 Record on Appeal 3)(rban, ) (Entered: 10/07/2013) |
| 10/07/2013 | 2 | Restricted Transcript Received from USBC. (rban, ) (Entered: 10/07/2013) |
| 10/07/2013 | 3 | Bankruptcy Scheduling Order: Appellant Brief due by 10/21/2013. Appellee Brief due by 11/4/2013. Appellant Reply Brief due by 11/18/2013. (rban, ) (Entered: 10/07/2013) |
| 10/16/2013 | | Case Reassigned to District Judge Claude M. Hilton. District Judge Liam O'Grady no longer assigned to the case. (rban, ) (Entered: 10/16/2013) |
| 10/18/2013 | 4 | Appellant's BRIEF by Highland Construction Management Services, LP. Appellee Brief due by 11/18/2013. (Attachments: # 1 Appendix)(Campbell, James) (Entered: 10/18/2013) |
| 11/18/2013 | 5 | Appellee's BRIEF by Wells Fargo, NA. (Goldman, Neil) (Entered: 11/18/2013) |
| 12/03/2013 | 6 | MOTION to Strike 5 Appellee's Brief by Highland Construction Management Services, LP. (Campbell, James) (Entered: 12/03/2013) |
| 12/03/2013 | 7 | Memorandum in Support re 6 MOTION to Strike 5 Appellee's Brief filed by Highland Construction Management Services, LP. (Campbell, James) |

| | | |
|---|---|---|
| | | (Entered: 12/03/2013) |
| 12/03/2013 | 8 | Notice of Hearing Date re 6 MOTION to Strike 5 Appellee's Brief (Campbell, James) (Entered: 12/03/2013) |
| 12/04/2013 | | Set Deadlines as to 6 MOTION to Strike 5 Appellee's Brief . Motion Hearing set for 12/13/2013 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (clar, ) (Entered: 12/04/2013) |
| 12/06/2013 | 9 | Memorandum in Opposition re 6 MOTION to Strike 5 Appellee's Brief filed by Wells Fargo, NA. (Goldman, Neil) (Entered: 12/06/2013) |
| 12/06/2013 | 10 | Memorandum in Opposition re 6 MOTION to Strike 5 Appellee's Brief *Refiled with Exhibit 1* filed by Wells Fargo, NA. (Attachments: # 1 Exhibit Exhibit 1 to Response in Opposition to Motion to Strike)(Goldman, Neil) (Entered: 12/06/2013) |
| 12/12/2013 | 11 | Notice of Filing of Proposed Order in re 6 MOTION to Strike 5 Appellee's Brief filed by Highland Construction Management Services, LP. (Campbell, James) (Entered: 12/12/2013) |
| 12/12/2013 | | Per CMHJ chambers motions set for 12/13/13 have been resolved (clar, ) (Entered: 12/12/2013) |
| 12/13/2013 | 12 | CONSENT ORDER withdrawing re 6 MOTION to Strike 5 Appellee's Brief filed by Highland Construction Management Services, LP. Signed by District Judge Claude M. Hilton on 12/13/13. (see order for details).(gwalk, ) (Entered: 12/13/2013) |
| 12/13/2013 | 13 | Appellant's REPLY BRIEF by Highland Construction Management Services, LP. (Campbell, James) (Entered: 12/13/2013) |
| 01/15/2014 | 14 | NOTICE of Hearing: Argument on Bankruptcy Appeal set for 2/14/2014at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (rban, ) (Entered: 01/15/2014) |
| 02/11/2014 | 15 | AFFIDAVIT re 13 Appellant's Reply Brief, 4 Appellant's Brief by Highland Construction Management Services, LP. (Campbell, James) (Entered: 02/11/2014) |
| 02/12/2014 | 16 | Joint MOTION to Continue *Oral Argument* by Highland Construction Management Services, LP. (Campbell, James) (Entered: 02/12/2014) |
| 02/12/2014 | 17 | ORDER granting 16 Motion to Continue. Signed by District Judge Claude M. Hilton on 2/12/14. (gwalk, ) (Entered: 02/14/2014) |
| 02/14/2014 | | Reset Hearings: Argument on Bankruptcy Appeal set for 2/21/2014 at 10:00 AM in Alexandria Courtroom 800 before District Judge Claude M. Hilton. (gwalk, ) (Entered: 02/14/2014) |
| 02/20/2014 | | Per CMH chambers motions set for 2/21/14 on the papers (clar, ) (Entered: 02/20/2014) |
| 02/21/2014 | 18 | ORDERED that the decision of the United States BankruptcyCourt is |

| | | |
|---|---|---|
| | | AFFIRMED. Signed by District Judge Claude M. Hilton on 02/21/2014. (jlan) (Entered: 02/24/2014) |
| 03/23/2014 | 19 | NOTICE OF APPEAL as to 18 Order by Highland Construction Management Services, LP. Filing fee $ 505, receipt number 0422-3896457. (Campbell, James) (Entered: 03/23/2014) |
| 03/24/2014 | 20 | Transmission of Notice of Appeal to US Court of Appeals re 19 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (jlan) (Entered: 03/24/2014) |
| 03/25/2014 | 21 | USCA Case Number 14-1259 4th Circuit, Case Manager T. Fischer for 19 Notice of Appeal filed by Highland Construction Management Services, LP. (rban, ) (Entered: 03/25/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/29/2014 10:03:22 | | |
| PACER Login: | al4043 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:13-cv-01244-CMH-TRJ |
| Billable Pages: | 3 | Cost: | 0.30 |

## UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In Re:

**HIGHLAND CONSTRUCTION
MANAGEMENT SERVICES, LP**                  Case No. 11-11413-RGM
                                           Chapter 11

Debtor.

### DEBTOR'S OBJECTION TO PROOF OF CLAIM

COMES NOW Highland Construction Management Services, LP ("Debtor"), by

counsel, and files this Objection to Proof of Claim 4-1 filed on behalf of Wells Fargo

f/b/o Jerome Guyant IRA and in support thereof, states as follows:

### BACKGROUND

1.    On February 28, 2011 Debtor filed a Voluntary Petition under Chapter 11

of the United States Bankruptcy Code.

2.    On July 5, 2011 Wells Fargo f/b/o Jerome Guyant IRA, by counsel, filed

Proof of Claim 4-1 ("Claim") in the amount of $1,396,657.52, which included the

principal amount of $1,082,000.00, interest, attorney's fees and expert witness fees on the

basis of money loaned.

3.    The Claim indicated it was a "secured claim" that was the subject of a lien

on the property owned by the Debtor.

1

**5**

## UCC FINANCING STATEMENTS

4.    On October 11, 2006, the Jerome Guyant IRA filed a UCC

Financing Statement ("UCC") with the Virginia State Corporation Commission.

A true and accurate copy of the UCC is attached hereto as Exhibit A.

5.    On January 18, 2007 the Jerome Guyant IRA filed an UCC

Financing Statement Amendment (hereafter "UCC Amendment 1") with the

Virginia State Corporation Commission. The UCC Amendment is attached hereto

as Exhibit B. The UCC Amendment 1 identifies the collateral securing the Jerome

Guyant IRA as follows:

> Fifty percent (50%) of Highland Construction Management
> Services, LP's interest in Sanford, LLC, a Virginia limited liability
> company at 25 Center Street, Suite 101, Stafford, Virginia 22554,
> which Fifty percent (50%) interest creditor and debtor agree is equal
> to Sixteen percent (16%) of the total of membership interests in
> Sanford, LLC; and Twenty Five percent (35%) of Highland's
> membership interest in Little Piney Run, LLC, a Virginia limited
> liability company at 10942 Harpers Ferry Road, Purcellville, VA
> 20132; and all of Highland's Fifty Seven percent (57%) membership
> interest in Barklay's Point, LLC, a Virginia limited liability
> company at 12022 Meadowville Court, Herndon, VA 20170.

6.    On February 1, 2010 the Jerome Guyant IRA filed an UCC

Financing Statement Amendment (hereafter "UCC Amendment 2") with the

Virginia State Corporation Commission. The UCC Amendment 2 is attached

hereto as Exhibit C. The UCC Amendment 2 identifies the collateral securing the

Jerome Guyant IRA as follows:

> An assignment of 33.33% of Highland Construction Management
> Services, LP's, a Virginia limited partnership, membership interest
> in Sanford, LLC, a Virginia limited liability company, to Jerome

2

**6**

Guyant IRA. Assignment of all Highland Construction Management
Services, LP's Fifty-Seven percent (57%) membership interest in
Barklay's Point, LLC, a Virginia limited liability company to Jerome
Guyant. These assignments are to serve as collateral for that certain
Revolving Credit Line Promissory Demand Note dated December
22, 2005, and amended on October 13, 2006, executed by Highland
Construction Management Services, LP for the benefit of Jerome
Guyant IRA.

### STATE COURT COMPLAINT

7.     On March 3, 2010, the Jerome Guyant IRA filed a Complaint ("State
Court Complaint") in the Circuit Court of Loudoun County, Virginia against the
Debtor. A copy of the State Court Complaint is attached hereto as Exhibit D.

8.     Count I of the State Court Complaint sought the recovery of a
money judgment. Count II sought the recovery of a money judgment against
Guarantor, Joseph L. Bane, Jr. Count III of the State Court Complaint sought
Declaratory Judgment that the Jerome Guyant IRA possessed a perfected security
interest in the collateral pursuant to the UCC attached as Exhibit A, as amended, in
accordance with Exhibit B and Exhibit C.

9.     On October 19, 2010, the Circuit Court of Loudoun County Virginia
entered judgment against the Debtor with respect to Count I and against Joseph L.
Bane, Jr. with respect to Count II in the amount of $1,082,000.00 and issued a
Declaratory Judgment with regard to Count III. A copy of the October 19, 2010
Judgment Order ("Order") is attached hereto as Exhibit E. The Order states the
following declaratory relief in regard to the UCC, UCC Amendment 1 and UCC
Amendment 2:

The Plaintiff Wells Fargo Bank, N.A. (formerly Wachovia Bank, N.A.) FBO Jerome Guyant IRA is awarded a declaratory judgment that it has a perfected security interest in: (i) Fifty percent (50%) of HCMS's membership interest in Sanford, LLC, a Virginia limited liability company; and (ii) Twenty-five percent (25%) of Bane's membership interest in Little Piney Run, LLC, a Virginia limited liability company; and (iii) all of HCMS' membership interest in Barklay's Point, LLC.

10.    Neither Count I, Count II nor Count II of the State Court Complaint sought the actual enforcement of the security instrument created by the UCC and UCC Amendments.   Given the mandate of *Ainslie v. Inman*, 265 Va. 347 (2003), the Declaratory Judgment did not constitute an enforcement action of the UCC.

11.    The UCC, as amended, expired or lapsed as a matter of law as the creditor, Jerome Guyant IRA, did not file a continuation statement prior to the expiration of the UCC on October 10, 2011.  See *Ainslie* at 354.

12.    Accordingly, Proof of Claim 4-1 is an unsecured claim in this proceeding as a matter of law.

WHEREFORE, for the reasons stated herein, the Debtor, Highland Construction Management Services, LP, respectfully requests that this Honorable Court enter Order declaring Proof of Claim 4-1 to be an unsecured claim and for such further relief as this Court deems appropriate.

                                        **HIGHLAND CONSTRUCTION**
                                        **MANAGEMENT SERVICES, LP**
                                        **By Counsel**

4

**8**

_____/s/ James P. Campbell_____
James P. Campbell, Esquire
*Campbell Flannery, P.C.*
1602 Village Market Boulevard, Suite 220
Leesburg, Virginia  20175
(703) 771-8344/Telephone
(703) 777-1485/Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that service of a true copy of the foregoing has been made as follows:

| | |
|---|---|
| Type of Service: | Electronic Mail via the United States Bankruptcy Court to all parties requesting notice and First-Class, U.S. Mail to the parties listed below |
| Date of Service: | October 23, 2012 |
| Persons served and address: | Neil D. Goldman, Esq.<br>Goldman & Van Beek, PC<br>510 King Street, Suite 416<br>Alexandria VA 22314<br><br>John J. Brennan, III, Esq.<br>Brennan Law LLC<br>510 King Street<br>Suite 416<br>Alexandria, VA 22314 |
| Item Served: | Debtor's Objection to Proof of Claim |

_/s/ James P. Campbell_
James P. Campbell

5

**9**

06 1022 1995.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Rachel K. Downs
Sevila, Saunders, Huddleston & White, P.C.
30 North King Street
Leesburg, VA 20176

0 6 1 0 4 1   7 0 5 6 - 0

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Highland Construction Management Services, LP | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PO BOX 3126 | Leesburg | VA | 20177 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Limited Partnership | Virginia | L014440-4 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Jerome Guyant IRA | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1214 Confederate Avenue | Richmond | VA | 23227-4402 | USA |

4. This FINANCING STATEMENT covers the following collateral:

An assignment of 16.67% of Highland Construction Management Services, LP's, a Virginia limited partnership, membership interest in Sanford, LLC, a Virginia limited liability company, to Jerome Guyant IRA. This assignment is to serve as collateral for that certain Revolving Credit Line Promissory Demand Note dated December 22, 2005 executed by Highland Construction Management Services, LP for the benefit of Wachovia Bank FBO Jerome Guyant IRA.

**EXHIBIT
A**

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum [if applicable]    7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional]    ☐ All Debtors   ☐ Debtor 1   ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**10**

oc 92    Filed 10/23/12    Entered 10/23/12 13:20:52    Desc Main
Document    Page 7 of 24

CLERK'S OFFICE

2010 FEB -1 PM 12: 37

100201 7185 -4

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER** [optional]
Neil D. Goldman (703) 548-1620

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Neil D. Goldman, Esq.
Young, Goldman & Van Beek P.C.
510 King Street, Suite 416
Alexandria VA 22314

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
06-10-11-7056-0

**1b.** ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.

☐ DELETE name: Give record name to be deleted in item 6a or 6b.

☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

**6. CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR **6b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | SUFFIX |

**7. CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR **7b. INDIVIDUAL'S LAST NAME** | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

Fifty percent (50%) of Highland Construction Management Services LP's interest in Sanford LLC, a Virginia limited liability company at 25 Center Street, Suite 101, Stafford, VA 22554, which Fifty percent (50%) interest creditor and debtor agree is equal to Sixteen percent (16%) of the total of membership interests in Sanford LLC; and Twenty Five percent (25%) of Highland's membership interest in Little Piney Run, LLC, a Virginia limited liability company at 10942 Harpers Ferry Road, Purcellville, VA 20132; and all of Highland's Fifty Seven percent (57%) membership interest in Barklay's Point LLC, a Virginia limited liability company at 12022 Meadowville Court, Herndon, VA 20170.

EXHIBIT
B

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR Highland Construction Management Services LP | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

**10. OPTIONAL FILER REFERENCE DATA**

**11**

070124 0749

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

Rachel K. Downs
Sevila, Saunders, Huddleston & White, P.C.
30 North King Street
Leesburg, Virginia 20176

070118 7263

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE # 06-10-11-7036-0

8. AMENDMENT (COLLATERAL CHANGE) check only one box.

An assignment of 33.33% of Highland Construction Management Services, LP's, a Virginia limited partnership, membership interest in Sanford, LLC, a Virginia limited liability company to Jerome Guyant IRA. Assignment of all Highland Construction Management Services, LP's Fifty-Seven percent (57%) membership interest in Barklay's Point, LLC, a Virginia limited liability company, to Jerome Guyant IRA. These assignments are to serve as collateral for that certain Revolving Credit Line Promissory Demand Note dated December 22, 2005, and amended on October 13, 2006, executed by Highland Construction Management Services, LP for the benefit of Jerome Guyant IRA.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT

9a. ORGANIZATION'S NAME
Highland Construction Management Services, LP

EXHIBIT
C

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

**12**

VIRGINIA:

#### IN THE LOUDOUN COUNTY CIRCUIT COURT

| | |
|---|---|
| WACHOVIA BANK N.A. FBO JEROME GUYANT IRA<br>1021 E. Cary Street, 4th Floor<br>Richmond, VA 23227<br><br>      Plaintiff,<br><br>    v.<br><br>HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP<br>604 S. King Street, Suite 005<br>Leesburg, VA 20175<br>Serve:  Robert E. Sevila<br>       30 North King Street<br>       Leesburg, VA 20176<br><br>    And<br><br>JOSEPH L. BANE, Jr.<br>12022 Meadowville Road<br>Herndon, VA 20170<br><br>      Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. <u>60287</u><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT FOR MONEY OWED, DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

COMES NOW Wachovia Bank N.A. FBO Jerome Guyant IRA (the Guyant IRA) and, in support of this Complaint, Plaintiff states as follows.

#### The Parties

1.  Jerome Guyant established the Guyant IRA as a self-directed IRA with Wachovia Bank as Trustee.  Jerome Guyant had and has the right and responsibility for managing the IRA's investments.

1



EXHIBIT
D

**13**

2.    Highland Construction Management Services, LP (Highland) is a Virginia limited partnership with offices at 604 S. King Street, Suite 005, Leesburg, VA 20175.

3.    Joseph L. Bane, Jr. (Bane) is an adult citizen and resides at 12022 Meadowville Court, Herndon, VA 20170.  Bane is the General Partner of Highland.

### The Promissory Note, Security Agreement and Guarantee

4.    In July, 2005, Highland began to borrow money from Guyant for commercial purposes, giving notes, security interests and the personal guarantee of Mr. Bane.

5.    In December, 2005, two prior loan transactions were consolidated in the Revolving Credit Line Promissory Demand Note for Six Hundred Fifty Thousand Dollars ($650,000) dated December 22, 2005 between Highland as Borrower and Wachovia Bank FBO Jerome Guyant IRA as Lender.  Exhibit 1.  This obligation and subsequent amendments set forth below are referred to collectively as the Note.

6.    The Note provides that Highland shall pay all costs of collection of the Note including reasonable attorneys' fees and court costs.  Exhibit 1, ¶ 6.

7.    Bane executed a Guaranty Agreement dated December 22, 2005.  Exhibit 2.

8.    Highland also entered into a Security Agreement dated December 22, 2005 granting the Guyant IRA a security interest in 16.67% of Highland's membership interest in Sanford, LLC (Sanford), a Virginia limited liability company at 25 Center Street, Suite 101, Stafford, VA 22554.  Exhibit 3.

9.    Highland is a member and manager of Sanford.  Highland directly owns twenty percent (20%) of Sanford.  Highland owns an additional twelve percent (12%) interest in Sanford through Foothills LLC (Foothills).  Foothills owns twenty four percent (24%) of Sanford and

2

**14**

Highland owns fifty percent (50%) of Foothills, giving Highland a total of thirty two percent (32%) of the Sanford membership interests.

10.    The value of the Sanford Collateral lies in the ownership of various real estate assets, including a large parcel of land located in Purcellville, in Loudoun County (the Aberdeen Parcel).

11.    The Guyant IRA has a security interest in Highland's Sanford membership interests and in the proceeds flowing from Highland's Sanford membership interests.

12.    Thereafter, Highland needed additional funds to meet other obligations.

13.    On October 13, 2006, Highland and the Guyant IRA, with Bane joining as Guarantor, entered into the Allonge to Revolving Credit Line Promissory Note. The Allonge increased the principal sum to Eight Hundred Fifty Thousand Dollars ($850,000). Exhibit 4.

14.    Highland executed an Amendment to Security Agreement on October 13, 2006, adding additional security by pledging 33.33% of Highland's interest in Sanford and all of Highland's 57% interest in Barklay's Pointe, LLC, also a Virginia LLC. Exhibit 5.

15.    Effective July 1, 2007, Highland and the Guyant IRA, with Bane joining as Guarantor, executed the Second Allonge to Revolving Credit Line Promissory Note, setting the due date for repayment of the loan on July 1, 2008 and making certain changes in interest rates and other terms. Exhibit 6.

16.    Highland, unable to pay the Note timely and in need of additional funds, requested that the Guyant IRA extend the Note and also give Highland additional funds under the line of credit.

3

**15**

17.     Effective November 1, 2008, Highland and the Guyant IRA, with Bane joining as Guarantor, executed a Third Allonge to Revolving Credit Line Promissory Demand Note increasing the available credit line to One Million Four Hundred Thousand Dollars ($1,400,000) and extending the payment date of all unpaid principal and interest to December 1, 2008. Exhibit 7.

18.     In the Third Allonge, Highland agreed to increase the security for the note from 33.33% of Highland's interest in Sanford to "Fifty percent (50%) of Borrower's interest in Sanford LLC, which the parties agree is equal to sixteen percent (16%) of the total membership interest" and to add twenty five percent (25%) of Highland's membership interest in Little Piney Run, LLC, a Virginia limited liability company. Exhibit 7, p. 2.

19.     Accordingly, Highland and the Guyant IRA entered into the Second Amendment to Security Agreement effective November 1, 2008 increasing the Guyant IRA's security interest to 50% of Highland's interests in Sanford, or a total of 16% of the membership interests of Sanford both directly and through Highland's ownership interest in Foothills and adding as an additional security interest 25% of Highland's interest in Little Piney Run LLC. Exhibit 8.

### Highland's Default

20.     Highland did not pay the principal and interest on the due date of December 1, 2008 and so defaulted on the Note.

21.     The principal amount due under the Note on December 1, 2008, and still outstanding and unpaid, is One Million Eighty Two Thousand Dollars ($1,082,000). The amount of interest due under the Note as of January 1, 2010 is Two Hundred Fifty Seven Thousand Five Hundred Ninety Five and 56/100 Dollars ($257,595.56) for a total indebtedness as of January 1,

4

**16**

2010 of One Million Three Hundred Thirty Nine Thousand Five Hundred Ninety Five and

56/110 Dollars ($1,339,595.56) (the Debt), on which interest continues to accrue.

22.    Highland has not made any payments of principal or interest since the due date.

23.    Upon information and belief, Highland does not have sufficient assets to pay the

debt under the Note.

### Misappropriation of Assets

24.    On December 30th, 2009, Sanford sold the Aberdeen Parcel to the Town of

Purcellville and received Two Million One Hundred Ninety Two Thousand One Hundred

Twenty Two Dollars ($2,192,122) in gross proceeds.

25.    Sanford then distributed to Highland a total of Three Hundred Nineteen Thousand

Fifty Nine Dollars ($319,059) (the Sanford-Highland Distribution) as its 20% share.  See

Distribution Spreadsheet attached as Exhibit 9.

26.    One half of The Sanford-Highland Distribution, One Hundred Fifty Nine

Thousand Five Hundred Twenty Nine and 50/100 Dollars ($159,529.50), constitutes cash

proceeds from secured collateral in which the Guyant IRA has a continuing security interest.

27.    Upon the sale of the Aberdeen Parcel, Sanford was obligated to distribute to Foothills

its 24% share which was Three Hundred Eighty Two Thousand Six Hundred Forty Dollars

($382,640).  Exhibit 9.

28.    One half of the Sanford-Foothills Distribution, One Hundred Ninety One Thousand

Three Hundred Twenty Dollars ($191,320) should have been distributed from Foothills to Highland.

29.    Under the terms of the Third Allonge and the Second Amendment to the Security

Agreement, Exhibits 7 and 8, one half of Highland's Sanford-Foothills Distribution, or Ninety Five

5

**17**

Thousand Six Hundred Sixty Dollars ($95,660) constitute cash proceeds from secured collateral in which the Guyant IRA has a continuing security interest.

30.    Upon information and belief, rather than distributing these proceeds to Foothills, Bane arranged to have Highland's share of the Sanford-Foothills Distribution paid directly to himself or to Highland.

31.    In total, Highland received Five Hundred Ten Thousand Three Hundred Seventy Nine Dollars ($510,379) from the Sanford sale of the Aberdeen parcel (the Total Sanford Distribution).

32.    Of the Total Sanford Distribution, fifty percent (50%) or Two Hundred Fifty Five Thousand One Hundred Eighty Nine Dollars ($255,189) are proceeds of the collateral securing the Note (the Secured Proceeds).

33.    After the Note matured and Highland was in default, Bane repeatedly told Mr. Guyant that Highland could not repay the amount due but represented that he would use Highland's share of the proceeds of the sale of the Aberdeen property owned by Sanford to pay down the Note. These repeated assurances were referred to in email from Mr. Bane. See Emails of March 2009, attached as Exhibit 10. In reliance on these representations, the Guyant IRA forbore taking immediate action to collect the debt.

34.    The Guyant IRA has demanded that Highland pay over to the Guyant IRA the funds Highland received from Sanford, as Mr. Bane promised, to reduce Highland's indebtedness to the Guyant IRA and Highland has wrongfully refused to do so.

35.    The Guyant IRA has demanded that Highland pay over to the Guyant IRA the Secured Proceeds to reduce Highlands' indebtedness to the Guyant IRA and Highland has wrongfully refused to do so.

6

**18**

36. Highland has exerted control and dominion over the Total Sanford Distribution and intends to convert the Total Sanford Distribution to uses to benefit Mr. Bane and entities other than.

37. For example, Mr. Bane stated to Mr. Guyant that Mr. Bane intended to use the funds buy out the interests of other persons who are investors in a completely unrelated investment known as Bluemont Overlook LLC and to pay expenses owed by Mr. Bane or entities which he controls, rather than applying the funds to the obligations of Highland including the debt owed to the Guyant IRA as required and as promised.

38. As a result, Highland has converted its property interest in Sanford, half of which is subject to the Guyant IRA's security interest, into money with the intent to hinder, delay or defraud the Guyant IRA as a creditor of Highland.

39. The Total Sanford Distribution is a material part of the estate of Highland and, upon information and belief, Highland has assigned or disposed of, or is about to assign or dispose of that material part of its estate with the intent to hinder, delay or defraud the Guyant IRA as a creditor of Highland.

40. Upon information and belief, Highland will convert the Secured Proceeds to its own use or for the benefit of Mr. Bane personally or otherwise deprive the Guyant IRA of its secured interest therein.

41. Upon information and belief, the Total Sanford Distribution will be removed, secreted or otherwise disposed of by Highland, in violation of Highland's obligations to the Guyant IRA under the Note and the Security Agreement, so as not to be forthcoming to answer the final judgment of the Court respecting the same.

7

**19**

42.    At the urgent personal request of Mr. Bane, the Guyant IRA agreed that Highland/Bane could use Fifty Thousand Dollars ($50,000) of the Total Sanford Proceeds of Five Hundred Ten Thousand Three Hundred Seventy Nine Dollars ($510,379) for expenses of Mr. Bane and various entities in which he has an interest while the parties explored a consensual resolution to this matter.  Accordingly, the Guyant IRA sought a prejudgment levy on only the balance of Four Hundred Sixty Thousand Three Hundred Seventy Nine Dollars ($460,379).

43.    Upon the petition of the Guyant IRA, in *Wachovia Bank N.A. FBO Jerome Guyant IRA v. Highland Construction Management Services, LP et al.*, (Circuit Court for Loudoun County, Case No. 59837), and upon the Plaintiff meeting requirements for bond, this Honorable Court issued its Order For Pretrial Levy on January 28, 2010 in the amount of Four Hundred Sixty Thousand Three Hundred Seventy Nine Dollars ($460,379).

44.    Contrary to the agreement made, Highland and Bane expended approximately Fifty Eight Thousand Dollars ($58,000) of the proceeds, thereby misappropriating approximately Eight Thousand Dollars ($8,000).

### Count One: Breach of Contract--Highland

45.    The allegations of the preceding paragraphs are incorporated herein.

46.    Highland is jointly and severally liable on the Note.

47.    The Guyant IRA has made demand upon Highland for payment of the indebtedness under the Note.

48.    Demand has been made upon Highland for payment of the indebtedness under the Note and Highland has failed and refused to pay.

8

**20**

### Count Two: Breach of Contract--Bane

49.    The allegations of the preceding paragraphs are incorporated herein.

50.    Bane personally guaranteed the Note.

51.    Bane is the General Partner of Highland and executed the Note as General Partner.

52.    Bane is personally liable for the indebtedness under the Note.

53.    Bane is jointly and severally liable with Highland on the Note.

54.    Demand has been made upon Bane for payment of the indebtedness under the Note and Bane has failed and refused to pay.

### Count Three: Declaratory Judgment and Injunction

55.    The allegations of the preceding paragraphs are incorporated herein.

56.    Sanford retains additional valuable property in the form of a right to certain tax credits arising out of the disposition of the Aberdeen property, which tax credits may be distributed to Sanford members or sold to third parties and the cash obtained from the sale of the tax credits distributed to Sanford members.

57.    The tax credits are subject to the approval of certain government agencies or entities before the market value of the tax credits can be realized.

58.    The amount of these tax credits is approximately Four Million Four Hundred Fifty Thousand Dollars ($4,450,000).

59.    Upon information and belief, the sale of these tax credits will provide Sanford an additional Three Million One Hundred Thousand Dollars ($3,100,000).

9

**21**

60.     Highland's share of the proceeds from Sanford's sale of the tax credits, directly and through Foothills, will be approximately Nine Hundred Ninety Two Thousand Dollars ($992,000).

61.     The Security Agreement, as amended, grants the Guyant IRA a security interest in fifty percent (50%) of Highland's interest in Sanford.

62.     Fifty percent (50%) of Highland's share of the proceeds from Sanford's sale of the tax credits, approximately Four Hundred Ninety Six Thousand Dollars ($496,000), is subject to the Guyant IRA's security interest (the Secured Tax Credit Proceeds).

63.     Highland and Bane, by wrongfully refusing to pay to the Guyant IRA the Secured Sanford Proceeds, have asserted dominion and control over the existing Secured Proceeds, in violation of the agreement between the parties.

64.     The actions of Highland and Bane with respect to the Secured Proceeds establish that there is an actual controversy between the parties regarding the Guyant IRA's rights and interests in the collateral and proceeds of collateral which are subject to the Security Agreement between the parties.

65.     The rights of the Guyant IRA to the Secured Tax Credit Proceeds should be declared and Highland and Bane should be enjoined from exercising any dominion or control over the amount of the tax credit sale proceeds which are subject to the Guyant IRA's security interest, and ordered to take whatever action is reasonably necessary to effect the Guyant IRA's security interest and to pay over to the Guyant IRA any amount available to Highland arising from the tax credits or the sale of the tax credits.

WHEREFORE, The Guyant IRA prays that this Honorable Court

10

**22**

   1)  Enjoin any further action by Highland Construction Management Services LP or Joseph L. Bane, Jr. using, expending, diverting or in any way exercising dominion or control of the funds subject to this Honorable Court's Order of January 28, 2010;

   2)  Upon judgment in this case, order the attachment and seizure of all funds subject to the Order of Levy and the payment of those funds to the Plaintiff, and order the release to the Plaintiff of the cash bond of Four Hundred Sixty Thousand Three Hundred Seventy Nine Dollars ($460,379) deposited by Plaintiff with the Clerk of the Court;

   3)  Declare judgment that fifty percent (50%) of the funds which are available or may become available to Highland through the Sanford sale of tax credits are subject to the Guyant IRA's security interest and must be paid over to the Guyant IRA at the time such funds become available, and enjoin any action by Highland Construction Management Services LP or Joseph L. Bane, Jr. using, expending, diverting or in any way exercising dominion or control over such funds;

   4)  Enter judgment against Highland Construction Management Services, LP and Joseph L. Bane, Jr. jointly and severally for One Million Eighty Two Thousand Dollars ($1,082,000) principal, interest due under the Note as of January 1, 2010 of Two Hundred Fifty Seven Thousand Five Hundred Ninety Five and 56/100 Dollars ($257,595.56) for a total indebtedness as of January 1, 2010 of One Million Three Hundred Thirty Nine Thousand Five Hundred Ninety Five and 56/110 Dollars ($1,339,595.56) plus interest accruing from January 1, 2010 at the rate set forth in the Note until date of judgment and thereafter until paid in full;

11

**23**

5) Enter judgment against Highland Construction Management Services LP and

Joseph L. Bane, Jr. jointly and severally for all costs of collection, including reasonable

attorneys' fees and court costs.

WACHOVIA BANK N.A. FBO
JEROME GUYANT IRA
By Counsel

YOUNG, GOLDMAN & VAN BEEK, P.C.

By: _Neil D. Goldman by JB_____
Neil D. Goldman, VSB No. 18352
510 King Street, Suite 416
P.O. Box 1946
Alexandria, Virginia 22313-1946
Telephone:    (703) 684-3260
Facsimile:    (703) 548-4742
Co-Counsel for Wachovia Bank N.A. FBO Jerome Guyant IRA

John J. Brennan, III, VSB No. 18297
510 King Street, Suite 416
Alexandria, VA 22314
Telephone: (703) 548-1620
Facsimile: (703) 548-4742
Co-Counsel for Wachovia Bank N.A. FBO Jerome Guyant IRA

12

**24**

VIRGINIA:

IN THE LOUDOUN COUNTY CIRCUIT COURT

WELLS FARGO BANK, N.A.                    )
(formerly Wachovia Bank, N.A.)            )
FBO JEROME GUYANT IRA                     )
                                          )
                Plaintiff,                )
        v.                                )
                                          )
HIGHLAND CONSTRUCTION MANAGEMENT          )
SERVICES, LP, et al.,                     )
                                          )
                Defendants                )

RECEIVED
OCT 19 2010
☒ Reviewed
☒ Scanned 10 / 19 / 10
Case No. 60287

## JUDGMENT ORDER

This cause came on for trial before the Court, sitting without a jury, on August 9, 2010

and August 10, 2010.  Upon consideration of the evidence presented, and the argument of

counsel, for the reasons stated from bench in open court on September 15, 2010, the Court finds

as follows:

A.    Defendant Highland Construction Management, LLC ("HCMS") is indebted to

Plaintiff Wells Fargo Bank, N.A. (formerly Wachovia Bank, N.A.) FBO Jerome Guyant IRA

under that certain Revolving Credit Line Promissory Demand Note (the "Original Note") dated

December 25, 2005, as modified by that certain "Allonge to Revolving Credit Line Promissory

Demand Note" dated October 13, 2006 (the "First Allonge"), and by that certain "Second

Allonge to Revolving Credit Line Promissory Demand Note" dated as of July 1, 2007 (the

"Second Allonge"), and by that certain "Third Allonge to Revolving Credit Line Promissory

Demand Note" dated as of November 1, 2008 (the "Third Allonge"), in the principal amount of

One Million Eighty-Two Thousand Dollars ($1,082,000.00), plus accrued but unpaid interest in

the amount of Eighty Two Thousand Four Hundred Fifty Three Dollars, Thirteen Cents

($82,453.13) through May 1, 2010, and attorneys fees' and costs in the amount of Forty Five



EXHIBIT
E

**25**

Thousand sixty Eight dollars and Six Cents($45,068.06), and Five Thousand Dollars ($5,000.00)
for expert witness fees incurred as costs for collection, plus costs of this action as permitted by
statute. Interest accrues on the outstanding principal balance at twenty percent (20%) per annum
from May 1, 2010 until this judgment is satisfied, calculated on a 360 day year. As of the date of
this Order, the principal balance is One Million Eighty-Two Thousand Dollars ($1,082,000.00),
and interest on such amount is Six Hundred One Dollars, Eleven Cents ($601.11) per day.

B.    Defendant Joseph L. Bane, Jr. ("Bane") is jointly and severally liable with
Defendant HCMS to Plaintiff for each of the amounts set forth in paragraph 1 pursuant to that
certain Guaranty Agreement dated December 22, 2005.

C.    By Security Agreement dated December 22, 2005, as amended by that certain
Amendment to Security Agreement dated October 13, 2006, and as further amended by that
certain Second Amendment to Security Agreement dated November 1, 2008, Defendant HCMS
granted to Plaintiff Wells Fargo Bank, N.A. (formerly Wachovia Bank, N.A.) FBO Jerome
Guyant IRA security interest in: (i) Fifty percent (50%) of HCMS's membership interest in
Sanford, LLC, a Virginia limited liability company; and (ii) Twenty-Five percent (25%) of
Bane's membership interest in Little Piney Run, LLC, a Virginia limited liability company; and
(iii) all of HCMS' membership interest in Barklay's Point, LLC.

Accordingly, it is by the Court, ORDERED, ADJUDGED AND DECREED:

1.    That judgment be, and hereby is, entered in favor of Plaintiff Wells Fargo Bank,
N.A. (formerly Wachovia Bank, N.A.) FBO Jerome Guyant IRA, and against Defendants
Highland Construction Management Services, LP, a Virginia limited partnership, and Joseph L.
Bane, Jr., an individual, jointly and severally, in the amount of One Million Eighty-Two
Thousand Dollars ($1,082,000.00), plus accrued but unpaid interest in the amount of Eighty

2

**26**

Two Thousand Four Hundred Fifty Three Dollars, Thirteen Cents ($82,453.13) through May 1,
2010, attorneys fees' and costs in the amount of Forty Five Thousand Sixty Eight dollars and Six
Cents($45,068.06), and Five Thousand Dollars ($5,000.00) for expert witness fees incurred as
costs for collection, plus costs of this action as permitted by statute. Interest accrues on the
outstanding principal balance at twenty percent (20%) per annum commencing May 1, 2010 until
this judgment is satisfied, calculated on a 360 day year. As of the date of this Order, the
principal balance is One Million Eighty-Two Thousand Dollars ($1,082,000.00), and interest on
such amount is Six Hundred One Dollars, Eleven Cents ($601.11) per day; and

     2.    That Plaintiff Wells Fargo Bank, N.A. (formerly Wachovia Bank, N.A.) FBO
Jerome Guyant IRA is awarded a declaratory judgment that it has a perfected security interest in:
(i) Fifty percent (50%) of HCMS's membership interest in Sanford, LLC, a Virginia limited
liability company; and (ii) Twenty-Five percent (25%) of Bane's membership interest in Little
Piney Run, LLC, a Virginia limited liability company; and (iii) all of HCMS' membership
interest in Barklay's Point, LLC.

     ENTER this 5 day of October, 2010. THIS IS A FINAL ORDER.

Hon. James H. Chamblin
Judge, Circuit Court of Loudoun County

3

**27**

WE ASK FOR THIS:

YOUNG, GOLDMAN & VAN BEEK, P.C.

By: _____
    Neil D. Goldman, VSB No. 18352
    510 King Street, Suite 416
    P.O. Box 1946
    Alexandria, Virginia 22313-1946
    Telephone:(703) 684-3260
    Facsimile: (703) 548-4742


_____
John J. Brennan, III, VSB No. 18297
510 King Street, Suite 416
Alexandria, VA 22314
Telephone: (703) 548-1620
Facsimile:  (703) 548-4742

Co-Counsel for Wells Fargo Bank, N.A.
(formerly Wachovia Bank, N.A.) FBO Jerome Guyant IRA


SEEN AND OBJECTED TO FOR THE REASONS STATED ON THE RECORD AS TO
PARAGRAPH 1 OF THE JUDGMENT ENTERED ABOVE; SEEN AND AGREED AS TO
PARAGRAPH 2 OF THE JUDGMENT ENTERED ABOVE:

ATWILL, TROXELL & LEIGH, P.C.

_____
William H. Atwill, Jr. (VSB No. 23543)
Benjamin D. Leigh (VSB No. 40460)
Michael C. Mattock (VSB No. 45613)
101 North King Street
Leesburg, Virginia 20176
Telephone: (703) 777-4000
Facsimile: (703) 777-4001

Counsel for Defendants

4

**28**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 11-11413-RGM |
| HIGHLAND CONSTRUCTION | ) | Chapter 11 |
| MANAGEMENT SERVICES LP | ) | |
| Debtor. | ) | |
| | ) | |

### THE JEROME GUYANT IRA'S MEMORANDUM IN OPPOSITION TO HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP'S OBJECTION TO PROOF OF CLAIM

Wells Fargo Bank, N.A. f/b/o Jerome Guyant IRA (the "Guyant IRA") respectfully requests that the Court overrule Highland Construction Management Services, L.P.'s Objection to the Guyant IRA's secured claim (the "Objection")[Docket nos. 91 and 92].

#### The Factual Background and Procedural History

During the period from December 2005 through November 2008, the Guyant IRA loaned Highland Construction Management Services, L.P. ("Highland") over $1,000,000. The total loan amount increased over time and was documented by a series of Allonges to the first Note. The Loan also was secured. In December, 2005, Highland and the Guyant IRA entered into a Revolving Credit Line Promissory Note and a Security Agreement. The loan was guaranteed by Joseph Bane. As the loan amount increased, the Security Agreement was amended twice, each time adding additional collateral for the increasing loan amount. On November 1, 2008, Highland and the Guyant IRA executed the Second Amendment to Security Agreement, Exhibit 1, which increased the collateral to "Fifty percent (50%) of Debtor's interest in Sanford LLC, which the parties agree is equal to sixteen percent (16%) of the total membership interest in Sanford, LLC."

Prior to dissociation through bankruptcy, Highland was a member of Sanford LLC, directly owning a 20% membership interest. Highland also owns a 50% membership interest in Foothills, LLC which, in turn, owns 24% of Sanford. The total of membership interests in Sanford owned by Highland is thus 32%. Highland pledged 50% of those interests, or 16% of Sanford, to the Guyant IRA.

**29**

The Guyant IRA filed a financing statement on October 11, 2006. Exhibit 2. This was amended on January 18, 2007 to reflect the additional collateral. On February 1, 2010, it was amended again to show yet more collateral. Exhibits 3 and 4.

In March, 2010, the Guyant IRA sued Highland and Bane to recover the loan amount and for a judgment declaring that the Guyant IRA had a perfected security interest in the Sanford membership interests and the other collateral. The request for declaratory judgment was driven by the fact that Highland, acting through Bane, had made known its intent to disregard the Guyant IRA's security interest and to seize the funds that were about to be produced by Sanford and divert them to Highland's or Bane's use.

Highland and Bane, in answer to the suit, denied that the Guyant IRA had a security interest in the Sanford membership and proceeds and affirmatively asserted that the security interest was void under the Sanford LLC Operating Agreement.

The Sanford Operating Agreement and amendments, Exhibit 5, prohibits assignments or pledges of Membership Interests without the prior written consent of all members unless the transfer is to an existing Member. The Guyant IRA was a member of Sanford.

In *Wells Fargo Bank, N.A. fbo Jerome Guyant IRA v. Highland Construction Management Services, LP* (Loudoun County Circuit Court No. 60287), the Circuit Court entered Final Judgment on October 5, 2010 (the "Loudoun County Judgment") and no appeal was taken. The Court entered judgment in favor of the Guyant IRA against Highland and against Joseph Bane, as guarantor, in the amount of $1,214,521.19 with interest running from May 1, 2010. The Court also entered a declaratory judgment holding that the Guyant IRA has a perfected security interest in 50% of Highland's membership interest in Sanford, and other collateral.

On February 28, 2011, Highland filed this case under Chapter 11 of the Bankruptcy Code, and assumed the status of a debtor-in-possession. On that date, the Guyant IRA had a perfected security interest in the collateral, as conceded by Highland in the Objection. On July 5, 2011, the Guyant IRA timely filed a proof of claim (Claim No. 4) in the amount of $1,396,657.52, and stated that the claim was

2

**30**

secured by, among other property, Highland's 16% interest in Sanford (the "Claim").  At the time of such

filing, the financing statement had not lapsed, and the security interest unquestionably was perfected.

### The Relief Sought by Highland May Be Obtained Only In an Adversary Proceeding

Highland's Objection seeks to have this Court "enter an Order declaring Proof of Claim 4-1 to be

an unsecured claim."  Putting aside for the moment the substantive objections to the request, such relief

must be sought through an adversary proceeding.  Fed. R. Bankr. P. 7001(2).  While an objection to a

claim typically need not be done through an adversary proceeding, where, as here, the objection to a claim

is joined with a demand for the kind of relief set out in Rule 7001(2), the relief is properly sought through

an adversary proceeding.  Fed. R. Bnkr. P. 3007(b);  Cen-Pen Corp. v. Hanson, 58 F.3d 89, 93 (4th Cir.

1995);  In re Arthur's Indus. Maintenance, 1992 Bankr. LEXIS 2339 (Bankr. W.D. Va. 1992).  This is the

second time that Highland has filed a motion when it should have filed an adversary proceeding.  See

Highland Construction Management Servies, LP's Motion for Turnover of its Entitilement to Tax Credits

Held by Aberdeen, LLC, Sanford LLC and Foothills, LLC (Doc. No. 79, 8/31/12) and Complaint,

Highland Construction Management Services, LP v Waller et al., Adv. Proc. No. 12-01418  (Doc. No. 85,

9/26/12).

### The Guyant IRA Retains a  First Priority Security Interest in One Half of Highland's Interest in Sanford Under Both Federal Bankruptcy Law and Virginia State Law

*As A Matter of Bankruptcy Law, Secured Status in Property Is Frozen*
*As of the Filing of the Bankruptcy Petition*

The Virginia UCC provides for the filing of UCC-3 continuation statements, and with the

changes effective with the 2001 revisions to Article 9, the UCC no longer expressly provides for tolling

during the pendency of an insolvency proceeding. Va. Code §8.9A-515.  While it appears generally

accepted that UCC continuation statements may be filed during the pendency of a bankruptcy proceeding

without violating the automatic stay[1], Official Comment 4 to §8.9A-515 notes the important role played

by bankruptcy law: "Of course, if the debtor enters bankruptcy before lapse, the provisions of this article

with respect to lapse would be of no effect to the extent that federal bankruptcy law dictates a contrary

---

[1] COLLIER ON BANKRUPTCY 546.03[5].

3

**31**

result (e.g., to the extent that the Bankruptcy Code determines rights as of the date of the filing of the bankruptcy petition)." Cases decided under the 2001 amendments hold that secured status is measured as of the date of the filing of the bankruptcy petition. In this case, the Guyant IRA was a perfected security interest on the date that Highland filed its bankruptcy petition. *See, e.g.*, In Re Wilkinson, 2012 Bankr. LEXIS 1539, 77 U.C.C. Rep. Serv. 2d (CBC) 363 (Bankr. N.D.N.Y. 2012); Great Am. Ins. Co. v. Merchs. & Planters Bank, 2008 U.S. Dist. LEXIS 23006, 32-34 (W.D. Tenn. Mar. 21, 2008).

For a period of time prior to the 2001 amendments, the UCC expressly provided that a filed financing statement was effective until 60 days after the termination of insolvency proceedings. §9-403(2). The modifications to the UCC effective July 1, 2001 deleted that rule. The 1994 amendments to the Bankruptcy Code appear to permit the filing of continuation statements without the necessity for obtaining stay relief. So, the first issue for discussion is the effect of the lapse of a financing statement under bankruptcy law, as expressly recognized in Official Comment 4 quoted above. One commentator has suggested that the question can be resolved by looking to decisions under the 1962 UCC, which did not contain an insolvency tolling rule. WARNER, CONTINUING PERFECTION DURING BANKRUPTCY UNDER REVISED ARTICLE 9, 20 APR Am. Bankr. Inst. J. 22 (2001).[2] "Although this issue does not arise under the current [1972] version of Article 9 because of the insolvency tolling rule, the prior 1962 version of Article 9 did not include an insolvency tolling rule. The cases decided under the 1962 version of Article 9 split, with a few cases holding that the unsecured creditor's failure to file a continuation statement post-petition destroyed the security interest. **However, most cases adopted the view that the bankruptcy filing freezes the secured creditor's status as of the petition date.**" (emphasis added).

This view was adopted by the Seventh Circuit in In the Matter of Chaseley's Foods, Inc., 726 F.2d 303 (7th Cir. 1983). In that case, the Court described the opinion of the District Judge, which it appended to its own opinion, as "able and well-reasoned." The District Judge held that a security interest perfected at the time of the filing of the bankruptcy petition remained perfected despite lapse during the

---

[2] For the convenience of the Court and the parties, a copy of the Warner article is attached as Exhibit 6.

4

**32**

pendency of bankruptcy proceedings. The court noted that a continuation statement was not required
because the trustee and existing creditors had knowledge of the perfected security interest and no further
notice was necessary. The court further noted that the strong arm provisions of Section 544 are to protect
creditors against secret liens. Where there is a valid financing statement as of the date of filing, there is
no secret lien.

"It is generally held that a secured creditor whose financing statement expires subsequent to the
filing of the debtor's petition in bankruptcy does not have to file a continuation statement in order to
maintain its secured status. *In the Matter of Funding System Asset Management Corporation,* 38 B.R. 351
(Bkrtcy. W.D. Pa. 1984); *In Re Delia Brothers, Inc.*, 29 U.C.C. Rep. Ser. 1446 (Bkrtcy. S.D. N.Y. 1980);
*In Re Chaseley's Foods, Inc.*, 30 B.R. 452 (Bkrtcy. N.D. Ind. 1983)*; In Re Paul H. Steigerwald*, 35 B.R.
254 (Bkrtcy. E.D. Pa. 1983); *In Re South County Motel Corp.*, 19 U.C.C. Rep. Serv. 1254 (Bkrtcy. D. R.I.
1976)." In re Catamount Dyers, Inc., 50 B.R. 788, 790 (Bankr. D. Vt. 1985). *See also*, Isaacs v. Hobbs
Tie & Timber Co., 282 U.S. 734, 738 (1930) ("valid liens existing at the time of the commencement of
the bankruptcy proceeding are preserved"), and Lockhart v. Garden City Bank & Trust Co., 116 F.2d 658
(2d Cir. 1940) (creditor's failure to refile a chattel mortgage after the bankruptcy was filed, as otherwise
required by state law, did not render the creditor's claim unperfected against the Trustee).

Accordingly, as a matter of bankruptcy law, the Guyant IRA's security interest, which was
perfected as of the date of the filing of the petition, remains a perfected security interest despite the failure
to file a UCC-3 continuation statement. .

### *Under Virginia Law, the Lapse of the Financing Statement Would Render the Guyant IRA Unperfected Rather than Unsecured, And It Would Still Have a First Priority Position in Distributions From Sanford*

As detailed above, under bankruptcy law, the Guyant IRA maintains that it has a perfected
security interest in the collateral described in the Proof of Claim. But in any event, under Virginia law,
the Guyant IRA retains a first priority security interest in that collateral, including the distributions
derived from the  proceeds of the sale of tax credits by Sanford that would be due to Highland, either
directly or through its interest in Foothills.

5

**33**

It its Objection, Highland seeks, without citation or analysis, to have this Court declare that the Guyant IRA's claim "be deemed unsecured." That result would not obtain upon lapse under the Virginia UCC. In fact, the Guyant IRA would still be secured, albeit unperfected, and under applicable rules of priority, would retain a first priority position in the proceeds due Highland from the sale of tax credits by Sanford.

Va. Code §8.9A-515(c) states that "[i]f the security interest ...becomes unperfected upon lapse, it is deemed never to have been perfected as against a purchaser of the collateral for value." Official Comment 3 states clearly that "[t]he deemed retroactive unperfection applies only with respect to purchasers for value; unlike former section 9-403(2), it does not apply with respect to lien creditors." Comment 3 also provides examples of priority following lapse. Those examples detail that upon lapse, the lapsed security interest retains priority as the holder of a perfected interest over all parties except an intervening "purchaser." The term "purchaser" includes a secured creditor, but not a lien creditor.

Further, the trustee's status under Section 544 as a hypothetical lien creditor and a hypothetical bona fide purchaser of real property applies only "as of the commencement of the case." So, in this case, not only does the attack of Highland as debtor-in-possession fail because it has the status of a lien creditor whose interest would remain subordinate upon lapse under §8.9A-515(c), lien creditor status is measured as of the date of the commencement of the case. Further, the collateral at issue (distributions on the membership interest in Sanford, LLC) is not real property, so Highland does not have the status of a hypothetical bona fide purchaser for value under Section 544(a)(3) . "Since the §544 strong-arm power gives the trustee the status of a lien creditor with respect to debtor's personal property, the 9-515(c) limitation should prevent the trustee from avoiding a personal property security interest based on a post-petition lapse of perfection." Warner, p. 2. *See also*, Mostoller v. CitiCapital Commer. Corp. (In re Stetson & Assocs.), 330 B.R. 613, 623 (Bankr. E.D. Tenn. 2005); GE Capital Corp. v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.), 273 B.R. 594, 597 fn. 10 (Bankr. W.D. Mo. 2002); Official Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank, FSB (In re Toy King Distribs.), 256

6

**34**

B.R. 1, 189 (Bankr. M.D. Fla. 2000); In re Provident Hospital & Training Asso., 79 B.R. 374, 378, fn. 10 (Bankr. N.D. Ill. 1987).

Highland's schedules reflect that there are no other parties having a security interest in Highland's membership interests in Sanford.[3]  Accordingly, under the rules of priority established in Va. Code §8.9A-317(a), and explained in Official Comment 3, the Guyant IRA retains a first priority security interest in Highland's 16% interest in Sanford, even if that interest would be deemed unperfected under Virginia law.

**Highland's Citation to *Ainslie v. Inman* Is Inapposite
and Irrelevant to the Issues Before This Court**

Highland argues that the Circuit Court's Final Judgment Order is not an "enforcement action of the UCC" against its interest in Sanford LLC.  Objection, pp. 3-4, citing Ainslie v. Inman, 265 Va. 347 (2003).  Clearly that is correct, but it is immaterial.  Ainslie analyzed the effect of a charging order sought after the requesting party obtained a judgment.  The Guyant IRA could not, in the action in which it sought judgment, demand a charging order as a judgment creditor.

Highland's reference to Ainslie implies that the decision somehow renders the Guyant IRA an unsecured creditor.  It does not.  The Guyant IRA remains a secured creditor; the question here is what effect, if any, should be given to lapse of the financing statement that occurred after Highland's bankruptcy filing.

Ainslie was decided under a prior version of Virginia's UCC and rested on now repealed Va. Code §8.9-403(2).  Section 403(2) stated that when a security interest lapsed for lack of a continuation statement, "[i]t is deemed to have been unperfected as against a person who became a purchaser *or lien creditor* before lapse." (Emphasis added).  Ainslie had filed a financing statement perfecting a security interest.  Another party obtained a judgment against the same debtor and then the Ainslie security interest lapsed with the passage of five years.  By operation of Section 403(2), Ainslie became junior to the intervening judgment lien creditor.  The Virginia Supreme Court ruled that, on those facts, Section 403(2)

---

[3] Nor in Highland's interest in Foothills.

7

**35**

gave the lien creditor the right to his charging order. No intervening bankruptcy proceeding was involved in Ainslie.

That is not the result under Virginia's revised UCC. Va. Code §8.9A-515(c) now addresses the effect of a lapse for failure to file a continuation statement and it eliminates "lien creditor" from the category of persons as to which a lapsed security interest would be unperfected: "If the security interest...becomes unperfected upon lapse, it is deemed never to have been perfected as against a purchaser of the collateral for value." As noted in Comment 3, "The deemed retrospective unperfection applies only to purchasers for value; unlike former section 9-403(2), it does not apply with respect to lien creditors." See Example 2 in Comment 3 (a lapsed security interest perfected at the time another acquired a judicial lien still has priority over the holder of the judicial lien). Since Highland as Debtor-in-Possession stands in the position of a lien creditor and not as a bona fide purchaser for value, Section 8.9A-515(c) makes clear that the Guyant IRA's security interest has priority over any interest that can be asserted by Highland.

Highland's implicit reliance on a charging order analysis also is immaterial. Va. Code §13.1-1041.1 sets forth the manner in which an LLC member's interests may be subjected to a charging order. "On application by a judgment creditor of a member...", the court may "charge the transferable interest of a judgment debtor..." The Guyant IRA could not have sought a charging order while the Circuit Court suit was pending, as it was not yet a judgment creditor. The Guyant IRA ultimately obtained a judgment for money, and succeeded in putting an end to Highland's attempts to violate the Security Agreement as amended by appropriating the Sanford proceeds.

After becoming a judgment creditor, the Guyant IRA did take enforcement action—it obtained a writ of fieri facias in a timely fashion, and the writ was executed by the Loudoun County Sheriff. It was, no doubt, the service of this writ that induced Highland to file this case. Of course, upon the bankruptcy filing, the Guyant IRA was barred by the automatic stay from further writs and from seeking a charging order under Section 13.1-1041.1.

8

**36**

## Conclusion

The Judgment Order of the Circuit Court determined that the Guyant IRA had a perfected security interest in Highland's collateral, including the Sanford membership interest. At the time of the bankruptcy petition, the Guyant IRA had a perfected security interest in that collateral which had been confirmed by the judgment. No other party has a security interest in Highland's interest in Sanford. Under both bankruptcy law and Virginia law without regard to bankruptcy law, the Guyant IRA remains a secured creditor holding a first priority security interest in with respect to Highland's interest in Sanford.

Dated: Alexandria, Virginia                    Respectfully submitted,

December 12, 2012

/s/ John P. Van Beek
Neil D. Goldman, Esq. (VSB No. 18352)
John P. Van Beek, Esq. (VSB No. 30897)
Goldman & Van Beek, P.C.
510 King St., Suite 416
Alexandria, Virginia 22314
Voice:        (703) 684-3260
Facsimile:   (703) 548-4742
ngoldman@goldmanvanbeek.com
jvanbeek@goldmanvanbeek.com

Counsel for Guyant IRA

/s/John J. Brennan, III
John J. Brennan, III
VSB No. 18297
510 King Street
Suite 416
Alexandria, VA 22314
Telephone:   (703) 548-1620
Facsimile:   (703) 548-4742

Co-Counsel for Guyant IRA

9

**37**

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of December, 2012, a true and correct copy of the foregoing Opposition has been served electronically using the ECF system on all registered users of the CM/ECF system who have filed notices of appearance in this matter, and by first class mail, postage prepaid to:

James P. Campbell, Esq.
Campbell Flannery P.C.
1602 Village Market Boulevard, #220
Leesburg, VA 20175
(703) 777-1485

And

United States Trustee, Region 4
115 South Union Street, Suite 210
Alexandria, VA 22314


/s/John J. Brennan, III

10

**38**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 11-11413-RGM |
| HIGHLAND CONSTRUCTION | ) | Chapter 11 |
| MANAGEMENT SERVICES LP | ) | |
| Debtor. | ) | |

## THE GUYANT IRA' OPPOSITION TO HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP'S OBJECTION TO PROOF OF CLAIM

### Exhibits One through Six

Dated: Alexandria, Virginia
December 12, 2012

Respectfully submitted,

 /s/ John P. Van Beek
Neil D. Goldman, Esq. (VSB No. 18352)
John P. Van Beek, Esq. (VSB No. 30897)
Goldman & Van Beek, P.C.
510 King St., Suite 416
Alexandria, Virginia 22314
Voice:          (703) 684-3260
Facsimile:      (703) 548-4742
ngoldman@goldmanvanbeek.com
jvanbeek@goldmanvanbeek.com

Counsel for Guyant IRA


/s/John J. Brennan, III
John J. Brennan, III
VSB No. 18297
510 King Street
Suite 416
Alexandria, VA 22314
Telephone:      (703) 548-1620
Facsimile:      (703) 548-4742

Co-Counsel for Guyant IRA

**39**

## SECOND AMENDMENT TO SECURITY AGREEMENT

THIS SECOND AMENDMENT TO SECURITY AGREEMENT is made this 1st
day of November 2008 (the "Second Amended Security Agreement"), by and between
HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP, a Virginia limited
partnership, (the "Debtor") for the benefit of WACHOVIA BANK FBO JEROME GUYANT
IRA. (the "Secured Party").

### R E C I T A L S :

WHEREAS, HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP, a
Virginia limited partnership (the "Debtor"), by that certain Revolving Credit Line Promissory
Demand Note dated December 22, 2005, as amended and modified by Allonge to Revolving
Credit Line Promissory Demand Note dated October 13, 2006, as further amended and modified
by Second Allonge, dated July 1, 2007, to Revolving Credit Line Promissory Demand Note, and
as further amended and modified by Third Allonge, dated October 1, 2007, to Revolving Credit
Line Promissory Demand Note (collectively "the Note"), promised to pay to the order of
WACHOVIA BANK FB0 JEROME GUYANT (the "Lender") the sum of One Million Four
Hundred Thousand Dollars ($1,400,000.00), or so much thereof as is advanced from time to time
or readvanced from time to time, with interest from the date such funds are advanced at the
interest rate stated in the Note; and

WHEREAS, the Note is secured by a Security Agreement dated December 22, 2005 as
amended in writing by the parties on October 13, 2006 (collectively the "October 13 Security
Agreement") from the Debtor to the Secured Party granting the Secured Party a security interest
in the Collateral described the October 13 Security Agreement; and

WHEREAS, the Secured Party's security interest in the Collateral is evidenced by a
Financing Statement filed in the UCC Division of the Virginia State Corporation Commission;
and

WHEREAS, the Debtor is willing to modify the Collateral securing repayment of the
Note upon the terms and conditions set forth in this Second Amended Security Agreement in
order to secure repayment of the Note; and

WHEREAS, the Lender has requested the Debtor and the Debtor agrees to increase the
security interest in Debtor's membership interest in Sanford, LLC, a Virginia limited liability
company, from Thirty-Three and 33/100 percent (33.33%) to Fifty percent (50%) of Debtor's
interest in Sanford, LLC, which the parties agree is equal to sixteen percent (16%) of the total
membership interest in Sanford, LLC; and

WHEREAS, the Lender has requested the Debtor and the Debtor agrees to pledge as
additional Collateral a security interest in Twenty-Five percent (25%) of Debtor's membership
interest in Little Piney Run, LLC, a Virginia limited liability company, located at 10942 Harpers

Guyant IRA Memo In Opp to Highland Objection to Claim
Exhibit 1

**40**

Ferry Road, Purcellville, Virginia 20132 which the parties agree is equal to Twelve and 75/100 percent (12.75%) of the total membership interest in Little Piney Run, LLC; and

NOW, THEREFORE, in consideration of the increase of the loan to the principal sum of $1,400,000.00, the recitals set forth hereinabove, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.  The following clause is hereby deleted from the October 13 Security Agreement:

1.    Grant.  Debtor hereby grants a security interest in, the following described property of Debtor (hereinafter called the "Collateral") to secure repayment of the Note, as amended by the Allonge:

33.33% of Debtor's membership interest in Sanford, LLC, a Virginia limited liability company, located at 25 Center Street, Suite 101, Stafford, VA 22554.  All of Debtor's Fifty-Seven percent (57%) membership interest in Barklay's Point, LLC, a Virginia limited liability company, located at 12022 Meadowville Court, Herndon, VA 20170.

2.  The following clause is hereby substituted in place of the deleted clause of the October 13 Security Agreement:

1.    Grant.  Debtor hereby grants a security interest in the following described property of Debtor (hereinafter called the "Collateral") to secure repayment of the Note:

Fifty percent (50%) of Debtor's membership interest in Sanford, LLC, a Virginia limited liability company, located at 25 Center Street, Suite 101, Stafford, VA 22554; Twenty-Five percent (25%) of Debtor's membership interest in Little Piney Run, LLC, a Virginia limited liability company, located at 10942 Harpers Ferry Road, Purcellville, Virginia 20132; and all of Debtor's Fifty-Seven percent (57%) membership interest in Barklay's Point, LLC, a Virginia limited liability company, located at 12022 Meadowville Court, Herndon, VA 20170.

3.  Except as expressly modified herein, all of the terms and conditions of the October 13 Security Agreement shall remain in full force and effect.

4.  Debtor hereby reaffirms its covenant and agreement to perform, comply with and be bound by each and every one of the terms and provisions of the October 13 Security Agreement.

5.  The parties to this Second Amended Security Agreement do not intend that this Second Amended Security Agreement be construed as a novation of the October 13 Security Agreement.

6.  Each term and provision of this Second Amended Security Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, successors, personal representatives and assigns.

Second Amendment to Security Agreement
Page 2 of 4

Guyant IRA Memo In Opp to Highland Objection to Claim
Exhibit 1

7.    In the case any one or more of the provisions outlined in this Second Amended Security Agreement shall be invalid, illegal or unenforceable, the validity and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

8.    This Second Amended Security Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Virginia.

IN WITNESS WHEREOF, the parties hereto have caused this Second Amended Security Agreement to be executed intending that it be effective as of ___November 1___, 2008.

Secured Party:

WACHOVIA BANK FBO
JEROME GUYANT IRA

By: _____ (SEAL)
Name: Jerome Guyant
Date: __8|12|2008__

COMMONWEALTH OF VIRGINIA,
COUNTY OF ___Richmond___, to wit:

___5 th___ The foregoing instrument was subscribed, sworn to, and acknowledged before me this ___ day of ___November___, 2008, by Jerome Guyant on behalf of Jerome Guyant IRA.

_____ (SEAL)
Notary Public

My Commission Expires: __2/12/2 9__
Notary Registration Number: __7138302__



OFFICIAL SEAL
NOTARY PUBLIC-COMMONWEALTH OF VIRGINIA
RICHARD WHITE
CITY OF RICHMOND
ID# 7138302
My Commission Expires
February 29, 2012

Second Amendment to Security Agreement
Page 3 of 4

Guyant IRA Memo In Opp to Highland Objection to Claim
Exhibit 1

**42**

Debtor:

HIGHLAND CONSTRUCTION MANAGEMENT
SERVICES, L.P.
a Virginia limited partnership

By: _Joseph L Bane_ (SEAL)
Name: Joseph L. Bane, Jr.
Title: General Partner
Date: 11/3/08

COMMONWEALTH OF VIRGINIA,
COUNTY OF _Fauhaus_, to wit:

    The foregoing instrument was subscribed, sworn to, and acknowledged before me this ___
_3_ day of _November_, 2008, by Joseph L. Bane, Jr., as the General Partner of
Highland Construction Management Services, L.P., a Virginia limited partnership, on behalf of
said partnership.

_Irene C Hill_ (SEAL)
Notary Public

My Commission Expires: _5/31/2011_
Notary Registration Number: _7095028_



Irene C. Hill
Notary Public - ID 7095028
Commonwealth of VA
My Com. exps.: 5/31/2011

Second Amendment to Security Agreement
Page 4 of 4

Guyant IRA Memo In Opp to Highland Objection to Claim
Exhibit 1

**43**

061022 1995

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Rachel K. Downs
Sevila, Saunders, Huddleston & White, P.C.
30 North King Street
Leesburg, VA 20176

061011 7056-0

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| Highland Construction Management Services, LP | | | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | | COUNTRY |
| PO BOX 3126 | Leesburg | | VA | 20177 | | USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Limited Partnership | 1f. JURISDICTION OF ORGANIZATION Virginia | | 1g. ORGANIZATIONAL ID #, if any L014440-4 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | | COUNTRY |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | | |
|---|---|---|---|---|---|---|
| Jerome Guyant IRA | | | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | | COUNTRY |
| 1214 Confederate Avenue | Richmond | | VA | 23227-4402 | | USA |

4. This FINANCING STATEMENT covers the following collateral:

An assignment of 16.67% of Highland Construction Management Services, LP's, a Virginia limited partnership, membership interest in Sanford, LLC, a Virginia limited liability company, to Jerome Guyant IRA. This assignment is to serve as collateral for that certain Revolving Credit Line Promissory Demand Note dated December 22, 2005 executed by Highland Construction Management Services, LP for the benefit of Wachovia Bank FBO Jerome Guyant IRA.

| 5. ALTERNATIVE DESIGNATION (if applicable) | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    (if applicable) | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) (ADDITIONAL FEE)    (optional) | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Guyant IRA Memo In Opp to Highland Objection to Claim
Exhibit 2

**44**

Case 11-01413-RGM    Doc 109-1    Filed 12/12/12    Entered 12/12/12 15:47:20    Desc
Exhibit(s)    Page 7 of 65

070124 0749

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A NAME & PHONE OF CONTACT AT FILER (optional)**

**B SEND ACKNOWLEDGMENT TO (Name and Address)**

Rachel K. Downs
Sevila, Saunders, Huddleston & White, P.C.
30 North King Street
Leesburg, Virginia 20176

070118 7263

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 06-10-11-7056-0 | |

2. ☐ TERMINATION  Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement

3. ☐ CONTINUATION  Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

4. ☐ ASSIGNMENT (full or partial)  Give name of assignee in item 7a or 7b and address of assignee in item 7c, and also give name of assignor in item 9

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☑ Debtor or ☐ Secured Party of record  Check only one of these two boxes

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7
☐ CHANGE name and/or address  Please refer to the detailed instructions in regards to changing the name/address of a party
☐ DELETE name  Give record name to be deleted in item 6a or 6b
☐ ADD name  Complete item 7a or 7b and also item 7c, also complete items 7e-7g (if applicable)

6. CURRENT RECORD INFORMATION

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added  or give entire ☑ restated collateral description  or describe collateral ☐ assigned

An assignment of 33.33% of Highland Construction Management Services, LP's, a Virginia limited partnership, membership interest in Sanford, LLC, a Virginia limited liability company, to Jerome Guyant IRA. Assignment of all Highland Construction Management Services, LP's Fifty-Seven percent (57%) membership interest in Barklay's Point, LLC, a Virginia limited liability company, to Jerome Guyant IRA.  These assignments are to serve as collateral for that certain Revolving Credit Line Promissory Demand Note dated December 22, 2005, and amended on October 13, 2006, executed by Highland Construction Management Services, LP for the benefit of Jerome Guyant IRA.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this Amendment

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Highland Construction Management Services, LP | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

Guyant IRA Memo In Opp to Highland Objection to Claim
Exhibit 3

**45**

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Neil D. Goldman (703) 548-1620

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Neil D. Goldman, Esq.
Young, Goldman & Van Beek P.C.
510 King Street, Suite 416
Alexandria VA 22314

100201 7185

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 06-10-11-7056-0 | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial)  Give name of assignee in item 7a or 7b and address of assignee in item 7c, and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address  Please refer to the detailed instructions in regards to changing the name/address of a party.  ☐ DELETE name  Give record name to be deleted in item 6a or 6b.  ☐ ADD name  Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☑ restated collateral description, or describe collateral ☐ assigned.

Fifty percent (50%) of Highland Construction Management Services LP's interest in Sanford LLC, a Virginia limited liability company at 25 Center Street, Suite 101, Stafford, VA 22554, which Fifty percent (50%) interest creditor and debtor agree is equal to Sixteen percent (16%) of the total of membership interests in Sanford LLC; and Twenty Five percent (25%) of Highland's membership interest in Little Piney Run, LLC, a Virginia limited liability company at 10942 Harpers Ferry Road, Purcellville, VA 20132; and all of Highland's Fifty Seven percent (57%) membership interest in Barklay's Point LLC, a Virginia limited liability company at 12022 Meadowville Court, Herndon, VA 20170.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☑ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR Highland Construction Management Services LP | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

Guyant IRA Memo in Opp to Highland Objection to Claim

Exhibit 4

**46**

# OPERATING AGREEMENT
## of
## SANFORD, LLC,
### a Virginia Limited Liability Company

This Subscription and Operating Agreement ("Agreement") of Sanford, LLC, a Virginia Limited Liability Company (the "LLC"), is made effective as of the _15th_ day of October 2002 (the "Effective Date") by and between the "Members" of the LLC, as listed in Exhibit "A" to this Agreement.

## SECTION I
## THE LLC - FORMATION and PURPOSE

### 1.1 Formation

In consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, all of the Members of the LLC hereby:

(i) acknowledge the formation by the Members of the LLC as a limited liability company pursuant to the Virginia Limited Liability Company Act, VIRGINIA CODE 13.1-1000 to 13.1069 (the "Act"), by virtue of Articles of Organization filed October 3, 2001 with the Virginia State Corporation Commission;

(ii) confirm and agree to their status as Members and subscribe for the acquisition of a Membership Interest, as that term is defined herein, upon the terms and conditions set forth in this Agreement; and

(iii) execute and adopt this Agreement as the Operating Agreement of the LLC pursuant to Section 13.1-1023 of the Act.

### 1.2 Name

The name of the limited liability company shall be "Sanford, LLC"

### 1.3 Governing Law

This Agreement and all questions with respect to the rights and obligations of the partners, the construction, enforcement and interpretation hereof, and the formation, administration and termination of the LLC shall be governed by the provisions of the Act and other applicable laws of the Commonwealth of Virginia.

### 1.4 Defined Terms

Except as otherwise specified or when the context may otherwise require, all capitalized terms used in this Agreement shall have the meanings specified in the Section where such capitalized term is first used.

### 1.5 Purpose, Properties and Assignment of Contracts

The purpose of the LLC shall be to act as the parent entity for a number of subsidiary limited liability companies (the "Subsidiary LLC's"), each established to purchase, own, operate, entitle, permit, plat, improve, mortgage, finance, refinance, maintain, sell and/or otherwise dispose of four

1

Guyant IRA 0062
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

EXHIBIT

**47**

parcels of land located in Loudoun County, Virginia (individually, the "Property" or, if referring to two or more, the "Properties"), for the production of income and profit, and to engage in such other lawful activities as are reasonably necessary or useful to the furtherance of the foregoing purposes, upon and subject to the terms and conditions of this Agreement.

Highland Construction Management Services, L.P. ("Highland") holds contracts to purchase three of the Properties and holds an interest in the Lucketts Parcel through Foothills, LLC. Highland agrees to assign its interest in each of the four Properties to the Subsidiary LLC designated below. The Properties are described as follows:

| Parcel Name | Name of LLC to Assign | Acreage | Status | Tax Map No. |
|---|---|---|---|---|
| Hahn | Purcellville A Street, LLC | 67.10 | Contract | 44/65-1 |
| Wright | Aberdeen, LLC | 180.75 | Contract | 21/59 |
| Light/Waterford | Old Wheatland Road, LLC | 337.00 | Contract | 27/14 & 27/16 |
| Lucketts | Foothills, LLC (to Sanford) | 101.00 | Fee Simple | 21/25 |
|  | TOTAL | 685.85 |  |  |

The strategy preferred and intended by the Members is for the LLC and Subsidiary LLC's to fully entitle each of the Properties and sell recorded lots in bulk to a national or regional homebuilder; in the event a bulk sales contract satisfactory to the Members is not obtained, the LLC and Subsidiary LLC's will proceed, subject to the terms of this Agreement, with development of the Properties and subsequent sale of lots either in bulk to a single homebuilder or by way of takedown agreements to a number of homebuilders. The LLC shall not engage in any other business unless expressly approved by all of the Members, in writing.

1.6 Term of the Company

The term of the Company shall commence as of the date of the filing of the Articles of Organization and shall continue until December 31, 2010, unless sooner terminated as hereinafter provided.

SECTION II
MEMBERS – STATUS, RIGHTS AND OBLIGATIONS

2.1 Members

The Members of the LLC and the notice address of each such Member are set forth in Exhibit "A" attached hereto.

2.2 Membership Interests

The Members agree that each Member's ownership interest in the LLC, hereinafter referred to generally as a "Membership Interest," shall be as set forth on Exhibit "A" as may be amended from time to time.

2.3 Other Activities

Except as expressly otherwise provided herein, any Member may engage in or possess any interest in other business and real estate ventures of any nature and description, independently or with others, even if such activity competes directly with the business of the LLC, and neither the LLC or any other Member hereof shall have any rights in or to any such independent venture or the income or profits derived therefrom.

2

Guyant IRA
0063
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**48**

2.4 <u>No Right of Withdraw</u>

No member shall have any right to voluntarily resign or otherwise withdraw from the LLC without the written consent of all remaining Members of the LLC

### SECTION III
### MANAGEMENT OF THE LLC

3.1 (a) <u>Management by Managers</u>

The Members hereby unanimously agree that the responsibility for managing the business and affairs of the LLC shall be delegated to two (2) managers pursuant to Section 13.1-1024 of the Act and hereby unanimously consent to the election of Highland and Garrett Development Corporation ("GDC") as Managers of the LLC. The Managers shall serve and continue in such office throughout the entire term of the LLC unless sooner removed by a vote of members holding seventy-five percent (75%) of the membership interests, by operation of law, or by order or decree of any court of competent jurisdiction, or by voluntary resignation or upon the death, insanity, liquidation or bankruptcy of the Manager.

In the event of the resignation or removal of a Manager, the written consent of Members holding seventy-five percent (75%) of the membership interests shall be required to designate a new Manager.

3.1 (b) <u>Power, Authority and Responsibilities of the Managers</u>

The Managers shall have complete and exclusive control of the management of the business and affairs of the LLC, and the Members, in their capacities as members, shall have no right to participate in the management of the conduct of the LLC's business and affairs nor any power or authority to act for or on behalf of the LLC in any respect whatsoever. Except as otherwise specifically provided in this Operating Agreement, (i) the Managers shall have the right, power and authority on behalf of the LLC and in its name to exercise all of the rights, powers and authority of the LLC under the Act, subject to any express limitations set forth herein, and (ii) all actions or decisions taken or made by the Managers shall require the approval of two (2) Managers to be effective. Notwithstanding the foregoing, no Manager shall, without the written consent of at least 66% of all Members in Interest, at a meeting of the Members held after 5 business days' written notice:

(i) Borrow funds or incur indebtedness for company purposes or utilize collateral owned by the LLC as security for such loans in excess of Twenty Thousand Dollars ($20,000);

(ii) Make, execute or deliver any deed, contract of sale, or other Instrument which operates to sell all or substantially all of the assets of the LLC;

(iii)Borrow money from the LLC or lend LLC funds to any person; or

(iv)To enter into contracts unrelated to the development, sale or management of the Properties.

GDC and Highland, as Managers of the LLC, will co-manage site planning, engineering and the zoning, approval and entitlement processes. GDC will manage the administration of both the LLC and Subsidiary LLC's, receive invoices and make payment of all LLC payables, generate management reports and coordinate the generation and submittal of tax returns. GDC and Highland will be paid or reimbursed for all direct expenses associated with administration of the LLC or Subsidiary LLC's.

3

Guyant IRA
0064
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**49**

3.1 (c) Rights Non-Managing Members

    No Member shall, in its capacity as a Member, take part in the management of the business, transact any business for the LLC, nor shall it have power to sign for or to bind the LLC; provided, however, the Members shall have the right to approve certain matters, as provided herein.

3.2 Third-Party Reliance

    Third parties dealing with the LLC shall be entitled to rely conclusively upon the power and authority of the Managers as set forth herein.

3.3 No Duty to Consult

    Except as otherwise provided herein, the Managers shall have no duty or obligation to consult with or seek the advice of the Members.

3.4 Duties of Managers

    The Managers shall devote such time, effort and skill to the business affairs of the LLC as each deems necessary and proper for the LLC's welfare and success. The Members expressly recognize that each Manager has substantial other business activities and agree that each Manager and its affiliates, officers, directors, employees and agents, as the case may be, shall not be bound to devote all of their business time to the affairs of the LLC, and each Manager of its affiliates may engage for its own account and for the accounts of others in other businesses or activities, even if such business or activities compete directly with LLC business or activities.

3.5 Fiduciary Relationship

    The Managers shall at all times act in a fiduciary capacity for the LLC. The Managers shall not have any hidden or concealed earnings from any activity of the LLC. The Managers shall not be liable, responsible or accountable to the LLC or the Members in damages or otherwise for any acts performed, or for any failure to act, taken in good faith; provided, however, that the Managers shall not be relieved of their fiduciary obligations to the Members and the LLC for fraud, malfeasance or gross negligence.

3.6 Reimbursement

    All expenses incurred with respect to the organization, operation and management of the LLC shall be borne by the LLC. The Managers shall be entitled to reimbursement from the LLC for direct expenses incurred for services or materials provided with respect to the organization, operation and management of the LLC

3.7 Managers and Affiliates Dealing With the Membership

    Subject to obtaining any consent expressly required hereunder, the Managers may appoint, employ, contract or otherwise deal with any person, including individuals with whom any Manager is related, and with business entities which have a financial interest in a Manager or in which a Manager has a financial interest, for transacting LLC business, including any acts or services for the LLC as the Managers may approve, provided, however, fees or other payments and terms of contract with such parties shall not be in excess of prevailing competitive rates for such transactions.

4

Guyant IRA
0065
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**50**

3.8 Limitation of Liability of Members and Managers

The Members hereby acknowledge and agree that the liability of any Member or Manager to the LLC or to any of the other Members shall be eliminated, to the maximum extent possible, pursuant to VIRGINIA CODE 13.1-1025 of the Act. Managers shall have no authority to obligate Members on any debt instrument.

SECTION IV
CAPITAL CONTRIBUTIONS AND
FINANCIAL OBLIGATIONS OF MEMBERS

4.1 Capital Contributions

The Members agree that each Member's capital contribution and ownership interest in the LLC shall be determined as set forth herein and on Exhibit "A" attached hereto. There is no provision in this agreement to allow Managers to issue Capital Calls. Capital contributions are to be used as deposits, engineering studies, soil studies and miscellaneous pre-development expenses.

Based upon information provided and certified by Highland, its current basis in the Properties, including (i) the gross acquisition cost of the Lucketts parcel by Foothills, LLC, which is to be replaced by another LLC, (ii) existing deposits on the three contracted parcels, and (iii) incurred-to-date soft costs is approximately $1,252,367, summarized as follows:

| | |
|---|---|
| Lucketts Acquisition Cost | $ 601,740 |
| Existing Deposits | $ 250,000 |
| Incurred-to-Date Soft Costs | $ 420,627 |
| TOTAL Incurred Costs | $1,252,367 |

Furthermore, Highland projects future remaining soft costs of approximately $1,206,453 and additional deposits required by the three contracts of $125,000, for a total amount of remaining budgeted soft costs and deposits of $1,331,453, summarized as follows:

| | |
|---|---|
| Remaining Budgeted Soft Costs | $1,206,453 |
| Additional Deposits Required by Contract | $ 125,000 |
| TOTAL Remaining Budgeted Soft Costs and Deposits | $1,331,453 |

The total amount of deposits and soft costs is $2,583,820. Highland has provided GDC an accounting for these amounts and will provide further support, as requested by GDC.

Two Members, Andrew S. Garrett, Inc. and Colorado Coronado, LP, as part of their initial capital contribution, will provide a funding commitment to the LLC of $2,325,438 (the "GDC Funding Commitment"), of which $993,985 will be disbursed to Highland and Foothills (the "Reimbursement") in order to reduce its capital contribution to $258,382. The remaining amount of the GDC Funding Commitment after the Reimbursement will be $1,331,453, equivalent to the Total Remaining Budgeted Soft Costs and Deposits established above. The net initial capital contributions and capital account balances of the Members subsequent to the Reimbursement are listed in Exhibit "A" to this Agreement. Highland will be responsible for all operating and/or other soft costs of the LLC over and above the total amount of deposits and soft costs amount of $2,583,820.

5

Guyant IRA
0066
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

Highland shall have the sole obligation to borrow all funds required for development of one or more of the Properties, or in the event closing of the purchase of one or more of the Properties becomes necessary. In the event the Managers elect to move forward to develop one or more Properties, such financing shall be secured by a first deed of trust on the Property or Properties. If the terms of the loan are less favorable than two points over prime and a one and one-half (1.5) point fee for a three-year note term, then such loan shall require approval of Members holding seventy-five percent (75%) of membership interests. Highland and, if required by the lender, Joseph L. Bane, Jr., shall guarantee such loan. If Highland is unable to borrow such funds and GDC is required to provide financing and recourse, then Highland will assign two percent of its interest to GDC in order that GDC has majority fifty-one percent (51%) interest and control of the LLC.

If the Managers identify and decide to acquire additional parcels of land to be added to the list of Properties (the "Additional Properties") and operated as required by the purpose of the LLC stated above, the same LLC structure utilized for the initial Properties will be used and Members which choose to participate will be allowed to participate by way of an additional capital contribution. A new limited liability company or re-balancing of membership interests will be required if all Members do not choose to participate in the Additional Properties in their same respective interests.

4.2 <u>Return of Capital Contributions</u>

No Member shall be entitled to withdraw any part of its Capital Contribution or its Capital Account, or to receive any distribution from the LLC, except as specifically provided in this Agreement. Except as otherwise provided herein, there shall be no obligation to return to any Member or withdrawn Member any part of such Member's capital contributions to the LLC for so long as the LLC continues to exist. If the LLC is continued by agreement of the remaining Members upon the dissolution, bankruptcy or withdrawal or death of a Member, the former Member or heirs of such member shall continue to receive the share of distributions and return of capital at such time and in such manner as such party would have received distributions had such former party remained a Member of the LLC.

4.3 <u>Loans Not to be Treated as Capital Contributions</u>

Any Member may, with the written consent to the Managers, loan funds to the LLC on such terms and conditions as are agreed to by the Managers. Any such loans shall be evidenced by a written note. Loans or advances by any Member to the LLC shall not be considered capital contributions and shall not increase the Capital Account balance of the lending or advancing Member.

4.4 <u>Limited Liability</u>

Except as provided in this Agreement, no Member shall be required under any circumstances to contribute or lend any money or property to the LLC.

6

Guyant IRA
0067
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

## SECTION V
## DISTRIBUTIONS

5.1    Distribution of Net Cash Flow

5.1 (a) Net Cash Flow Defined

The term "Net Cash Flow" for a fiscal year of the LLC, or other period designated by the Managers, shall mean all cash receipts as shown on the books of the LLC (including capital contributions from Members, net proceeds to the LLC from sale or disposition of LLC assets, condemnation proceeds, and excess title, property, casualty or liability insurance proceeds, if any, for the restoration or repair of the LLC assets), reduced by:  (A) cash disbursements for LLC purposes, including interest and principal on any development loan(s) for subdivision of Properties and/or any other loan(s) to the LLC or Subsidiary LLC's, and/or repayment of any non-pro rata Member loans, and (B) all cash reserves set aside by decision of the Manager which the Managers deem necessary, in the exercise of the Managers' sole and absolute discretion, to accomplish the business of the LLC or Subsidiary LLC's; plus any other funds, including amounts previously set aside as reserves deemed available, in the sole and absolute discretion of the Managers, for distribution as Net Cash Flow.  Cash Flow shall not be reduced by depreciation, amortization or similar allowances.

5.1 (b) Priority of Distribution

The Net Cash Flow of the LLC shall be paid out to the Members in accord with the priorities and preferences set forth below on an annual basis or at such shorter intervals as the Manager shall determine.

(i) First, towards repayment of outstanding principal and interest on all loans, if any, made by Members pro rata to the LLC;

(ii) Second, pro rata toward the payment of a Preferred Return to Members in the amount of twelve percent (12%) per annum on the then current net balance of their Capital Accounts.

(iii) Third, pro rata toward the repayment of the Unrecovered Capital Contributions made by the Members; and

(iv) Fourth, pro rata to Members in accordance with their respective membership interests (the "Profit Distributions").

5.1 (c) Interim Distributions

The Managing Members, in their sole and absolute discretion, may elect to make interim distributions of Net Cash Flow during a fiscal year. When financial statements for each company year are complete, however, the amount properly distributable to each Member for that company year shall be determined and the amounts of interim distributions of Net Cash Flow and all other distributions to the Members both for that company year and, if need by, for subsequent company years, shall be adjusted to reflect the amount properly distributable to each Member for that Company year.

7

Guyant IRA
0068
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

5.2  Distribution of Net Cash From Sales, Refinancing or Dissolution

5.2  (a) Sale of Substantially All Assets or Dissolution

In the event of a sale of substantially all of the assets of the LLC or other dissolution of the LLC, the Net Cash from Sale shall be distributed in the following order of priority;

(i)  First, towards the satisfaction of all outstanding debts and other obligations of the LLC other than loans from Members;  including any non-pro rata loan made by a Member;

(ii)  Second, pro rata towards repayment of outstanding principal and interest on all loans, if any, made by the Members to the LLC;

(iii)  Third, pro rata toward payment of a Preferred Return to the Members in the amount of twelve percent (12%) per annum on the then current net balance of their Capital Accounts.

(iv)  Fourth, pro rata toward the repayment of the Unrecovered Capital Contributions made by the Members; and

(v)  Fifth, the remaining proceeds of the sale shall be distributed pro rata among the Members according to their respective membership interests (the "Profit Distributions").

SECTION VI
FEDERAL AND STATE TAX MATTERS

6.1  Maintenance of Members' Capital Accounts

With respect to each Member, a separate "capital account" for such Member shall be established and maintained throughout the term of the LLC in accordance with applicable Treasury Regulations that must be complied with in order for the allocations of taxable profits and losses provided in this Agreement to have "economic effect" under applicable Treasury Regulations.

6.2  Allocations of Taxable Profits, Losses and Credits of the LLC

Except as expressly otherwise provided, the LLC's net taxable income or loss and tax credits for a fiscal year, computed in accordance with applicable federal income tax accounting principles, shall be allocated among the Members for each fiscal year as follows:

6.2  (a)  Credits

All tax credits (and credit recapture, if any) shall be allocated in the manner specified by the INTERNAL REVENUE CODE of 1986, as amended, and the regulations issued thereunder.

6.2  (b)  Net Taxable Loss

The net taxable loss, if any, for a fiscal year of the LLC shall be allocated to the Members in accordance with their respective Membership Interests, provided, however, that no Member shall be allocated any loss which would cause that Member's capital account to be negative.

8

**54**

6.2  (c)  Net Taxable Income

The net taxable income for a fiscal year of the LLC shall be allocated to the Members in accordance with their respective Membership Interests.

6.3  Tax Year and Accounting Matters

The taxable year of the LLC shall be the calendar year. The LLC shall adopt the accrual method of accounting and maintain all books and file its tax returns on such basis. Unaudited cash flow statements shall be sent to all members quarterly.

6.4  Tax Elections

The Managers, in the exercise of their reasonable discretion, may cause the LLC to make or revoke all tax elections provided for under the INTERNAL REVENUE CODE.

SECTION VII
TERM AND TERMINATION OF THE LLC

7.1  Term of the LLC

The term of the LLC shall commence upon filing of Articles of Organization with the Virginia State Corporation Commission and shall continue until December 31, 2012, unless sooner dissolved and terminated as provided in this Agreement.

7.2  Events of Termination

The LLC shall be dissolved upon the occurrence of any of the following events:

(a) The determination in writing of all Members to dissolve and terminate the LLC;

(b) The expiration of the term of the LLC as stated above;

(c) The sale, transfer or assignment of all of the assets of the LLC;

(d) The adjudication of the LLC as insolvent within the meaning of insolvency in either bankruptcy or equity proceedings, or the filing of an involuntary petition in bankruptcy against the LLC (which is not dismissed within ninety [90] days), or the filing against the LLC of a petition for reorganization under the FEDERAL BANKRUPTCY CODE or any state statute (which is not dismissed within ninety [90] days), or a general assignment by the LLC for the benefit of creditors, or the voluntary claim (by the partnership) that it is insolvent under any provisions of the BANKRUPTCY CODE (or any state insolvency statutes), or the appointment for the LLC of a temporary or permanent receiver, trustee, custodian, sequestrator and such receiver, trustee, custodian, or sequestrator is not dismissed within ninety (90) days;

(e) Upon the liquidation, termination, resignation or insolvency or other bankruptcy (within the scope of Section 7.2[d] above) of a Member unless, within ninety (90) days of such event, all of the remaining Members agree to continue the LLC, in which event the LLC shall not be dissolved and the LLC and the business of the LLC shall be continued;

9

**55**

(f) When so determined in accord with other specific provisions of this LLC Agreement; and

(g) As otherwise required by Virginia law.

### 7.3 Conclusion of Affairs

In the event of the dissolution of the LLC for any reason, the Managers shall proceed promptly to wind up the affairs of and liquidate the LLC Except as otherwise provided in this Agreement, the Members shall continue to share distributions and tax allocations during the period of liquidation in the same manner as before the dissolution. The Managers shall have reasonable discretion to determine the time, manner and terms of any sale or sales of LLC property pursuant to such liquidation having due regard to the activity and the condition and relevant market and general financial and economic conditions and consistent with its fiduciary obligations to the Members.

### 7.4 Liquidating Distributions

After paying or providing for the payment of all debts or liabilities of the LLC and all expenses of liquidation, and subject to the right of the Managers to set up such reserves as it may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the LLC, the proceeds of the liquidation and any other assets of the LLC shall be distributed to or for the benefit of the Members in accordance with this Agreement. No Managers shall have any right to demand or receive property other than cash upon dissolution and termination of the LLC.

### 7.5 Termination

Within a reasonable time following the completion of the liquidation of the LLC, the Managers shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the LLC as of the date of complete liquidation and each Member's portion of the distributions pursuant to this Agreement. Upon completion of the liquidation of the LLC and the distribution of all LLC assets, the LLC shall terminate, and the Managers shall have the authority to execute and record a Certificate of Cancellation of the LLC as well as any and all other documents required to effectuate the dissolution and termination of the LLC.

### SECTION VIII
### TRANSFERS AND THE ADDITION, SUBSTITUTION AND
### WITHDRAWAL OF MEMBERS

### 8.1 Restrictions on Transfers

(a) No Membership Interest may be assigned, hypothecated, pledged or otherwise transferred ("Transferred") in whole or in part without the prior written consent of all Members unless such transfer is:

(i) A transfer to any party already a Member of the LLC; or

(ii) A transfer or disposition by gift, will or intestacy to or for the benefit of the deceased Member's (or assignee's) Family, or a transfer outright or through a trust or partnership to or for the benefit for that Member's (or assignee's) Family. For the purposes of this Agreement, "Family" is defined as (1) the spouse and/or the estate of a then Member (or assignee), (2) lineal ancestors, lineal descendants (including without limitation those related By blood, adoption, marriage and stepchildren),

Guyant IRA
0071
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

siblings of a Member (or assignee) and spouses of any of the foregoing, or (3) a current (as of the date of this Agreement) beneficiary of a Member (or assignee) which is an estate or trust (or a then beneficiary who is otherwise a Family member of such estate or trust as of the date of this Agreement); or

(b) Any Transfer of a Membership Interest shall be effective only to give the Transferee the right to receive the share of tax allocations and distributions to which the Transferor would otherwise be entitled. No Transferee of a Membership Interest shall have the right to become a substituted Member unless all of the other Members, in the exercise of their sole and absolute discretion, expressly consent thereto in writing and the Transferee agrees to be bound by all the terms and conditions of this Agreement as then in effect. Unless and until a Transferee is admitted as a substituted Member, the Transferor shall have no right to exercise any of the powers, rights and privileges of a Member hereunder. Upon assignment of his or her entire Membership Interest, a Member shall cease to a Member and thereafter shall have no further powers, rights and privileges as a Member hereunder, but shall, unless otherwise relieved of such obligations by agreement of all of the other Members or by operation of law, remain liable for all obligations and duties as a Member.

(c) The Managers may, in their reasonable discretion, charge a reasonable fee to cover the additional administrative expenses incurred in connection with or as a consequence of the Transfer of all or part of a Membership Interest.

(d) The LLC, each Member, and any other person or persons having business with the LLC need deal only with Members who are admitted as Members or as substituted Members of the LLC, and they shall not be required to deal with any other person by reason of assignment by a Member or by reason of the death of a Member, except as otherwise provided in this Agreement. In the absence of the substitution (as provided herein) of a Member for an assigning or a deceased Member, any payment to a Member or to a Member's executors or administrators shall acquit the LLC and the Manager of all liability to any other persons who may be interested in such payment by reason of an assignment by, or the death of, such Member.

(e) No person shall have a perfected lien or security interest in a Membership Interest unless the creation of such interest is in accord with the provisions of this Agreement and the LLC is notified of such interest and provided a copy of all documentation with respect thereto, including financing statements, prior to execution and filing.

(f) Any Transfer not in accord with this Agreement shall be void ab initio; and

(g) Restrictions on Transfer of Interest - Tax Purposes: Each Member agrees not to transfer all or any part of its Membership Interest (or take or omit any action, filing election or other action which could result in a deemed transfer) if such transfer (either considered alone or in the aggregate with prior transfers by other Members) would result in the termination of the LLC for federal income tax purposes. Such a transfer is void ab initio.

8.2 <u>Involuntary Buy-Sell Provision</u>

(a) Upon the death, adjudication of incompetency, bankruptcy or liquidation and termination of a Member (or assignee) (herein "withdrawal"), if the Company is continued by the unanimous consent of the remaining Members, then, unless the withdrawing Member (or assignee) has transferred or bequeathed his or her entire Percentage Interest to another Member in this Company, or to his or her family, then the Company may, at its option, exercisable in writing, purchase and retire all or a part of the Interest of the withdrawing Member (or assignee) and distribute to such withdrawing Member (or

11

Guyant IRA
0072
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**57**

assignee) the value of his or her Interest, all pursuant to paragraph (d) below. The Company's election to purchase is subject to the written consent of at least a majority of all Members in Interest, not counting the offering Member's (or assignee's) Percentage Interest. The Company's election to purchase such Percentage Interest shall be exercised by giving written notice thereof to the withdrawing Member (or assignee) or the personal representative of the deceased Member or assignee (or if no personal representative has been appointed at the time of such election, then to any one of the known heirs of the deceased Member or assignee at the last known address of such heir within ninety (90) days after the effective date of withdrawal). The purchase price shall be the pro rata share of: i) the current Fair Market Value of the Property as determined by an MAI appraiser, ii) less all debts of the company and cost of sale, iii) but not discounted as a minority interest. The Company shall thereby be obligated to make complete payment of the purchase price within 90 days after such election.

(b) If the Company shall elect not to purchase any or all of such Percentage Interest, then any remaining Member shall have the right to purchase a portion of the remainder of such Percentage Interest that the company has not elected to purchase (such portion shall be proportionate to the ratio of his or her Percentage Interest to the total of the Percentage Interests of the Members desiring to purchase portions of such Interest). Any such election to purchase a portion of the withdrawing Member's (or assignee's) Percentage Interest shall be made by written notice given to the withdrawing Member (or assignee) or the personal representative of the deceased Member (or assignee) (or if no personal representative has been appointed at the time of such election, then to anyone of the known heirs of the deceased Member (or assignee) at the last known address of such heir), within forty-five (45) days following the last date available to the Company to make its election to purchase such Percentage Interest. Any remaining Percentage Interest available for purchase caused by the failure of a Member to purchase the maximum portion allowed to him or her by the preceding sentence shall be available for purchase by any other Member desiring to purchase a portion of it in an amount proportionate to the ratio of that Member's Percentage Interest to the total of the Company Interests of the Members desiring to purchase such remaining Interest. In making any election, any such remaining Member shall thereby be obligated to make the payments as specified in paragraph (b) above.

(c) If neither the Company nor any remaining Member exercises the election to purchase the Percentage Interest of the withdrawing Member (or assignee) in accordance with this paragraph (8.2), so that after the application of the above paragraphs there still remains a Percentage Interest owned by the withdrawing Member (or assignee), then any such remaining Percentage Interest shall pass to his or her estate and beneficiaries/heir thereof as assigned as permitted by law.

(d) If the Company is not continued by the unanimous consent of the remaining members upon a withdrawal of a Member, then the Company shall be dissolved and wound up.

8.3 <u>Voluntary Buy-Sell Provision</u>

(a) <u>Failure of Managers to Agree.</u> This provision may be initiated thirty (30) days after the two Managers have declared their failure to agree on the direction or operations of the project and one Manager has given written notice of this impasse to the other Manager and all the Members of the LLC. If no solution to the disagreement of the Managers can be achieved in such thirty (30) day period and the Members have not elected new managers in accordance with Section 3.1(a) above, then either Manager may initiate the following buy-sell procedure.

12

Guyant IRA
0073
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

(b) <u>Procedures.</u>  The Manager initiating this procedure shall give notice to the Members that it represents a Member or group of Members owning forty percent (40%) or more of the interest in the LLC and is requiring the recipients of the notice (the "Recipients") to elect either (i) to sell to the party or parties giving such notice (the "First Party") all of the interest then owned by the Recipient(s) of such notice, or (ii) to purchase all of the interest in the company owned by the First Party, at a price per percentage of LLC interest specified in such notice (the "Specified Price").

The Recipient shall, within thirty (30) days after receiving such notice, give notice to the First Party of election by the Recipient either to sell the Recipient's interest or buy the First Party's interest, in either case at the Specified Price.  If the Recipient's election is to buy the First Party's interest pursuant to clause (ii) in item (b) immediately above, the Recipient shall deposit with an escrow agent reasonably acceptable to the First Party (the "Escrow Agent"), and shall forward to the First Party simultaneously with such notice to the First Party, proof that the Recipient has so deposited (i) an amount equal to twenty percent (20%) of the Specified Price, and (ii) irrevocable instructions to the Escrow Agent to pay such deposit to the First Party at the closing for the purchase of such LLC interests as part of the Specified Price then payable.

If the Recipient does not give such notice and proof, the First party shall have the right, exercisable by giving a second written notice to the Recipient within fifteen (15) days after expiration of the above thirty (30) day period, to treat the Recipient as having made, and the Recipient shall be deemed for all purposes hereof to have made, an election under clause (i) in item (b) immediately above.  Any election made or deemed to have been made hereunder shall obligate the party making or deemed to have made such election and the other parties to proceed with the closing for the purchase and sale of the LLC interests in accordance with such election and for payment of the purchase price of said interests, as provided hereinafter.

(c) <u>Closing.</u>  The closing for the purchase and sale of LLC interest pursuant to an election made or deemed made hereunder shall take place on the forty-fifth (45th) day after the giving of the notice referred to in the first sentence of Section 8.2(a) above at a mutually agreeable location or, in the absence of agreement, at the principal office of the LLC at a time specified by the First Party.  At the closing, the Member(s) required to sell shall sell all their interest to the Member(s) required to purchase free and clear of all claims, liens, encumbrances and security interests.  The Escrow Agent shall pay to the seller(s) the twenty percent (20%) deposit held with the Escrow Agent, and the purchaser(s) shall pay the remainder of the Specified Price pro rata to each Member in cash or by certified or cashier's check.  Seller(s) shall sign such documents as are necessary to evidence the transfer to the interests in the LLC from Seller(s) to Buyer(s).

<u>SECTION IX</u>
<u>ADMINISTRATIVE PROVISIONS</u>

9.1 <u>Principal Office</u>

(a)  The initial principal place of business and principal office of the LLC shall be 6 Royal Street SW, Suite 490, Leesburg, Virginia 20175-2911. The LLC may relocate the principal office and principal place of business and have such additional offices as the Managers may deem advisable.

(b)  The Managers shall have the power, on behalf of the LLC, to designate, where required, a registered agent (or other agent for receipt of service of process) in each state or other jurisdiction in which the LLC transacts business and to designate, to the extent required, an office, place of business or mailing address, within or without that state or other jurisdiction.

13

Guyant IRA
0074
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

9.2 <u>Bank Accounts</u>

(a) Funds of the LLC shall be deposited in an account or accounts of a type, in form and name and in a bank(s) or other financial institution(s) which are participants in federal insurance programs as selected by the Managers. The Managers shall arrange for the appropriate conduct of such accounts; provided, however, that all transactions involving the investment, withdrawal, transfer or expenditure of funds in any such accounts shall require the joint signature of Highland and GDC. Funds may be withdrawn from such accounts only for bona fide and legitimate LLC purposes and may from time to time be invested in such short-term securities, money market funds, certificates of deposit or other liquid assets as the Managers deem appropriate.

(b) The Managers acknowledge that the Managers may maintain LLC funds in accounts, money market funds, Certificates of Deposit, other liquid assets in excess of the insurance provided by the Federal Deposit Insurance Corporation, or other depository insurance institutions and that the Managers shall not be accountable or liable for any loss of such funds resulting from failure or insolvency of the depository institution.

9.3 <u>Books and Records</u>

At all times during the term of the LLC, the Managers shall keep, or cause to be kept, full and faithful books of account, records and supporting documents, which shall reflect, completely, accurately and in reasonable detail, each transaction of the LLC (including without limitation, transactions with the Managers or affiliates). The books of account shall be maintained and tax returns prepared and filed on the accrual method of accounting. The books of account, records and all documents and other writings of the LLC shall be kept and maintained at the principal office of the LLC Each Member or their designated representative shall, upon reasonable notice to the Managers, have access to such financial books, records and documents during reasonable business hours and may inspect and make copies of any of them at their own expense.

The Managers shall cause the LLC to keep at the offices of Garrett Development Corporation, 25 Center Street, Suite 101, Stafford, Virginia 22556, the following:

(i) a current list of the full name and last known business address of each Member, in alphabetical order;

(ii) a copy of the Articles of Organization and the Certificate of Organization, and all Articles of Amendment and Certificates of Amendment thereto;

(iii) copies of the LLC federal, state and local income tax returns and reports, if any, for the three (3) most recent years; and

(iv) copies of the Operating Agreement, as amended, and any financial statements of the LLC for the three (3) most recent years.

9.4 <u>Notices</u>

Unless otherwise provided herein, any offer, acceptance, election, approval, consent, certification, request, waiver, notice or other communication required or permitted to be given hereunder (hereinafter collectively referred to as a "Notice"), shall be given by enclosing the same in an envelope addressed to the Member to whom the Notice is to be given at the appropriate address set forth on Exhibit "A" attached hereto or at such other address as any Member hereafter may designate to

14

Guyant IRA
0075
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

the others in accordance with the provisions of this Section 9.5, and deposited in the U.S. Mail postage prepaid. In addition, the Managers shall be sent a copy of all such Notices, by registered or certified mail, return receipt requested. The date at which notice shall be deemed received shall be the date of the receipt of the copy of such notice by the Managers.

SECTION X
MISCELLANEOUS PROVISIONS

10.1 Entire Agreement

    This Agreement, including the Exhibits or other documents or schedules attached hereto or incorporated herein by reference constitutes the entire agreement of the Members with respect to the matters covered herein. This Agreement supersedes all prior agreements and oral understandings among the Members with respect to such matters.

10.2 Amendment

    Except as provided by law or otherwise set forth herein, this Agreement may only be modified or amended by a written instrument which evidences the approval of seventy-five percent (75%) of the Members; provided, however, any amendment which would increase the capital contribution obligations of a Member or which would have a non pro rata adverse effect on any Member shall require the prior written consent of such Member.

    Provided, that Exhibit "A" attached hereto may be amended from time to time by the Managers to the extent required to accurately reflect the then current status of the information contained thereon.

10.3 Interpretation

    Whenever the context may require, any noun or pronoun used herein shall include the corresponding masculine, feminine or neuter forms. The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

10.4 Severability

    Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions hereof are determined to be invalid and contrary to existing or future law, such invalidity shall not impair the operation or affect those portions of this Agreement which are valid, and this Agreement shall remain in full force and effect and shall be construed and enforced in all respects as if such invalid or unenforceable provision or provisions had been omitted.

10.5 Burden and Benefit Upon Successors

    Except as expressly otherwise provided herein, this Agreement is binding upon and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors and assigns.

15

Guyant IRA
0076
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**61**

## 10.6 Further Assurances

Each Member hereby agrees that it shall hereafter execute and deliver such further instruments, provide all information and take or forbear such further acts and things as may be reasonably required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof

## 10.7 Purchase of Lots by Members

It is expressly agreed that any Member, Manager or affiliate of a Member of Manager may purchase lots owned by the LLC at the price and on the terms and conditions then prevailing in the market, less the commission that would otherwise be paid to the broker selling the lots at that price and terms.

## 10.8 Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together will constitute one instrument, binding upon all parties hereto, notwithstanding that all of such parties may not have executed the same counterpart.

IN WITNESS HEREOF, the parties have executed this Agreement.

Witness:                              MANAGERS:

_~K Bowman~_                          _[signature]_

                                      Garrett Development Corporation
                                      By:  Andrew S. Garrett
                                      Its:  President

_~K Bowman~_                          _[signature]_

                                      Highland Construction
                                      Management Services, L.P.
                                      By:  Joseph L. Bane, Jr.
                                      Its:  General Partner, Trustee

Witness:                              TITLE HOLDER for LUCKETTS Parcel:

_~K Bowman~_                          _[signature]_

                                      Foothills, LLC
                                      By:  Joseph L. Bane, Jr.
                                      Its:  Operating Manager

16

Guyant IRA
0077
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**62**

Witness:                              MEMBERS:

_K Bowman_                         _Joseph L. Bart_          10/15/02

                                   Highland Construction
                                   Management Services, L.P.

_K Bowman_                         _P. S. Daley_             10-15-02

                                   Foothills, LLC
                                   By:  Peter S. Daley
                                   Its: Operating Manager

_K Bowman_                                                   10/15/02

                                   Andrew S. Garrett, Inc.
                                   By:  Andrew S. Garrett
                                   Its: President

_K Bowman_                                                   10/15/02

                                   Colorado Coronado, LLC
                                   By:  Christian G. Waller
                                   Its: Managing Member

17

Guyant IRA
0078

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**63**

EXHIBIT "A"

TO THE

OPERATING AGREEMENT OF SANFORD, LLC

MEMBERS

| Members | Membership Interest in the LLC | Net Initial Capital Contributions |
|---|---|---|
| Highland Construction Management Services, L.P. 604 W. Potomac Street Brunswick, MD 21716 | 26.00% | $ 131,724 |
| Foothills, LLC c/o Peter S. Daley 15614 Daley Farm Lane Purcellville, Virginia 20132 | 25.0% | $ 126,658 |
| Andrew S. Garrett, Inc. c/o Garrett Development Corporation 25 Center Street, Suite 101 Stafford, VA 22556 | 24.50% | $1,162,719 |
| Colorado Coronado, LLC c/o Garrett Development Corporation 25 Center Street, Suite 101 Stafford, VA 22556 | 24.50% | $1,162,719 |
| | TOTAL | $2,583,820 |

18

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**64**

## AMENDMENT TO OPERATING AGREEMENT
### of
### SANFORD, LLC

This Amendment to the Operating Agreement of Sanford, LLC is made and entered into, effective for all purposes and in all respects, as of the 1st day of November 2002, by and among the undersigned parties.

#### WITNESSETH

Whereas Sanford LLC ("Sanford"), a Virginia limited liability company, was formed by virtue of Articles of Organization filed with the Virginia State Corporation Commission on October 3, 2002, and

Whereas the members of the Company signed an Operating Agreement effective October 15, 2002, and

Whereas these members are Highland Construction Management Services, L.P. ("Highland"), Andrew S. Garrett, Inc. ("ASG, Inc."), Foothills, LLC ("Foothills"), and Colorado Coronado, LLC ("Colorado Coronado") (collectively, the "Initial Members"), and

Whereas as of October 29, 2002, in relation to the "Net Initial Capital Contributions" specified in Exhibit "A" to the Operating Agreement, Highland Construction and Foothills have fully funded, Colorado Coronado has funded $1,150,000 of its $1,162,719 commitment and ASG, Inc. subsequently funded a total of $540,000 of its $1,162,719 commitment, and

Whereas Colorado Coronado and ASG, Inc. now desire to transfer a total of 8.0121% of their membership interests to MJC Ventures LC ("MJC Ventures") and Jerry Guyant, by way of a retirement account entitled Jerome O. Guyant IRA ("Guyant IRA") (collectively, the "New Members") for $450,000, which will be paid to Sanford by June 30, 2003, and

Whereas the Initial Members of Sanford have agreed to waive any right they might have under Section VIII of the Operating Agreement to purchase the 8.012% membership being transferred and to accept the New Members as members of Sanford, and

Whereas, both the Initial Members and the New Members desire to correct certain inconsistencies in the Operating Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in accordance with the Operating Agreement, the undersigned, being all the Members of Sanford, unanimously do hereby agree and certify as follows:

1. Paragraph 1.5 of the Operating Agreement, entitled Purpose, Properties and Assignment of Contracts, shall be corrected in the table contained at the end of the second paragraph so that the Tax Map Number for the Wright Parcel is indicated to be 25/59.

2. Paragraph 1.6 of the Operating Agreement, entitled Term of the Company, shall be corrected to be consistent with paragraph 7.1, so that the term of the Company shall continue until December 31, 2012.

3. Paragraph 4.1 of the Operating Agreement, entitled Capital Contributions, shall be corrected in the first table that appears in the paragraph so that Existing Deposits are indicated to be $230,000 rather than $250,000 (the total of $1,252,367 is correct).

4. As of October 29, 2002, Colorado Coronado and ASG, Inc. hereby assign, transfer and convey a total of 8.0121% in membership interest, as follows: 4.0060% to MJC Ventures for $225,000 and 4.0060% to the Guyant IRA for $225,000, with payment for each such membership interest to be made to Sanford on or before July 7, 2003. The $450,000 in total capital contributions owed by the New Members shall be divided equally and paid by Sanford $225,000 to each of Colorado Coronado and ASG, Inc. Exhibit "A" of the Operating Agreement of Sanford dated October 15, 2002 is hereby deleted, and the revised Exhibit "A" with the restated membership interests, attached hereto and made a part hereof, is substituted therefore.

5. Each of the New Members shall complete payment to Sanford of the $225,000 it owes for its Capital Contribution to Sanford and both Colorado Coronado and ASG, Inc, shall fully fund the remaining portions of their total original obligations of $1,162,719 by July 7, 2003.

Guyant IRA

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**65**

6.  The capital contributions of Initial Members set forth in Exhibit (a) shall earn Preferred Return in accordance with Section V of the Operating Agreement beginning October 29, 2002, and the New Members shall each earn Preferred Return as of October 30, 2002.  The New Members shall each pay Sanford interest of $18,567, for a total of $37,134, to reimburse Sanford for the Preferred Return to be paid to the New Members for the period between their entrance into Sanford as of October 29, 2002 and the July 7, 2003 date they are to fund their capital contributions.  This reimbursement of Preferred Return of $37,134 paid by the New Members shall then be divided equally and paid by Sanford as interest in amounts of $18,567 to each of Colorado Coronado and ASG, Inc.

7.  The Initial Members hereby agree to waive any and all rights under Section VIII of the Operating Agreement to buy the 8.012% interest herein transferred by Colorado Coronado and ASG, Inc. to the New Members and to accept the New Members as substituted members with all the powers, rights and privileges of a Member under the Operating Agreement.  MJC Ventures and the Guyant IRA hereby agree to be bound by all the terms and conditions of the Operating Agreement as hereby amended.

8.  The term "current net balance of their Capital Accounts" in Paragraph 5.2 (a) (iii) shall be changed to "Unrecovered Capital Contributions".  Members shall accrue Preferred Return on Unrecovered Capital Contributions from the date on which the Member either paid or committed funding of such capital contribution. Any Preferred Return earned but not paid shall be accrued and credited to the account of the member, and all accrued but unpaid Preferred Return shall be paid to Members prior to any Profit Distribution pursuant to Paragraphs 5.1(b)(iv) and 5.2(a)(v).  Paragraph 5.2(a)(iii) shall be revised and restated as follows:

(iii) Third, pro rata toward payment of a Preferred Return to the Members in the amount of twelve percent (12%) per annum, non-cumulative, on the Unrecovered Capital Contributions paid or committed to by members as of October 29, 2002. All accrued Preferred Return shall be paid to Members prior to any Profit Distributions.

9.  All other terms and provisions of the Operating Agreement not inconsistent herewith are reaffirmed.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

Witness:                                    MEMBERS:

_____          _____
                                         Highland Construction
                                         Management Services, L.P.    Trustee, General Partner

                                         _____
                                         Foothills, LLC
                                         By Peter Daley, Operating Manager

                                         _____
                                         Andrew S. Garrett, Inc.
                                         By Andrew S. Garrett, President

                                         _____
                                         Colorado Coronado, LLC
                                         By Christian G. Waller, Managing Member

                                         _____
                                         Jerry Guyant for the Jerome O. Guyant IRA

                                         _____
                                         MJC Ventures LC
                                         By Cutler Development Corporation
                                         Miriam Cutler, President

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

Guyant IRA 0081

6. The capital contributions of the Initial Members earn a Preferred Return in accordance with Section V of the Operating Agreement beginning October 29, 2002, and the New Members shall earn Preferred Return as of October 30, 2002. The New Members shall each pay Sanford interest of $18,567, for a total of $37,134, to reimburse Sanford for the Preferred Return to be paid to the New Members for the period between their entrance into Sanford as of October 29, 2002 and the July 7, 2003 date they are to fund their capital contributions. This reimbursement of Preferred Return of $37,134 paid by the New Members shall then be divided equally and paid by Sanford as interest in amounts of $18,567 to each of Colorado Coronado and ASG, Inc.

7. The Initial Members hereby agree to waive any and all rights under Section VIII of the Operating Agreement to buy the 8.012% interest herein transferred by Colorado Coronado and ASG, Inc. to the New Members and to accept the New Members as substituted members with all the powers, rights and privileges of a Member under the Operating Agreement. MJC Ventures and the Guyant IRA hereby agree to be bound by all the terms and conditions of the Operating Agreement as hereby amended.

8. The term "current net balance of their Capital Accounts" in Paragraph 5.2 (a) (iii) shall be changed to "Unrecovered Capital Contributions". Members shall accrue Preferred Return on Unrecovered Capital Contributions from the date on which the Member either paid or committed funding of such capital contribution. Any Preferred Return earned but not paid shall be accrued and credited to the account of the member, and all accrued but unpaid Preferred Return shall be paid to Members prior to any Profit Distribution pursuant to Paragraphs 5.1(b)(iv) and 5.2(a)(v). Paragraph 5.2(a)(iii) shall be revised and restated as follows:

(iii) Third, pro rata toward payment of a Preferred Return to the Members in the amount of twelve percent (12%) per annum, non-cumulative, on the Unrecovered Capital Contributions paid or committed to by members as of October 29, 2002. All accrued Preferred Return shall be paid to Members prior to any Profit Distributions.

9. All other terms and provisions of the Operating Agreement not inconsistent herewith are reaffirmed.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

Witness:                                         MEMBERS:

                                                 Highland Construction
                                                 Management Services, L.P.

_____                          _____   7/25/03
DAVID G. DALEY                                   Foothills, LLC
GREENWOOD HOMES LLC                              By Peter Daley, Operating Manager
PURCELLVILLE VA 2?2B?

_____                          _____
                                                 Andrew S. Garrett, Inc.
                                                 By Andrew S. Garrett, President

_____                          _____
                                                 Colorado Coronado, LLC
                                                 By Christian G. Waller, Managing Member

_____                          _____
                                                 Jerry Guyant for the Jerome O. Guyant IRA

_____                          _____
                                                 MJC Ventures LC
                                                 By Cutler Development Corporation
                                                 Miriam Cutler, President               Guyant IRA
                                                                                         0082

**67**

6. The capital contributions shall Exhibit 5(a) Manage a0l earn Preferred Return in accordance with Section V of the Operating Agreement beginning October 29, 2002, and the New Members shall earn Preferred Return as of October 30, 2002. The New Members shall each pay Sanford interest of $18,567, for a total of $37,134, to reimburse Sanford for the Preferred Return to be paid to the New Members for the period between their entrance into Sanford as of October 29, 2002 and the July 7, 2003 date they are to fund their capital contributions. This reimbursement of Preferred Return of $37,134 paid by the New Members shall then be divided equally and paid by Sanford as interest in amounts of $18,567 to each of Colorado Coronado and ASG, Inc.

7. The Initial Members hereby agree to waive any and all rights under Section VIII of the Operating Agreement to buy the 8.012% interest herein transferred by Colorado Coronado and ASG, Inc. to the New Members and to accept the New Members as substituted members with all the powers, rights and privileges of a Member under the Operating Agreement. MJC Ventures and the Guyant IRA hereby agree to be bound by all the terms and conditions of the Operating Agreement as hereby amended.

8. The term "current net balance of their Capital Accounts" in Paragraph 5.2 (a) (iii) shall be changed to "Unrecovered Capital Contributions". Members shall accrue Preferred Return on Unrecovered Capital Contributions from the date on which the Member either paid or committed funding of such capital contribution. Any Preferred Return earned but not paid shall be accrued and credited to the account of the member, and all accrued but unpaid Preferred Return shall be paid to Members prior to any Profit Distribution pursuant to Paragraphs 5.1(b)(iv) and 5.2(a)(v). Paragraph 5.2(a)(iii) shall be revised and restated as follows:

(iii) Third, pro rata toward payment of a Preferred Return to the Members in the amount of twelve percent (12%) per annum, non-cumulative, on the Unrecovered Capital Contributions paid or committed to by members as of October 29, 2002. All accrued Preferred Return shall be paid to Members prior to any Profit Distributions.

9. All other terms and provisions of the Operating Agreement not inconsistent herewith are reaffirmed.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

Witness:                                MEMBERS:

_____                         Highland Construction
                                        Management Services, L.P.

_____                         Foothills, LLC
                                        By Peter Daley, Operating Manager

                                        Andrew S. Garrett, Inc.
                                        By Andrew S. Garrett, President

                                        Colorado Coronado, LLC
                                        By Christian G. Waller, Managing Member

_____                         Jerry Guyant for the Jerome O. Guyant IRA

_____                         MJC Ventures LC
                                        By Cutler Development Corporation
                                        Miriam Cutler, President

Guyant IRA Memo in Opp to Highland Objection to Claim    Guyant IRA 0083
                                        Exhibit 5

**68**

6.  The capital contributions of the New Members shall earn Preferred Return in accordance with Section V of the Operating Agreement beginning October 29, 2002, and the New Members shall earn Preferred Return as of October 30, 2002.  The New Members shall each pay Sanford interest of $18,567, for a total of $37,134, to reimburse Sanford for the Preferred Return to be paid to the New Members for the period between their entrance into Sanford as of October 29, 2002 and the July 7, 2003 date they are to fund their capital contributions.  This reimbursement of Preferred Return of $37,134 paid by the New Members shall then be divided equally and paid by Sanford as interest in amounts of $18,567 to each of Colorado Coronado and ASG, Inc.

7.  The Initial Members hereby agree to waive any and all rights under Section VIII of the Operating Agreement to buy the 8.012% interest herein transferred by Colorado Coronado and ASG, Inc. to the New Members and to accept the New Members as substituted members with all the powers, rights and privileges of a Member under the Operating Agreement.  MJC Ventures and the Guyant IRA hereby agree to be bound by all the terms and conditions of the Operating Agreement as hereby amended.

8.  The term "current net balance of their Capital Accounts" in Paragraph 5.2 (a) (iii) shall be changed to "Unrecovered Capital Contributions".  Members shall accrue Preferred Return on Unrecovered Capital Contributions from the date on which the Member either paid or committed funding of such capital contribution. Any Preferred Return earned but not paid shall be accrued and credited to the account of the member, and all accrued but unpaid Preferred Return shall be paid to Members prior to any Profit Distribution pursuant to Paragraphs 5.1(b)(iv) and 5.2(a)(v).   Paragraph 5.2(a)(iii) shall be revised and restated as follows:

(iii) Third, pro rata toward payment of a Preferred Return to the Members in the amount of twelve percent (12%) per annum, non-cumulative, on the Unrecovered Capital Contributions paid or committed to by members as of October 29, 2002. All accrued Preferred Return shall be paid to Members prior to any Profit Distributions.

9.  All other terms and provisions of the Operating Agreement not inconsistent herewith are reaffirmed.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

Witness:                                          MEMBERS:

_____               Highland Construction
                                                       Management Services, L.P.

_____               Foothills, LLC
                                                       By Peter Daley, Operating Manager

_____               Andrew S. Garrett, Inc.
                                                       By Andrew S. Garrett, President

_____               Colorado Coronado, LLC
                                                       By Christian G. Waller, Managing Member

                                                       _____
                                                       Jerry Guyant for the Jerome O. Guyant IRA

_____               MJC Ventures LC
                                                       By Cutler Development Corporation
                                                       Miriam Cutler, President

                                                                                        Guyant IRA
                                                                                        0084
                          Guyant IRA Memo in Opp to Highland Objection to Claim
                                                                                  Exhibit 5

**69**

5.    The Initial Members hereby agree to waive any and all rights under Section VIII of the Operating Agreement to buy the 8.012% interest herein transferred by Colorado Coronado and ASG, Inc. to the New Members and to accept the New Members as substituted members with all the powers, rights and privileges of a Member under the Operating Agreement. MJC Ventures and the Guyant IRA hereby agree to be bound by all the terms and conditions of the Operating Agreement as hereby amended.

6.    The term "current net balance of their Capital Accounts" in Paragraph 5.2 (a) (iii) shall be changed to "Unrecovered Capital Contributions". Members shall accrue Preferred Return on Unrecovered Capital Contributions from the date on which the Member either paid or committed funding of such capital contribution. Any Preferred Return earned but not paid shall be accrued and credited to the account of the member, and all accrued but unpaid Preferred Return shall be paid to Members prior to any Profit Distribution pursuant to Paragraphs 5.1(b)(iv) and 5.2(a)(v). Paragraph 5.2(a)(iii) shall be revised and restated as follows:

(iii) Third, pro rata toward payment of a Preferred Return to the Members in the amount of twelve percent (12%) per annum, non-cumulative, on the Unrecovered Capital Contributions paid or committed to by members as of October 29, 2002. All accrued Preferred Return shall be paid to Members prior to any Profit Distributions.

6.    All other terms and provisions of the Operating Agreement not inconsistent herewith are reaffirmed.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

Witness:                                MEMBERS:

_____                       _____
                                        Highland Construction
                                        Management Services, L.P.


_____                       _____
                                        Foothills, LLC
                                        By Peter Daley, Operating Manager


_____                       _____
                                        Andrew S. Garrett, Inc.
                                        By Andrew S. Garrett, President


_____                       _____
                                        Colorado Coronado, LLC
                                        By Christian G. Waller, Managing Member


_____                       _____
                                        Jerry Guyant for the Jerome O. Guyant IRA

                                        _____
                                        MJC Ventures LC
                                        By Cutler Development Corporation
                                        Miriam Cutler, President

Guyant IRA
0085
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**70**

EXHIBIT "A"
to the
OPERATING AGREEMENT of SANFORD, LLC.

## MEMBERS

| Members | Membership Interest In the LLC | Initial Capital Contributions |
|---|---|---|
| Highland Construction Management Services, L.P. | 26.0000% | $131,724 |
| Foothills, LLC | 25.0000% | $126,658 |
| Andrew S. Garrett, Inc. | 20.4940% | $937,719 |
| Colorado Coronado, LLC | 20.4940% | $937,719 |
| MJC Ventures L.C. | 4.0060% | $225,000 |
| Jerome O. Guyant IRA | 4.0060% | $225,000 |
| TOTAL | 100.00% | $2,583,820 |

SECOND AMENDMENT TO
OPERATING AGREEMENT
OF
SANFORD, LLC

This Second Amendment (this "Second Amendment") to the Operating Agreement of
Sanford, LLC, a Virginia limited liability company (the "LLC"), is made effective as of
Apr ( 9th , 2004 (the "Effective Date") by and among the LLC, Highland Construction
Management Services, L.P. ("Highland"), Foothills, LLC ("Foothills"), Andrew S. Garrett,
Inc. a Virginia corporation ("ASG, Inc."), Colorado Coronado, LLC, a _____ limited
liability company ("Colorado Coronado"), the Jerome O. Guyant IRA ("Guyant IRA"), and
MJC Ventures LC, a Virginia limited liability company ("MJC"). Highland, Foothills, ASG,
Colorado, Guyant IRA and MJC are all of the members in the LLC (the "Members").

RECITALS

A.  The LLC was organized pursuant to Articles of Organization filed with the
Virginia State Corporation Commission on October 3, 2001. The Members of the LLC
adopted an operating agreement made effective as of October 15, 2002, as amended by that
certain Amendment to Operating Agreement dated November 1, 2002 (collectively, the
"Operating Agreement").

B.  Section 4.1 of the Operating Agreement imposes on Highland the sole obligation to
borrow all funds required for the development of one or more of the Properties or in the event
closing of the purchase of one or more of the Properties becomes necessary. Section 4.1
further provides that if Highland is unable to borrow such funds and GDC is required to
provide financing and recourse, then Highland will assign two percent of its interest to GDC
in order that GDC has majority fifty-one percent (51%) interest and control of the LLC.

C.  Highland has been unable to borrow the funds required by Section 4.1 of the
Operating Agreement and ASG, Inc., on behalf of GDC, has been required to provide such
financing and recourse. Therefore, as required by Section 4.1 of the Operating Agreement,
Highland desires to and does hereby assign two percent of its Membership Interest in the LLC
to ASG, Inc. in order that ASG, Inc. has majority fifty-one percent (51%) interest and control
of the LLC

B.  The Members and the Company desire to amend the Operating Agreement to
effectuate the foregoing.

NOW, THEREFORE, for good and valuable consideration the receipt and sufficiency
of which are hereby acknowledged, the Members and the Company agree as follows:

A-1

Guyant IRA
0087

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**72**

1.    Recitals.  The foregoing recitals are by this reference made a substantive part of this First Amendment as though set forth in full herein.

2.    Amendment of Operating Agreement.

(a)    As of the Effective Date, the Membership Interest in the Company of (i) Highland is decreased by one percent from twenty-six percent to twenty-five percent, (b) Foothills is decreased by one percent from twenty-five percent to twenty-four percent, and (c) ASG, Inc. is increased by two percent from 20.4940% to 22.4940%.  Contemporaneous therewith and effective as of the Effective Date, Exhibit A to the Operating Agreement shall be deleted and Exhibit A attached hereto shall be substituted in its place and stead.

3.    Continuance of the Operating Agreement.  Except as expressly amended by this Second Amendment, the Operating Agreement shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the day and year first above written.

MEMBERS:
Highland Construction Management Services, L.P.

By: _____
Joseph L. Bane, Jr, General Partner

Foothills, LLC

By: _____
Joseph L. Bane, Jr., Operating Manager

Andrew S. Garrett, Inc.

By: _____
Andrew S. Garrett, President

Colorado Coronado, LLC

By: _____
Christian G. Waller, Managing Member

A-2

Jerome O. Guyant IRA

By: _____
       Name: _____
       Title: _____

MJC Ventures LC
By: Cutler Development Corporation

     By : _____
        Miriam Cutler, Presidnet

**COMPANY**
SANFORD, LLC
By:   Highland Construction Management Services, L.P.,
     Member and Manager

     By: _____
        Joseph L. Bane, General Partner

By:   Garrett Development Corporation, Manager

     By: _____
        Andrew S. Garrett, President

A-3

Guyant IRA
0089
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**74**

Jerome O. Guyant IRA

By: _____

    Name: _____

    Title: _____

MJC Ventures LC
By: Cutler Development Corporation

    By : _____
        Miriam Cutler, Presidnet

**COMPANY**
SANFORD, LLC
By:  Highland Construction Management Services, L.P.,
    Member and Manager

    By: _____
        Joseph L. Bane, General Partner

By:  Garrett Development Corporation, Manager

    By: _____
        Andrew S. Garrett, President

A-3

Guyant IRA
0090

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

Jerome O. Guyant IRA

By: _____
     Name: _____
     Title: _____

MJC Ventures LC
By: Cutler Development Corporation

    By _____
      Miriam Cutler, Presidnet

**COMPANY**
SANFORD, LLC
By:   Highland Construction Management Services, L.P.,
     Member and Manager

    By: _____
      Joseph L. Banc, General Partner

By:   Garrett Development Corporation, Manager

By _____
    Andrew S. Garrett, President

A-3

Guyant IRA
0091

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**76**

EXHIBIT "A"
to the
OPERATING AGREEMENT of SANFORD, LLC
effective as of *April 5th*, 2004

MEMBERS

| Members | Membership Interest In the LLC | Initial Capital Contributions |
|---|---|---|
| Highland Construction Management Services, L.P. | 25.0000% | $131,724 |
| Foothills, LLC | 24.0000% | $126,658 |
| Andrew S. Garrett, Inc. | 22.4940% | $937,719 |
| Colorado Coronado, LLC | 20.4940% | $937,719 |
| MJC Ventures L.C. | 4.0060% | $225,000 |
| Jerome O. Guyant IRA | 4.0060% | $225,000 |
| TOTAL | 100.00% | $2,583,820 |

A-4

Guyant IRA
0092

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

77

### THIRD AMENDMENT TO
### OPERATING AGREEMENT
### of
### SANFORD, LLC

This Third Amendment (this "Third Amendment") to the Operating Agreement of Sanford, LLC, a Virginia limited liability company (the "LLC"), is made effective as of May 1ST, 2004 (the "Effective Date") by and among the LLC, Highland Construction Management Services, L.P. ("Highland"), Foothills, LLC ("Foothills"), Andrew S. Garrett, Inc., a Virginia corporation ("ASG, Inc."), Colorado Coronado, LLC, a Colorado limited liability company ("Colorado Coronado"), Jerome O. Guyant IRA ("Guyant IRA"), MJC Ventures LLC, a Virginia limited liability company ("MJC") and Miriam Cutler (Cutler). Highland, Foothills, ASG, Colorado, Guyant IRA and MJC are presently all of the members in the LLC (the "Members").

### RECITALS

A. The LLC was organized pursuant to Articles of Organization filed with the Virginia State Corporation Commission on October 3, 2001. The Members of the LLC adopted an operating agreement made effective as of October 15, 2002, as amended by that certain Amendment to Operating Agreement dated November 1, 2002 (collectively, the "Operating Agreement").

B. On April 4, 2004, the Operating Agreement was amended to transfer one percent (1%) of the interest of Highland and one percent (1%) of the interest of Foothills to ASG, Inc.

C. Highland now desires to transfer a portion of its membership to Guyant IRA and to Miriam Cutler, who will be admitted as a new member of the Company.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and the Company agree as follows:

1.      In exchange for a payment by Guyant IRA to Highland of $159,000 and a payment by Cutler to Highland of $159,000, receipt of which is hereby acknowledged by Highland, Highland hereby (A) assigns and transfers 2.5% of his membership interest in the LLC to Guyant IRA, (B) assigns and transfers to Guyant IRA the right under Section 5.1(b)(iii), as amended below, to be paid, prior to Profit Distributions, the unrecovered capital contribution amount of $65,862, (C) assigns and transfers to Guyant IRA the right under Section Section 5.1 (b)(ii), as amended below, to be paid a Preferred Return of 12% on the unrecovered capital contribution amount of $65,862 from the date of such contribution by Highland, (D) assigns and transfers 2.5% of his membership interest in the LLC to Cutler, (E) assigns and transfers to Cutler the right under Section 5.1(b)(iii), as amended below, to be paid, prior to Profit Distributions, the unrecovered capital contribution amount of $65,862, (F) assigns and transfers to Cutler the right under Section Section 5.1 (b)(ii), as amended below, to be paid a Preferred Return of 12% on the unrecovered capital contribution amount of $65,862 from the date of such contribution by Highland. The Members confirm that they have each approved and do each hereby approve such assignments and transfers by Highland. Accordingly, as of the Effective Date, the Membership Interests in the LLC are revised as follows: (a) Highland is decreased by five percent (5%) from twenty-five percent (25%) to twenty percent (20%), (b) Guyant IRA is increased by 2.5% to 6.056%, and (c) Cutler is admitted as a new member with an interest of 2.5%. The Membership Interests of all of the Members in the LLC in effect on the Effective Date are shown on the revised Exhibit A to the Operating Agreement, which is attached hereto.

2.      Section 5.1 (b) (i), (ii) and (iii) are hereby amended and restated to read as follows:

Guyant IRA
0093
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**78**

(i) First, except for the loans described in (iii) below, toward repayment of outstanding principal and interest on all loans, if any, made by Members pro rata to the LLC;

(ii) Second, pro rata toward the payment of a Preferred Return to Members in the amount of twelve percent (12%) per annum on their respective unrecovered capital contributions, such Preferred Return to be calculated in each case from the date that the unrecovered contribution was made to the LLC by the contributing Member.

(iii) Third, pro rata toward (A) the repayment of the unrecovered capital contributions made by the Members, and (B) the repayment of amounts loaned by Highland to the LLC after the date of this Third Amendment and prior to the sale of the Wright Property to enable the LLC to obtain bank financing which will retire acquisition financing for the Wright Property. Notwithstanding the foregoing, the Members agree that the loan by Highland described in this Section 5.1(b)(iii) above will only be entitled to repayment at the time of the LLC's distribution hereunder of Wright Property sales proceeds, and that from the distribution owed to Highland of Wright Property sales proceeds under this Section 5.1(b)(iii), Highland will pay $84,138 plus a 12% preferred return (calculated from May 3, 2004 to the date of distribution) to Guyant IRA and $84,138 plus a 12% preferred return (calculated from May 3, 2004 to the date of distribution) to Cutler.

(iv) Fourth, pro rata to Members in accordance with their respective membership interests (the "Profit Distributions").

2.    By signing this Third Amendment, the Members waive any right they might have under Section VIII to buy the 5% interest herein being transferred by Highland to Guyant IRA and Cutler, and they hereby accept Cutler as a new and substitute Member with all the powers, rights and privileges of a Member under the Operating Agreement. Cutler hereby agrees to be bound by all the terms and conditions of the Operating Agreement as hereby amended.

3.    All other terms and provisions of the Operating Agreement not inconsistent herewith are reaffirmed.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

MEMBERS:
Highland Construction Management Services, L.P.

By: _____
    Joseph L. Bane, Jr., General Partner

Foothills LLC

By: _____
    Joseph L. Bane, Jr., Operating Manager

Andrew S. Garrett, Inc.

Guyant IRA
0094

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

MAY 1 2 2004

By:_____
    Andrew S. Garrett, President

Colorado Coronado, LLC

By:_____
    Christian G. Waller, Managing Member

Jerome O. Guyant IRA

By:_____
    Name: JEROME O GUYANT
    Title:_____

MJC Ventures LC
By: Cutler Development Corporation

        By:_____
            Miriam Cutler, President


        Miriam J. Cutler

        _____



COMPANY
SANFORD, LLC
By:    Highland Construction Management Services, L.P.
       Member and Manager

        By:_____
            Joseph L. Bane, General Partner

By:    Garrett Development Corporation, Manager

        By:_____
            Andrew S. Garrett, President

Guyant IRA
0095
Guyant IRA Memo in Opp to Highland Objection to Claim
                                        Exhibit 5

**80**

By: _____
        Andrew S. Garrett, President

Colorado Coronado, LLC

By: _____
        Christian G. Waller, Managing Member

Jerome O. Guyant IRA

By: _____
        Name: _____
        Title: _____

MJC Ventures LC
By: Cutler Development Corporation

        By _____
                Miriam Cutler, President

Miriam J. Cutler

_____

COMPANY
SANFORD, LLC
By:    Highland Construction Management Services, L.P.
        Member and Manager

        By _____
                Joseph L. Bane, General Partner

By:    Garrett Development Corporation, Manager

        By: _____
                Andrew S. Garrett, President

Guyant IRA
0096

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**81**

EXHIBIT "A"

THIRD AMENDMENT to the
OPERATING AGREEMENT of SANFORD, LLC

| MEMBERS: | Membership Interest In the LLC | Unrecovered Capital Contributions |
|---|---|---|
| Highland Construction Management Services, L.P. | 20.0000% | $    -0- |
| Foothills, LLC | 24.000% | $   126,658 |
| Andrew S. Garrett, Inc. | 22.4940% | $   937,719 |
| Colorado Coronado, LLC | 20.4940% | $   937,719 |
| MJC Ventures L.C. | 4.0060% | $   225,000 |
| Miriam Cutler | 2.5000% | $    65,862 |
| Jerome O. Guyant IRA | 6.5060% | $   290,862 |
| TOTAL | 100.00% | $2,583,820 |

Guyant IRA
0097
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**82**

Case 11-11413-RGM    Doc 109-1    Filed 12/12/12    Entered 12/12/12 15:47:28    Desc
Exhibit(s)    Page 45 of 65

## FOURTH AMENDMENT to
## OPERATING AGREEMENT of SANFORD, LLC

This Fourth Amendment (this "Fourth Amendment") to the Operating Agreement of Sanford, LLC, a Virginia limited liability company (the "LLC"), is made effective October ____, 2005 (the "Effective Date") by and among the LLC, Highland Construction Management Services, L.P. ("Highland"), Foothills, LLC ("Foothills"), Andrew S. Garrett, Inc., a Virginia corporation ("ASG, Inc."), Colorado Coronado, LLC, a Colorado limited liability company ("Colorado Coronado"), Jerome O. Guyant IRA ("Guyant IRA"), MJC Ventures LC, a Virginia limited liability company ("MJC") and Miriam Cutler (Cutler). Highland, Foothills, ASG, Colorado, Guyant IRA and MJC are presently the members of the LLC (collectively, the "Members").

### RECITALS

A. The LLC was organized pursuant to Articles of Organization filed with the Virginia State Corporation Commission on October 3, 2001. The Members of the LLC adopted an operating agreement (the "Operating Agreement") made effective as of October 15, 2002 (the "Effective Date"), as amended by that certain Amendment to Operating Agreement dated November 1, 2002, that certain Second Amendment to Operating Agreement dated April 5, 2004 and that certain Third Amendment to Operating Agreement dated May 1, 2004 (collectively, the "Operating Agreement").

B. Although Exhibit "A" to the Third Amendment to Operating Agreement of Sanford, LLC (the "Third Amendment") properly establishes the Jerome O. Guyant IRA as holding a 6.5060% membership interest in the LLC, Provision 1 on the first page of the Third Amendment improperly states "(the) Guyant IRA is increased by 2.5% to 6.056%" and the Members now desire to correct this error.

C. Garrett Development Corporation ("GDC"), an affiliate by ownership of ASG, Inc., since shortly after the effective date of the Operating Agreement, has been performing many of the asset management, marketing and sale responsibilities originally agreed to by the parties and designated by the Operating Agreement to be performed by Highland.

D. The Members now desire to provide GDC a management fee in order to compensate GDC for these responsibilities that GDC now performs.

E. Although the Members will retain the authority to vote for and decide on decisions regarding the buying and selling of property, such as pricing and to whom to sell, the Members desire to vest authority to manage the process of negotiating, finalizing and executing contracts, agreements and other documents to purchase, sell or (re)finance property with Christian G. Waller and Andrew S. Garrett.

F. The Members desire to limit the expenditure authority of any of the Managers to a reasonable limit.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and the Company agree as follows:

1. Provision 1 of the Third Amendment is hereby modified to state "Guyant IRA is increased by 2.5% to 6.506%."

Guyant IRA Memo in Opp to Highland Objection to Claim
Guyant IRA 00303
Exhibit 5

**83**

2.    The Operating Agreement is hereby modified to reassign certain functions and responsibilities from Highland to GDC, in addition to the accounting and tax return functions already performed by GDC, including the following reassigned administrative and asset management functions: (i) maintaining an office for the LLC; (ii) coordinating legal efforts; (iii) financial forecasting and budgeting; (iv) arranging and organizing partner meetings; and (v) marketing, contract negotiation and coordination of the sales process for properties; as compensation for performance of these responsibilities, upon liquidation of the assets of the LLC, the LLC will pay GDC an annual management fee of $200,000 (the "GDC Management Fee") to be paid retroactive from the date one year following the Effective Date of the Operating Agreement (October 15, 2002, thus making the retroactive date October 15, 2003) and pro rated on a daily basis, as well as pro rated according to the remaining acreage of property held by the LLC (i.e., subsequent to the sale of the Lucketts Property only, the GDC Management Fee would be reduced to 85.5% [(698 total acres – 101 acres of Lucketts Property)/698 total acres] of its original amount).

3.    Highland will continue to be responsible for the following functions and responsibilities: (i) identification of prospective properties for acquisition, (ii) coordination of due diligence review of prospective properties for acquisition, including property studies and title, (iii) coordination and communication with contractors, including engineers, environmental consultants, soils consultants, etc.; (iv) coordination and communication with sellers of property to Sanford; (v) coordination of the entitlement process for owned or contracted properties; (vi) coordination with and timely provision of appropriate information to GDC personnel for administrative, accounting and budgeting purposes, (vii) maintaining necessary communications with municipal and County personnel, and (viii) property management functions, including timber management, maintenance of buildings and coordination of tax payments, as well as other functions typical of proper management of land assets.

4.    The priority for payment of the GDC Management Fee will be junior in priority to payments to trade creditors, bank loans to the LLC and loans to the LLC from Members but senior in priority to the Garrett Credit Enhancement Fee, while the priority for payment of the Garrett Credit Enhancement Fee will be junior to the GDC Management Fee but senior to payments of Preferred Return and Profits Distributions to Members.

5.    Although the Members will retain the authority to vote for and decide on decisions regarding the financing, buying and selling of property, such as loan terms, pricing and to whom to sell, the LLC hereby vests sole authority to manage the process of negotiating, finalizing and executing (a) contracts and agreements to purchase or sell property, (b) loan documents to finance or refinance acquisition and development loans for properties currently owned or to be acquired by the LLC, and (c) any amendments or modifications to either of the items in (a) or (b) above, with Christian G. Waller and Andrew S. Garrett, as officers of GDC, a Manager of the LLC.

6.    The following cash and expense control operating procedures will be implemented: (i) all operating and capital expenditures of the LLC will be included in an operating and capital budget generated and approved by the Managers, (ii) no individual Member will have authority to bind the LLC for any contracts or incur expenses in the name of the LLC, and (iii) any contract ratification or expense amount of $5,000 or more will require the approval of both Managers.

7.    Any Member that is 30 days or more delinquent in funding a cash call for the LLC or its subsidiary LLC's will have the voting rights of the Member pertaining to decisions or actions of the LLC suspended until such time as all of its delinquent cash calls are paid in full. Additionally, an interest rate of 15 percent will be assessed on the outstanding balance of the cash call from such date 30 days following delinquency until the amount is paid by the Member.

**84**

8.      References to Sanford or the LLC shall include the parent company and its
subsidiaries.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as
of the date first written above.

MEMBERS:
Highland Construction Management Services, L.P.

By: _____
        Joseph L. Bane, Jr., General Partner

Foothills, LLC

By: _____
        Joseph L. Bane, Jr., Operating Manager

Andrew S. Garrett, Inc.

By: _____
        Andrew S. Garrett, President

Colorado Coronado, LLC

By: _____
        Christian G. Waller, Managing Member

Jerome O. Guyant IRA

By: _____
Name: Jerome O. Guyant,

MJC Ventures LC
By: Cutler Development Corporation

        By: _____
                Miriam Cutler, President

        Miriam J. Cutler

        _____

COMPANY:    SANFORD, LLC
By: Highland Construction Management Services, L.P.
        Member and Manager

By: _____
        Joseph L. Bane, General Partner

By: Garrett Development Corporation, Manager

By: _____
        Andrew S. Garrett, President



# GARRETT DEVELOPMENT
## C O R P O R A T I O N
P.O. Box 2648
Stafford, Virginia 22555

---

### *CONFIDENTIALITY NOTICE*

This transmission is privileged and confidential, and intended solely for use by the
addressee(s) named below. If you are not an addressee, or an authorized agent/ employee
of an addressee, be advised that any dissemination, distribution, copying or reliance upon
the information within this transmission is strictly prohibited. If you received this
transmission in error, please call us at (540) 659-6172. Thank you.

---

PLEASE DELIVER IMMEDIATELY:        DATE: _10/19/05_

TO: _Dasha_        FAX NO: _301·280·3609_

FROM: _Sandy_        Phone: (540) 659-6172
        Fax: (540) 659-3449

_4_ TOTAL PAGES (includes this sheet)

SUBJECT: _Sanford 4th Amendment_

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

_Please find attached the fourth amendment_
_to the operating agreement for Sanford LLC_

Guyant IRA
0101
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**86**

Case 11-11413-RGM   Doc 109-1   Filed 12/12/12   Entered 12/12/12 15:47:28   Desc
Exhibit(s)    Page 49 of 65

```
*********************************
***     ACTIVITY REPORT     ***
*********************************
```

| ST. TIME | CONNECTION TEL/ID | SENDER NAME | NO. | MODE | | PGS. | RESULT | |
|---|---|---|---|---|---|---|---|---|
| *10/14 16:38 | 540 898 7931 | | 6534 | AUTO RX | ECM | 1 | OK | 00'31 |
| *10/14 16:42 | 5406584599 | | 6535 | AUTO RX | ECM | 1 | OK | 00'33 |
| *10/14 17:02 | 93713479 | | 0858 | TRANSMIT | ECM | 5 | OK | 01'10 |
| *10/14 18:24 | 7038419873 | | 0859 | MANUAL TX | ECM | 2 | OK | 00'38 |
| *10/17 08:50 | 540 898 7931 | | 6536 | AUTO RX | ECM | 3 | OK | 00'59 |
| *10/17 08:56 | 97036419873 | | 0860 | TRANSMIT | ECM | 3 | OK | 00'43 |
| *10/17 08:58 | 97037926461 | | 0861 | TRANSMIT | ECM | 1 | OK | 00'28 |
| *10/17 09:00 | 96584003 | | 0862 | TRANSMIT | ECM | 1 | OK | 01'17 |
| *10/17 09:07 | | | 6537 | AUTO RX | ECM | 1 | OK | 00'57 |
| *10/17 09:13 | 7038419873 | | 6538 | AUTO RX | ECM | 1 | OK | 00'20 |
| *10/17 09:14 | 7038419873 | | 6539 | AUTO RX | ECM | 4 | OK | 00'43 |
| *10/17 09:51 | | | 6540 | AUTO RX | ECM | 3 | OK | 00'54 |
| *10/17 09:58 | 912524492819 | | 0863 | TRANSMIT | ECM | 2 | OK | 00'32 |
| *10/17 13:53 | 97038419873 | | 0864 | TRANSMIT | ECM | 4 | OK | 00'59 |
| *10/17 15:16 | 540 898 7931 | | 6541 | AUTO RX | ECM | 3 | OK | 01'05 |
| *10/17 15:28 | | | 6542 | AUTO RX | ECM | 2 | OK | 00'39 |
| *10/17 15:28 | 97038419873 | | 0865 | TRANSMIT | ECM | 1 | OK | 00'24 |
| *10/17 15:34 | 918045001016 | | 0866 | TRANSMIT | ECM | 2 | OK | 00'31 |
| *10/17 16:30 | 703 787 8979 | | 6543 | AUTO RX | ECM | 2 | OK | 00'38 |
| *10/17 16:38 | 540 288 9381 | | 6544 | AUTO RX | ECM | 2 | OK | 03'08 |
| *10/17 23:17 | 225239041 | | 6545 | AUTO RX | G3 | 1 | OK | 01'12 |
| *10/18 01:56 | | | 6546 | AUTO RX | ECM | 1 | OK | 00'29 |
| *10/18 09:47 | 7037717424 | | 6547 | AUTO RX | ECM | 2 | OK | 00'35 |
| *10/18 10:08 | 3 | | 6548 | AUTO RX | ECM | 3 | OK | 00'34 |
| 10/18 10:39 | L-AND-F NEW HOME | | 6549 | AUTO RX | ECM | 1 | OK | 00'19 |
| | 7032930090 | | | | | | | |
| *10/18 11:04 | 4107983057 | | 6550 | AUTO RX | ECM | 1 | OK | 00'30 |
| *10/18 11:31 | 97035008019 | | 0867 | TRANSMIT | ECM | 24 | OK | 06'39 |
| *10/18 11:48 | 540 898 7931 | | 6551 | AUTO RX | ECM | 1 | OK | 00'30 |
| *10/18 11:51 | | | 6552 | AUTO RX | G3 | 2 | OK | 01'23 |
| 10/18 12:17 | 7038419873 | | 6553 | AUTO RX | ECM | 1 | OK | 00'21 |
| 10/18 12:24 | 7038419873 | | 6554 | AUTO RX | ECM | 5 | OK | 00'54 |
| 10/18 13:32 | 5406506565 | | 6555 | AUTO RX | ECM | 1 | OK | 01'08 |
| 10/18 15:10 | 804+833+9021 | | 6556 | AUTO RX | ECM | 2 | OK | 00'25 |
| 10/18 15:49 | 540 898 7931 | | 6557 | AUTO RX | ECM | 2 | OK | 00'50 |
| 10/18 17:09 | 5406584599 | | 6558 | AUTO RX | ECM | 1 | OK | 00'33 |
| 10/18 17:10 | 96586824 | | 0868 | TRANSMIT | ECM | 3 | OK | 00'43 |
| 10/19 09:38 | | | 6559 | AUTO RX | ECM | 22 | OK | 06'40 |
| 10/19 09:47 | 7038419873 | | 6560 | AUTO RX | ECM | 3 | OK | 00'33 |
| 10/19 09:58 | 913012803809 | | 0869 | TRANSMIT | G3 | 4 | OK | 04'14 |
| 10/19 10:12 | 7038419873 | | 6561 | AUTO RX | ECM | 3 | OK | 00'33 |

Guyant IRA
0102
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**87**

## FOURTH AMENDMENT to
## OPERATING AGREEMENT of SANFORD, LLC

This Fourth Amendment (this "Fourth Amendment") to the Operating Agreement of Sanford, LLC, a Virginia limited liability company (the "LLC"), is made effective October _14th_ 2005 (the "Effective Date") by and among the LLC, Highland Construction Management Services, L.P. ("Highland"), Foothills, LLC ("Foothills"), Andrew S. Garrett, Inc., a Virginia corporation ("ASG, Inc."), Colorado Coronado, LLC, a Colorado limited liability company ("Colorado Coronado"), Jerome O. Guyant IRA ("Guyant IRA"), MJC Ventures LC, a Virginia limited liability company ("MJC") and Miriam Cutler (Cutler).  Highland, Foothills, ASG, Colorado, Guyant IRA and MJC are presently the members of the LLC (collectively, the "Members").

### RECITALS

A.  The LLC was organized pursuant to Articles of Organization filed with the Virginia State Corporation Commission on October 3, 2001.  The Members of the LLC adopted an operating agreement (the "Operating Agreement") made effective as of October 15, 2002 (the "Effective Date"), as amended by that certain Amendment to Operating Agreement dated November 1, 2002, that certain Second Amendment to Operating Agreement dated April 5, 2004 and that certain Third Amendment to Operating Agreement dated May 1, 2004 (collectively, the "Operating Agreement").

B.  Although Exhibit "A" to the Third Amendment to Operating Agreement of Sanford, LLC (the "Third Amendment") properly establishes the Jerome O. Guyant IRA as holding a 6.5060% membership interest in the LLC, Provision 1 on the first page of the Third Amendment improperly states "(the) Guyant IRA is increased by 2.5% to 6.056%" and the Members now desire to correct this error.

C.  Garrett Development Corporation ("GDC"), an affiliate by ownership of ASG, Inc., since shortly after the effective date of the Operating Agreement, has been performing many of the asset management, marketing and sale responsibilities originally agreed to by the parties and designated by the Operating Agreement to be performed by Highland.

D.  The Members now desire to provide GDC a management fee in order to compensate GDC for these responsibilities that GDC now performs.

E.  Although the Members will retain the authority to vote for and decide on decisions regarding the buying and selling of property, such as pricing and to whom to sell, the Members desire to vest authority to manage the process of negotiating, finalizing and executing contracts, agreements and other documents to purchase, sell or (re)finance property with Christian G. Waller and Andrew S. Garrett.

F.  The Members desire to limit the expenditure authority of any of the Managers to a reasonable limit.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and the Company agree as follows:

1.    Provision 1 of the Third Amendment is hereby modified to state "Guyant IRA is increased by 2.5% to 6.506%."

Guyant IRA

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**88**

2.    The Operating Agreement is hereby modified to reassign certain functions and responsibilities from Highland to GDC, in addition to the accounting and tax return functions already performed by GDC, including the following reassigned administrative and asset management functions: (i) maintaining an office for the LLC; (ii) coordinating legal efforts; (iii) financial forecasting and budgeting; (iv) arranging and organizing partner meetings; and (v) marketing, contract negotiation and coordination of the sales process for properties; as compensation for performance of these responsibilities, upon liquidation of the assets of the LLC, the LLC will pay GDC an annual management fee of $200,000 (the "GDC Management Fee") to be paid retroactive from the date one year following the Effective Date of the Operating Agreement (October 15, 2002, thus making the retroactive date October 15, 2003) and pro rated on a daily basis, as well as pro rated according to the remaining acreage of property held by the LLC (i.e., subsequent to the sale of the Lucketts Property only, the GDC Management Fee would be reduced to 85.5% [(698 total acres – 101acres of Lucketts Property)/698 total acres] of its original amount).

3.    Highland will continue to be responsible for the following functions and responsibilities: (i) identification of prospective properties for acquisition, (ii) coordination of due diligence review of prospective properties for acquisition, including property studies and title, (iii) coordination and communication with contractors, including engineers, environmental consultants, soils consultants, etc.; (iv) coordination and communication with sellers of property to Sanford; (v) coordination of the entitlement process for owned or contracted properties; (vi) coordination with and timely provision of appropriate information to GDC personnel for administrative, accounting and budgeting purposes, (vii) maintaining necessary communications with municipal and County personnel, and (viii) property management functions, including timber management, maintenance of buildings and coordination of tax payments, as well as other functions typical of proper management of land assets.

4.    The priority for payment of the GDC Management Fee will be junior in priority to payments to trade creditors, bank loans to the LLC and loans to the LLC from Members but senior in priority to the Garrett Credit Enhancement Fee, while the priority for payment of the Garrett Credit Enhancement Fee will be junior to the GDC Management Fee but senior to payments of Preferred Return and Profits Distributions to Members.

5.    Although the Members will retain the authority to vote for and decide on decisions regarding the financing, buying and selling of property, such as loan terms, pricing and to whom to sell, the LLC hereby vests sole authority to manage the process of negotiating, finalizing and executing (a) contracts and agreements to purchase or sell property, (b) loan documents to finance or refinance acquisition and development loans for properties currently owned or to be acquired by the LLC, and (c) any amendments or modifications to either of the items in (a) or (b) above, with Christian G. Waller and Andrew S. Garrett, as officers of GDC, a Manager of the LLC.

6.    The following cash and expense control operating procedures will be implemented: (i) all operating and capital expenditures of the LLC will be included in an operating and capital budget generated and approved by the Managers, (ii) no individual Member will have authority to bind the LLC for any contracts or incur expenses in the name of the LLC, and (iii) any contract ratification or expense amount of $5,000 or more will require the approval of both Managers.

7.    Any Member that is 30 days or more delinquent in funding a cash call for the LLC or its subsidiary LLC's will have the voting rights of the Member pertaining to decisions or actions of the LLC suspended until such time as all of its delinquent cash calls are paid in full. Additionally, an interest rate of 15 percent will be assessed on the outstanding balance of the cash call from such date 30 days following delinquency until the amount is paid by the Member.

**89**

8.    References to Sanford or the LLC shall include the parent company and its subsidiaries.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

**MEMBERS:**

Highland Construction Management Services, L.P.

By: _____

Joseph L. Bane, Jr., General Partner

Foothills, LLC

By: _____

Joseph L. Bane, Jr., Operating Manager

Andrew S. Garrett, Inc.

By: _____

Andrew S. Garrett, President

Colorado Coronado, LLC

By: _____

Christian G. Waller, Managing Member

Jerome O. Guyant IRA

By: _____

Name: Jerome O. Guyant,

MJC Ventures, LC

By: Cutler Development Corporation

By: _____

Miriam Cutler, President

Miriam J. Cutler

_____

**COMPANY:    SANFORD, LLC**

By:  Highland Construction Management Services, L.P.
Member and Manager

By: _____

Joseph L. Bane, General Partner

By: Garrett Development Corporation, Manager

By: _____

Andrew S. Garrett, President

Guyant IRA
0105

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**90**

## FIFTH AMENDMENT to
## OPERATING AGREEMENT of SANFORD, LLC

This Fifth Amendment (this "Fifth Amendment") to the Operating Agreement of Sanford, LLC, a Virginia limited liability company (the "LLC"), is made effective January 1, 2008 (the "Effective Date") by and among the LLC, Highland Construction Management Services, L.P., a Virginia limited partnership ("Highland"), Foothills, LLC, a Virginia limited liability company ("Foothills"), Andrew S. Garrett, Inc., a Virginia corporation ("ASG, Inc."), Colorado Coronado, LLC, a Colorado limited liability company ("Colorado Coronado"), Jerome O. Guyant IRA ("Guyant IRA"), MJC Ventures LC, a Virginia limited liability company ("MJC"), and Miriam J. Cutler ("Cutler"). Highland, Foothills, ASG, Colorado, Guyant IRA, MJC and Cutler are presently the members of the LLC (collectively, the "Members").

### RECITALS

A.   The LLC was organized pursuant to Articles of Organization filed with the Virginia State Corporation Commission on October 3, 2001. The members of the LLC adopted an Operating Agreement made effective as of October 15, 2002 as amended by that certain (i) Amendment to Operating Agreement dated November 1, 2002, (ii) Second Amendment to Operating Agreement dated April 5, 2004, (iii) Third Amendment to Operating Agreement dated May 1, 2004, and (iv) Fourth Amendment to Operating Agreement dated October 14, 2005 (collectively, the "Operating Agreement").

B.   The Members desire to amend the Operating Agreement and to take such other actions as are set forth in this Fifth Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members and the LLC agree as follows:

1.      Recitals.  The foregoing recitals are by this reference incorporated into and made a substantive part of this Fifth Amendment as though set forth herein.

2.      Definitions.  Capitalized terms not defined in this Fifth Amendment shall have the meaning given to them by the Operating Agreement. The term "Agreement" as set forth in the Operating Agreement is amended to mean and include the Operating Agreement and the Fifth Amendment.

3.      Amendments to the Operating Agreement.  Pursuant to and in accordance with the provisions of Section 10.2 of the Operating Agreement, the Operating Agreement is amended as follows:

Section 4.1 – Capital Contributions.  The Members acknowledge and agree that, pursuant to Section 4.1 of the Operating Agreement, Highland is responsible for funding all operating and/or soft costs of the LLC over and above the total amount of deposits and soft costs amount of $2,583,820. However, the Members also acknowledge the possibility that Highland may default in satisfying its funding obligations under said Section 4.1 of the Operating Agreement and desire to provide for such possibility by amending the first paragraph of said Section 4.1. Accordingly, the Members agree that the entire first paragraph of Section 4.1 of the Operating Agreement is hereby deleted and the following is substituted in its place and stead:

The Members agree that each Member's initial capital contribution and ownership interest in the LLC shall be determined as set forth herein and on "Exhibit A" attached hereto. There is no provision in this Agreement to allow Managers to issue Capital Calls provided, however, the Company shall make Capital Calls on Highland pursuant to Highland's

1

**91**

responsibility for all operating and/or other soft costs of the LLC over and above the total amount of deposits and soft costs amount of $2,583,820. No action or prior action of any Member in making any contribution to the Company shall in any way be deemed to constitute a waiver of the foregoing provision that the Managers may not issue Capital Calls to any Member other than Capital Calls on Highland as described above.

New Section 4.1A – Delinquency in Making Capital Contributions – The following new Section 4.1A is added to the Operating Agreement immediately following the existing Section 4.1.

4.1A Delinquency in Making Capital Contributions. If Highland fails to timely and fully pay all operating and/or other soft costs of the LLC over and above the total amount of deposits and soft costs amount of $2,583,820 (each such failure by Highland is herein referred to as a "Delinquent Contribution"), then, until such failure is cured, Highland shall have no right to participate in the management or operation of the LLC and shall be considered and treated as a Delinquent Member. Upon the occurrence of such a delinquency, the Manager other than Highland shall notify all Members of such delinquency and may elect to pursue any one or more of the following remedies:

(a)    Cause the LLC to pursue whatever legal or equitable remedies are available to it against Highland, including, without limitation, the institution of a suit or suits at law or in equity, and in such event Highland shall compensate the LLC and all other Members for all costs incurred and damages suffered by any of them by reason of such failure or delinquency, including reasonable attorneys' fees and expenses;

(b)    Reduce Highland's percentage of Membership Interest by one and one-half percent (1.5%) for each percentage point of the Net Worth of the Company represented by the dollar amount of Highland's Delinquent Contribution. For purposes of this Section 4.1A, (i) the Net Worth of the Company shall be determined as of the date of Highland's Delinquent Contribution and shall be equal to the result obtained by subtracting the total liabilities of the Company as of such date from the fair market value of the Company's assets as of such date; provided, however, the Net Worth of the Company shall not be less than zero dollars ($0.00), (ii) the number of percentage point(s) of the Net Worth of the Company represented by the dollar amount of Highland's Delinquent Contribution shall be equal to the quotient derived by dividing (1) the dollar amount of Highland's Delinquent Contribution by (2) the Net Worth of the Company, and (iii) the Naet Wworth equity of the Company; (i.e., equivalent to the result obtained by subtracting the total liabilities of the Company from the fair market value of the Company's assets less liabilities;) as of July 1, 2008, is $7,157,817; such Net Worthfair market value shall continue to apply for purposes of this Section 4.1A unless and until an adjusted Net Worthfair market value is agreed upon by Members holding a majority of the Membership Interests. The Company shall reallocate such reduction in Highland's

2

Guyant IRA
0107
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

percentage of Membership Interest to the other Members in proportion to
their percentages of Membership Interest;

        (c)      Permit any of the Members other than Highland
to advance all or any portion of Highland's Delinquent Contribution to
the LLC and treat such advance as a demand loan (a "Delinquency
Loan") to Highland. Each Delinquency Loan shall be evidenced by
Highland's promissory note substantially in the form of Exhibit A
attached (each such promissory note is referred to in this Agreement as a
"Delinquency Note"), which Delinquency Note shall (i) be dated as of
the date the other Member advances all or any portion of the Delinquent
Contribution to the LLC, (ii) bear interest at the compounded annual rate
of fifteen percent (15%), (iii) provide for the payment of principal and
interest on demand, and (iv) be secured by the entire interest in the LLC
of Highland. Highland hereby makes, constitutes and appoints GDC its
true and lawful attorney-in-fact to act for it and in its name, place and
stead and for its use and benefit to prepare, sign and acknowledge, swear
to, file and record the Delinquency Note and all security agreements,
pledge agreements, financing statements and other instruments necessary
or appropriate to evidence and perfect security for the Delinquency Loan.
If more than one of the other Members desires to advance Highland's
Delinquent Contribution, such other Members shall be entitled to make
such advances in proportion to their respective percentages of
Membership Interest (or as they may otherwise agree). Thereafter, all
amounts distributable or payable by the LLC to Highland shall be paid to
the other Members who have advanced funds to Highland as
Delinquency Loan(s) until all such Delinquency Loan(s), plus interest
thereon, are paid in full. All such payments shall be apportioned among
the holders of all Delinquency Loans in proportion to the relative
principal amounts, plus interest, owing to each thereunder (or as they
may otherwise agree); and

        (d)      Permit any of the other Members to make
Highland's Delinquent Contribution. If one or more other Members is
willing to make Highland's Delinquent Contribution, such Members
shall be entitled to make such Delinquent Contributions in proportion to
their respective percentages of Membership Interest (or as otherwise
agreed). If the other Members make all or any portion of Highland's
Delinquent Contribution, Highland's percentage of Membership Interest
shall be reduced by the number of percentage points equal to the product
of (i) 150%, and (ii) the number of percentage points of the Net Worth of
the Company represented by the dollar amount of Highland's Delinquent
Contribution. Any such reduction in Highland's percentage of
Membership Interest shall be reallocated to the other Members who
make the Delinquent Contribution in proportion to the manner in which
they made such contribution.

Neither the LLC nor any Member shall be entitled to recover more than
the delinquent capital contribution, interest thereon, and damages and
expenses suffered or incurred by the LLC and/or the Member in
connection with or as a result of the failure of any Member to make any
required capital contribution.

3

Guyant IRA
0108

4.    <u>Contributions to LLC.</u> Exhibit Members acknowledge and agree that, in response to Capital Call made and issued by all Members during January 2008, the following Members have contributed cash to the LLC during 2008 in the amounts set forth below.

| Member | Amount of Contribution |
|--------|------------------------|
| Colorado Coronado, LLC | $56,359.00 |
| Andrew S. Garrett, Inc. | $61,859.00 |
| MJC Ventures LC | $11,016.50 |
| Miriam J. Cutler | $6,875.00 |
| Jerome O. Guyant IRA | $17,982.00 |
| Foothills, LLC | $65,000.00 |
| Highland Construction Management Services, L.P. | $55,000.00 |

5.    <u>Continuance of the Operating Agreement.</u>  Except as expressly amended by this Fifth Amendment, the Operating Agreement shall continue in full force and effect.

IN WITNESS HEREOF, the undersigned have caused this Agreement to be executed as of the date first written above.

MEMBERS:

Highland Construction Management Services, L.P.

By:_____
        Joseph L. Bane, Jr., General Partner

Foothills, LLC

By:_____
        Joseph L. Bane, Jr., Operating Manager

Andrew S. Garrett, Inc.

By:_____
        Andrew S. Garrett, President

Colorado Coronado, LLC

By:_____
        Christian G. Waller, Managing Member

Jerome O. Guyant IRA

By:_____
Name:  Jerome O Guyant, _____

4

Guyant IRA
0109
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

MJC Ventures LC

By:_____
      Stephanie Cutler, Managing Member

Miriam J. Cutler

_____

**COMPANY:  SANFORD, LLC**
By:  Highland Construction Management Services, L.P.
      Member and Manager

By:_____
      Joseph L. Bane, General Partner

By:  Garrett Development Corporation, Manager

By:_____
      Andrew S. Garrett, President

5

Guyant IRA
0110
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**95**

EXHIBIT A
to the
Fifth Amendment to
Operating Agreement
of
Sanford LLC

## DELINQUENCY NOTE

NAME _____    TAX ID # _____
ADDRESS _____
_____
_____

$_____    _____, 20__

FOR VALUE RECEIVED the undersigned ("Borrower"), promises to pay to the order of
_____ ("Lender" which term shall include any holder of this Note)
without offset, at the principal office of the Lender, the principal sum of _____ Dollars
($_____), together with interest on the principal balance outstanding from time to time at the
rate provided in this Note.

INTEREST RATE. This Note shall bear interest on the principal balance outstanding from time
to time, from the date of this Note until paid in full, at the compounded annual rate of fifteen percent
(15%). Any amount of overdue principal shall bear interest, payable on demand, for each day until paid
at a rate per annum equal to the sum of 3% plus the otherwise applicable interest rate. Interest shall be
computed on the basis of a 360 day year, counting the actual number of days elapsed.

PAYMENT TERMS. The Borrower agrees to pay this Note immediately on demand.

PREPAYMENT. The Borrower may pay the whole or any part of the outstanding indebtedness
evidenced by this Note at any time without penalty by paying the principal amount to be prepaid together
with accrued interest thereon to the date of prepayment. Any prepayment of principal shall not affect the
obligation of the Borrower to make subsequent principal payments at the times and in the amounts
required until this Note is paid in full.

DEFAULT. Each of the following events or conditions shall constitute a default ("Default")
under this Note:

(a)    the failure to make any payment of principal, interest or any other amount due under this
Note when such payment is due;

(b)    any failure by Borrower to perform or observe any warranty, covenant, or other condition
of this Note;

(c)    the merger, consolidation, reorganization, dissolution, or termination of existence of
Borrower;

(d)    the pledge, lease or other disposition of all or substantially all of the assets of Borrower;

(e)    any change, or any transaction which results or could result in a change, in the Control of
Borrower;

6

Guyant IRA
0111

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

(f)    the inability of Borrower to pay its debts as they mature, the insolvency of Borrower, the filing of a petition by or against Borrower under the provisions of any bankruptcy, reorganization, arrangement, insolvency, liquidation or similar law for relief of debtors, the appointment or application for appointment of any receiver for Borrower or the property of Borrower, the issuance or service of any attachment, levy, garnishment, tax lien or similar process against Borrower or the property of Borrower, the entry of a judgment against Borrower, or an assignment for the benefit of creditors by Borrower; or

(g)    any agreement or other document granting Lender security for the payment of this Note shall cease for any reason to be in full force and effect as such security with the priority stated to be created thereby, or the grantor of such security shall contest the validity or enforceability of the security or deny that it has any further liability or obligation under such agreement or other document

ACCELERATION.  At the option of the Lender, upon the occurrence of a Default as defined above, the full amount remaining unpaid on this Note shall become immediately due and payable without presentment, demand or notice of any kind; and the Lender may exercise any or all remedies available to it under applicable law.

ACCOUNT RECORD.  The Lender may maintain records of the dates and amounts of advances of principal and payments of principal and interest, the date to which interest has been paid, accrued interest, the unpaid principal balance, and any other account information.  Such records may be maintained unilaterally by the Lender without notice to the Borrower and shall be presumed to be correct, provided, however, any failure of the Lender to maintain such records or any error therein or in any notice hereunder shall not in any manner affect the obligation of the Borrower to pay this Note in accordance with the terms hereof.

IMMEDIATELY AVAILABLE FUNDS.  The principal of and interest on this Note shall be payable in immediately available funds in lawful money of the United States which shall be legal tender for public and private debts at the time of payment.  The making of any payment in other than immediately available funds which the Lender, at its option, elects to accept shall be subject to collection, and interest shall continue to accrue until the funds by which payment is made are available to the Lender for its use.

APPLICATION OF PAYMENTS.  Payments will be applied to interest, principal, and late charges and other charges due at the time such payments are received, in that order.  All payments shall be applied to satisfaction of scheduled payments in the order in which they become due.

WAIVER.  The Borrower (a) waives presentation, demand, protest and notice of dishonor and protest, (b) waives the benefit of its homestead exemptions as to this debt, (c) waives any right which it may have to require the Lender to proceed against any other party or any collateral given to secure the payment of this Note, and (d) agrees that, without notice to the Borrower and without affecting the liability of the Borrower, the Lender, at any time or times, may grant extensions of the time for any payment due on this Note or any other indulgence or forbearance, releases any party from the obligation to make payments on this Note, permit the renewal of this Note, or permit the substitution, exchange or release of any security for this Note.

LATE CHARGE; ATTORNEYS' FEES.  If the Borrower fails to pay any amount due under this Note within 15 days of the date due, the Borrower shall pay to the Lender on demand a late charge equal to five percent (5%) of the amount due.  The Borrower shall pay to the Lender on demand all costs incurred by the Lender, and attorneys' fees in the amount of the greater of $100 or fifteen percent (15%) of the unpaid balance of the Note, in the collection or enforcement of this Note in the event of Default, whether or not suit is brought.

7

Guyant IRA
0112
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

SET-OFF. The Lender will have the right, in addition to all other remedies permitted by law (including, without limitation, other rights of set-off), to set off the amount now or hereafter due under this Note or due under any other obligation of the Borrower to the Lender against any and all accounts, credits, money, securities, or other property now or hereafter on deposit with, held by, or in the possession of the Lender to the credit or for the account of the Borrower, without notice to or consent by the Borrower. In addition to the right of set-off, to secure the payment of this Note the Borrower assigns and grants to the Lender a security interest in all accounts, credits, money, securities, or other property now or hereafter on deposit with, held by, or in the possession of the Lender to the credit or for the account of the Borrower.

DEFINITIONS. The following terms, as used in this Note, have the following meanings:

"Control" of a Person means (a) ownership, control, or power to vote 20% or more of any class of voting securities of such Person, directly or indirectly or acting through one or more other Persons; (b) control in any manner over the election or appointment of a majority of the directors, trustees, managers or general partners (or individuals exercising similar functions) of such Person; (c) the direct or indirect power to exercise a controlling influence over the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise; or (d) conditioning in any manner the transfer of 20% or more of any class of voting securities of such Person upon the transfer of 20% or more of any class of voting securities of another Person.

"Debt" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, (d) all obligations of such Person under capital leases, (e) all non-contingent obligations of such Person to reimburse any other Person in respect of amounts paid under a letter of credit or similar instrument, (f) all obligations of others secured by a lien on any asset of such Person, whether or not any such obligation is assumed by such Person, and (g) all obligations of others guaranteed by such Person.

"Person" means any natural person, corporation (including any non-profit corporation), cooperative, company, foundation, general partnership, limited partnership, limited liability company, unlimited liability company, joint venture, estate, trust, association, organization, labor union, governmental body, custodian, nominee and any other individual or entity.

ADDITIONAL TERMS.

THE BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS NOTE, WHETHER SUCH SUIT, ACTION, PROCEEDING, OR COUNTERCLAIM IS INSTITUTED BY THE LENDER, THE BORROWER OR ANY OTHER PARTY.

The Borrower irrevocably (a) submits to the jurisdiction of any Virginia state court or federal court sitting in the Commonwealth of Virginia with respect to any suit, action, or proceeding relating to this Note, (b) waives any objection which it may now or hereafter have to the laying of venue of any such suit, action, or proceeding brought in any such court and any claim that any such suit, action, or proceeding brought in any such court has been brought in an inconvenient forum, (c) waives the right to object that any such court does not have jurisdiction over it, and (d) consents to the service of process in any such suit, action, or proceeding by the mailing of copies of such process to it by certified mail at the address indicated in this Note or at such other address of which the Lender shall have received notice. Nothing in this paragraph shall affect the Lender's right to serve process in any other manner permitted by law or to bring proceedings against the Borrower in any other court having jurisdiction. The proceeds

8

Guyant IRA
0113
Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**98**

of this Note shall be used solely to acquire or carry on a business, professional, investment, or commercial enterprise or activity.

The rights and remedies of the Lender under this Note and applicable law shall be cumulative and concurrent, and the exercise of any one or more of them shall not preclude the simultaneous or later exercise by the Lender of any or all such other rights or remedies. In the event any provision of this Note is held to be invalid, illegal, or unenforceable for any reason, then such provision only shall be deemed null and void and shall not affect any other provisions of this Note, which shall remain effective. No modification or waiver of any provision of this Note shall be effective unless it is in writing and signed by the Lender, and any such waiver shall be effective only in the specific instance and for the specific purpose for which it is given. The failure of the Lender to exercise its option to accelerate this Note as provided above, or to exercise any other option, right or remedy, in any one or more instances, or the acceptance by the Lender of partial payments or partial performance, shall not constitute a waiver of any Default, or the right to exercise any option, right or remedy at any time. The nouns, pronouns, and verbs used in this Note shall be construed as being of such number and gender as the context may require. This Note shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia.

WITNESS the following signature and seal:

BORROWER

Name: _____

9

Guyant IRA
0114

Guyant IRA Memo in Opp to Highland Objection to Claim
Exhibit 5

**99**

CONTINUING PERFECTION DURING BANKRUPTCY..., 20-APR Am. Bankr....

20-APR Am. Bankr. Inst. J. 22

**American Bankruptcy Institute Journal**
April, 2001

Column
Lien On Me

CONTINUING PERFECTION DURING BANKRUPTCY UNDER REVISED ARTICLE 9

Prof. G. Ray Warner

Visiting Professor, LL.M. Program St. John's University School of Law Of Counsel, Greenberg Traurig LLP
warnerg@umkc.edu

Copyright (c) 2001 by American Bankruptcy Institute; G. Ray Warner

In many ways, revised Article 9 simplifies life for secured creditors. This is particularly true with respect to most of the act's bankruptcy implications, which have been the subject of these columns. However, one change in the revision will impose new bankruptcy-related duties on secured creditors.

Under current law, the pendency of a bankruptcy or other insolvency proceeding freezes the perfected status of the security interest during the case. If the normal five-year term of the financing statement expires during bankruptcy, the secured creditor is relieved of the duty to continue its financing statement until 60 days after termination of the insolvency proceeding.[1]

The revised act eliminates this rule.[2] Bankruptcy no longer tolls the expiration of the financing statement. Thus, for financing statements expiring after July 1, 2001, secured creditors must file continuation statements before the financing statement lapses, even if the debtor is in bankruptcy.

**A Little Background**

Under current law, a financing statement perfects a security interest for five years from the date of filing.[3] If the secured party wishes to maintain perfection beyond the five-year period, a continuation statement must be filed within six months prior to the expiration of the five-year period.[4] If the continuation statement is not filed during the 4 1/2 to 5-year window,[5] then the financing statement lapses upon the expiration of the five-year period, and the security interest becomes unperfected.[6]

However, current Article 9 tolls the expiration of the financing statement during the pendency of a bankruptcy or other insolvency proceeding. Thus, if the security interest is perfected by filing at the time a bankruptcy proceeding is instituted, it remains perfected until, at the earliest, 60 days after termination of the bankruptcy proceeding.[7] While current Article 9 permits the secured creditor to file a continuation statement within the usual six-month period if it wishes, the insolvency tolling rule makes it unnecessary for the secured party to take any action in order to maintain perfection during a bankruptcy proceeding.

Initially, it was not clear whether the § 362 automatic stay[8] prevented the filing of a continuation statement during a bankruptcy case. Several cases addressing this issue drew a distinction between acts to perfect a lien and acts to maintain the perfection of a lien.[9] Under this view, a secured creditor wishing to file a continuation statement during a bankruptcy case and within the usual six-month window did not need to first obtain an order lifting the stay.

With the 1994 amendments to the Bankruptcy Code,[10] it became clear that the filing of a bankruptcy did not prevent a secured creditor from filing a continuation statement. Following the developing case law, Congress amended §§ 362(c)(3) and 546(b) to create an express exception to the automatic stay for acts to maintain or continue the perfection of an interest in

Guyant IRA Memo in Opp Highland Objection to Claim
Exhibit 6

**100**

CONTINUING PERFECTION DURING BANKRUPTCY..., 20-APR Am. Bankr....

property.[11] As a result of this amendment, one of the primary justifications for the insolvency tolling rule was eliminated.

In addition, the rule created practical problems for the UCC filing offices. Since the filing office was permitted to remove and destroy financing statements one year after lapse,[12] non-continued statements could be destroyed after six years. If the filing office was not advised of a pending bankruptcy proceeding, a six-year-old financing statement might be destroyed even though the tolling rule had prevented it from lapsing.[13] As a result, the continuation statement filed after termination of the bankruptcy proceeding might refer to a financing statement that no longer existed.

**Lapse Waits for No Bankruptcy**

The revised act simply deletes the tolling rule. Instead, it requires in all cases that continuation statements be filed "only within six months before the expiration of the five-year period."[14] Thus, after the revised act's July 1, 2001, effective date, a secured creditor must file a timely continuation statement if it wishes to maintain perfection and to preserve the priority position established by its initial financing statement.[15]

What is the effect of a failure to file a timely continuation statement to continue the initial filing? Revised Article 9 modifies the current lapse rule to limit the retroactive effect of the lapse of a financing statement. The revision carries forward the current rule that the security interest becomes unperfected upon lapse.[16] Thus, the security interest would be subordinate to a lien creditor who acquires its lien after the lapse and could be avoided under the § 544(a)(1) "strong-arm power" in a bankruptcy filed after the lapse.

However, with respect to the retroactive effect of lapse, the revision deletes the words "lien creditor" from the current rule. Thus, if the financing statement lapses, the security interest "is deemed never to have been perfected as against a purchaser of the *23 collateral for value."[17] Since the term "purchaser" includes a secured creditor but not a lien creditor, the lapse is retroactive only as to purchasers and secured creditors.[18]

Since the § 544 strong-arm power gives the trustee the status of a lien creditor with respect to the debtor's personal property, the § 9-515(c) limitation should prevent the trustee from avoiding a personal property security interest based on a post-petition lapse of perfection. But, since the trustee is given bona fide purchaser status with respect to real property, § 9-515(c) may not have that effect with respect to real estate-related interests like fixtures.

However, that result would be inconsistent with the majority view under the case law dealing with post-petition lapse. Although this issue does not arise under the current version of Article 9 because of the insolvency tolling rule, the prior 1962 version of Article 9 did not include an insolvency tolling rule. The cases decided under the 1962 version of Article 9 split, with a few cases holding that the secured creditor's failure to file a continuation statement post-petition destroyed the security interest.[19] However, most cases adopted the view that the bankruptcy filing freezes the secured creditor's status as of the petition date.[20] Thus, since the trustee's strong-arm power was measured as of the petition date, the post-petition lapse could not be used to avoid a security interest that was properly perfected as of the petition date.

Even though the trustee may not be able to take advantage of a post-petition lapse in perfection, a secured creditor who fails to timely file a continuation statement runs the risk that a third party may prime its lien. Under § 9-515(c), a junior secured creditor might be able to take advantage of the post-petition lapse, unless the courts apply the "bankruptcy freeze" logic to all competing parties rather than just the trustee. A more significant threat will come from parties who deal with the debtor post-petition. While the likelihood of this occurring is small in a liquidation case, it is much greater in a reorganization case where the debtor retains the collateral and continues to operate its business.

In such a case, a trustee might even be able to avoid the security interest. For example, in *General Electric Credit Corp. v. Nardulli & Sons Inc.*, 836 F.2d 184, 192 (3d Cir. 1988), the secured creditor failed to re-file a financing statement in the new state when the debtor moved its chief executive office after the chapter 11 plan was confirmed. When the plan failed and the case was converted, the chapter 7 trustee attempted to use the strong-arm power to avoid the security interest. The court rejected that attempt because the petition date of the original chapter 11 case was the relevant date for measuring the strong-arm powers of the trustee in the post-conversion chapter 7 phase of the case. While the secured creditor prevailed in *Nardulli*, note that the lien could have been avoided by the trustee if, instead of converting to chapter 7, a new bankruptcy had been filed.

Guyant IRA Memo in Opp Highland Objection to Claim
Exhibit 6

**101**

CONTINUING PERFECTION DURING BANKRUPTCY..., 20-APR Am. Bankr....,

### Enactment Update

No additional states have enacted revised Article 9 since the last issue. Thus, as of early March, only 28 states plus the District of Columbia have adopted revised Article 9. The act has been introduced in six new states, including New York and Pennsylvania, and revision bills are pending in 18 states plus the U.S. Virgin Islands.

### Footnotes

[1]    *See* current § 9-403(2). All citations are to the revised 1999 version of Article 9 of the Uniform Commercial Code, unless otherwise indicated. Citations to the currently applicable 1972 version of Article 9 are indicated by the term "current."

[2]    *Compare* current § 9-403(2) *with* § 9-515(d); *see, also,* § 9-515, cmt. 4.

[3]    *See* current § 9-403(2).

[4]    *See* § 9-403(3).

[5]    A continuation statement filed either before or after the six-month window is ineffective. *See* Hawkland, *Lord & Lewis UCC Series* § 9-403:4, pp. 9-572-73 (Art 9, 1997).

[6]    *See* current § 9-403(2) and (3). Current § 9-403(2) provides that, "Upon lapse, the security interest becomes unperfected, unless it is perfected without filing. If the security interest becomes unperfected upon lapse, it is deemed to have been unperfected as against a person who became a purchaser or lien creditor before lapse." Since the term "purchaser" includes an Article 9 secured party [*see* §§ 1-201(32) and (33)], this provision has the effect of rendering the security interest unperfected both prospectively and retroactively.

[7]    *See* current § 9-403(2). If the original five-year period is longer than this 60-day period, then the security interest remains perfected for that longer period. *Id.*

[8]    *See* 11 U.S.C. § 362(a)(4) and (5).

[9]    *See John Deere Co. v. Alamosa Nat'l Bank*, 786 P.2d 505, 506 (Colo. App. 1989); *cf. In re Larson*, 979 F.2d 625, 627 (8th Cir. 1992) (addendum to mortgage); *but, see In re Bond Enterprises Inc.* 54 B.R. 366 (Bankr. D. N.M. 1985) (dicta); *see, generally,* Chobot, John C., *Some Bankruptcy Stay Metes and Bounds*, 99 Comm. L.J. 301, 310-11 (1994).

[10]    *See* Bankruptcy Reform Act of 1994, § 204.

[11]    *See* 11 U.S.C. §§ 362(c)(3) and 546(b).

[12]    *See* current § 9-403(3) and current § 9-403, cmt. 2.

[13]    *See* § 9-515, cmt. 4.

[14]    *See* § 9-515(d). Note that although the five-year rule applies to the great majority of transactions, financing statements filed for public-finance or manufactured-home transactions are effective for 30 years. *See* § 9-515(b). In addition, financing statements filed for transmitting utilities and mortgages filed as fixture filings are effective indefinitely. *See* § 9-515(f) and (g).

Guyant IRA Memo in Opp Highland Objection to Claim
Exhibit 6

**102**

CONTINUING PERFECTION DURING BANKRUPTCY..., 20-APR Am. Bankr....

[15]    Note that if the original financing statement was filed under current Article 9, the revised act's transition rules may impose special requirements on a continuation statement filed under revised Article 9. For example, the revised act requires that most financing statements be filed in the debtor's state of incorporation, whereas current law requires that the financing statements be filed in the state where either the collateral or the debtor's chief executive office is located. *Compare* current § 9-103(a) and (c) *with* § 9-301 and 9-307(b). Thus, the continuation statement may need to be filed in a state different from the state in which the original financing statement was filed. In such cases, the revised act requires the filing in the new state of an "initial financing statement in lieu of a continuation statement." *See* §§ 9-705(d) and 9-706(a). This record must identify the pre-revision financing statement and indicate that it remains effective. Unlike a normal continuation statement, such a statement may be filed at any time during the five-year life of the original financing statement. *See* § 9-706(b) and (c).

[16]    Section 9-515(c) states, in part, "Upon lapse, a financing statement ceases to be effective, and any security interest or agricultural lien that was perfected by the financing statement becomes unperfected."

[17]    § 9-515(c).

[18]    Note that the "for value" restriction will not exclude any Article 9 secured creditors because secured creditors give value by definition when they obtain a security interest. *See* § 1-201(44)(b).

[19]    *See In re Radcliff Door Co. Inc.*, 17 B.R. 153, 156 (Bankr. W.D. Ky. 1982).

[20]    *See, e.g., Matter of Chaseley's Foods Inc.*, 726 F.2d 303, 304, 308 (7th Cir. 1983); *In re Catamount Dyers Inc.*, 50 B.R. 788, 790 (Bankr. D. Vt. 1985) (citing cases); *cf. In re Halmar Distribs. Inc.*, 968 F.2d 121, 127-28 (1st Cir. 1992) (bankruptcy freezes matters so post-petition interstate moves do not require refiling under § 9-103).

20-APR AMBKRIJ 22

**End of Document**    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

Guyant IRA Memo in Opp Highland Objection to Claim
Exhibit 6

**103**

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In Re:

HIGHLAND CONSTRUCTION
MANAGEMENT SERVICES, LP                     Case No. 11-11413-RGM
                                            Chapter 11
        Debtor.

## REPLY TO GUYANT'S OPPOSITION TO
## DEBTOR'S OBJECTION TO PROOF OF CLAIM

        COMES NOW Highland Construction Management Services, LP ("Debtor"), by

counsel, and files this Reply to Jerome Guyant's Opposition to Debtor's Objection to

Proof of Claim 4-1 filed on behalf of Wells Fargo f/b/o Jerome Guyant IRA ("Guyant")

and in support thereof, states as follows:

I.      **Summary of the Case**

        The Debtor respectfully contends that 2001 amendments to the Uniform

Commercial Code ("UCC") mandate continuation statements, even if an initial

UCC lapses after the filing of a bankruptcy petition.

        Because the language of the UCC is clear, there are few cases interpreting

the continuation statement obligation mandate of the 2001 amendments.  In fact,

your Debtor has only found two courts directly on point, each reaching a different

result.

        Resolution of this issue is critical as the Debtor is poised to receive up to

$800,000 in distributions from Sanford, LLC consistent with the November 4,

1

**104**

2012 Order of this Court resolving *Highland Construction Management Services, Inc. v. Christian Waller*, Adversary Proceeding No. 12-01418.  Further, in potential violation of the automatic stay, Mr. Guyant has communicated with the Members of Sanford, LLC, seeking enforcement of his secured interest without aid of this Court.  A copy of Mr. Guyant's letter to the Members of Sanford, LLC is attached hereto as Exhibit A.

**II.    The 2001 amendments to the UCC are clear and unambiguous.**

While relying upon *In Re: Wilkinson*, Lexis 2012 Bankr. Lexis 1039 (2012), a single bankruptcy case[1] in the Northern District of New York, and cases decided prior to the 2001 amendments to UCC, Guyant asserts that the 2001 amendments to the UCC, in conjunction with amendments to the Bankruptcy Code, were meaningless.

In *Miller Brothers Lumbar Company*, 2012 Bankr. Lexis 2031 (2012), the Bankruptcy Court for the Middle District of North Carolina found that the obligation to file continuing UCC Financing Statements to be clear and unambiguous based upon the 2001 amendment to the UCC[2]:

> Although under former Section 9-403(2) lapse was tolled if the debtor entered bankruptcy or another insolvency proceeding, new *subsection (c)* deletes the former tolling provision and "imposes a new burden on the secured parties: to be sure that a financing statement does not lapse during the debtor's bankruptcy." *N.C. Gen. Stat. § 25-9-515(c) cmt. n.4*; 26A N.C. Index 4th Secured

---

[1] Guyant also cites Great American Ins. Co. v. Merchants and Planters Bank, 2008 U.S. District Lexis 23006 (2008) for the proposition that continuation statements are not required following the 2001 amendments to the Bankruptcy Code. However, Great American does not even mention the 2001 amendments to the UCC.  Thus, Great American does not support Guyant's position

[2] The amendments to the North Carolina Act are identical to the amendments to the Virginia Act.

2

**105**

Transactions § 107. Thus, parties which fail to file UCC-3 continuation statements will lose their secured status, even when the lapse occurs post-petition. Because American Bank's financing statement expired on October 27, 2011, and no continuation statement was ever filed, its original [*7] financing statement is ineffective and its lien on the Debtor's equipment is unperfected. The Debtor, therefore, may avoid American Bank's security interest pursuant to *Section 544 of the Bankruptcy Code.*

In *Miller,* a creditor raised precisely the same argument as is being raised here. Specifically, the creditor in *Miller,* American Bank, asserted that the tolling modification in the 2001 amendments to the UCC was meaningless because "perfected status was, in essence, fixed as of the petition date." However, the *Miller* Court concluded that under the 2001 amendments "parties which fail to file UCC-3 continuation statements will lose there secured status, even when the lapse occurs post-petition."

**III.    Priorities Upon Lapse**

Under the Bankruptcy Code, the Trustee (and the Debtor-in-Possession) holds the status of hypothetical lien creditor. 11 U.S.C. §544(a)(1978). Section 544(a) allows the trustee to avoid any unperfected liens on property belonging to the bankruptcy estate. *In re Chaseley's Foods, Inc.,* 726 F.2d 303 (7th Cir. 1983). While the rights given to the trustee are governed by federal law, the extent of the rights in regard to the priority of lien holders is controlled by state law. *See Commercial Credit Co. v. Davidson*, 112 F.2d 54 (5th Cir.1940). Therefore, the Bankruptcy Code gives the trustee the rights of a lien creditor, but whether a lien creditor has priority over another claimant is determined by looking at state law.

3

**106**

Virginia Code §8.9A-515 prescribes the effect of a lapsed financing

statement:

> (c) Lapse and continuation of financing statement. The effectiveness
> of a **filed financing statement lapses on the expiration** of the
> period of its effectiveness **unless before the lapse a continuation
> statement is filed** pursuant to subsection (d). **Upon lapse, a
> financing statement ceases to be effective** and any security interest
> or agricultural lien that was perfected by the financing statement
> becomes unperfected, unless the security interest is perfected
> otherwise.[3] If the security interest or agricultural lien becomes
> unperfected upon lapse, it is deemed never to have been perfected as
> against a purchaser of the collateral for value. *Emphasis added.*

Official Comment #4 to Virginia Code §8.9A-515 provides that tolling no

longer occurs upon filing:

> "**Under former section 9-403(2), lapse was tolled** if the debtor entered
> **bankruptcy or another insolvency proceeding.** Nevertheless, being
> unaware that insolvency proceedings had been commenced, filing offices
> routinely removed records from the files as if lapse had not been tolled.
> **Subsection (c) deletes the former tolling provision and thereby imposes
> a new burden on the secured party:** To be sure that a financing statement
> does not lapse during the debtor's bankruptcy. **The secured party can
> prevent lapse** by filing a continuation statement, even **without first
> obtaining relief from the automatic stay.** See Bankruptcy Code Section
> 362(b)(3).

Virginia law clearly requires a continuation statement, even after

bankruptcy filing. However, the comment goes on to state that, "if the debtor

enters bankruptcy before lapse, the provisions of this article with respect to lapse

would be of no effect to the extent that federal bankruptcy law dictates a contrary

---

[3] Perfected otherwise would include an enforcement action, rather than a declaratory judgment action as
discussed hereinafter.

4

**107**

result (e.g., to the extent that the Bankruptcy Code determines rights as of the date
of the filing of the bankruptcy petition)." Although the Bankruptcy Code was
amended to permit the filing of UCC continuation statements without the necessity
of seeking relief from the automatic stay, the Bankruptcy Code does not otherwise
address this issue.

Guyant asserts essentially that the 2001 amendments to the UCC were
meaningless. There are no bankruptcy cases applying Virginia's UCC provisions
to lapsed financing statements and the resulting effects on priorities. This appears
to be a case of first impression in this District.

## IV.    State Court Complaint

Perfection of a financing statement under the Uniform Commercial Code
may also be accomplished by an enforcement action. The claim objection filed
herein specifically identifies the State Court Complaint filed by Mr. Guyant in the
Circuit Court of Loudoun County and the Order of October 19, 2012. That Order
granted Declaratory Judgment confirming that there was at that time a "perfected
security interest" in the disputed property. However, neither Count I, Count II nor
Count III of the State Court Complaint sought the actual enforcement of the
security instrument created by the UCC and UCC Amendments.   Given the
mandate of *Ainslie v. Inman*, 265 Va. 347 (2003), the Declaratory Judgment did
not constitute an enforcement action of the UCC. The UCC, as amended, expired
or lapsed as a matter of law as the creditor, Jerome Guyant IRA, did not file a

5

**108**

continuation statement prior to the expiration of the UCC on October 10, 2011.

See *Ainslie* at 354.

## V.    Procedure for Determining Secured Claim

Some courts deny motions without addressing the merits if a proceeding to determine priorities is brought in the form of a motion rather than as an adversary proceeding. *See In re Morton*, 43 B.R. 215 (Bankr.E.D.N.Y. 1984). However, other courts treat motions as complaints in the interest of expeditious resolution of the case. *See e.g. In re Veasey*, 43 B.R.396 (Bankr.E.D.Pa. 1984); *see also In re Yagow*, 62 B.R. 73 (Bankr.D.N.D. 1986). The Eastern District of Virginia Bankruptcy court has acknowledged that objections to proofs of claim that seek to dispute the validity[4], priority, or extent of a lien or other interest in property should be brought as adversary proceedings rather than via motion practice. Nevertheless, the court has held that failure to bring such an action as an adversary proceeding is not a jurisdictional defect, and may be waived. Where the rights of the parties have been adequately presented, no prejudice results from consideration of the issues on the merits. *See In re Enfolin, Inc.*, 233 B.R. 351, 354 (Bankr.E.D.Va. 1999)(citing *In re Robinson*, 217 B.R. 527 (Bankr.E.D.Tx. 1998)); *see also In re Felker*, 181 B.R. 1017 (Bankr.M.D.Ga. 1995).

---

[4] The Debtor respectfully asserts that an objection is an appropriate way to bar a lapsed claim, just as an objection would be an appropriate way to address a claim barred by an applicable statute of limitations.

6

**109**

## VI.    CONCLUSION

The Debtor seeks the prompt resolution of this dispute and is certainly

willing to file an adversary proceeding if the Court determines that the same is

necessary.  Although Guyant has raised the necessity of an adversary proceeding,

he has also addressed the issues on the merits.  Accordingly, the issue is ripe for

determination.

The authority cited by Guyant unrelated to the 2001 amendments to the

UCC is not persuasive.  It is clear from the Joint Committee comments that the

UCC was amended to affirmatively require continuation statements, particularly to

resolve the confusion that occurred associated with bankruptcy filings.  This is

compelling indicia of legislative intent, particularly combined with the amendment

to the Bankruptcy Code, which allows continuation statements to be filed without

relief from the automatic stay.

The Bankruptcy Code does not address this issue because State Law

governs.  Because State Law requires continuation statements, the Guyant claim

became an unsecured one upon lapse in October, 2011.  Accordingly, the Debtor

respectfully asserts that the persuasive authority from the United States

Bankruptcy Court for the Middle District of North Carolina in *Miller* should be

followed in this case, and the claim objection should be sustained.

> HIGHLAND CONSTRUCTION
> MANAGEMENT SERVICES, LP
> By Counsel

7

**110**

_/s/ James P. Campbell_
James P. Campbell, Esquire
*Campbell Flannery, P.C.*
1602 Village Market Boulevard, Suite 220
Leesburg, Virginia 20175
(703) 771-8344/Telephone
(703) 777-1485/Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that service of a true copy of the foregoing has been made
as follows:

Type of Service:            Electronic Mail via the United States Bankruptcy Court
                            to all parties requesting notice and First-Class, U.S.
                            Mail to the parties listed below

Date of Service:            December 17, 2012

Persons served and address:    Neil D. Goldman, Esq.
                               Goldman & Van Beek, PC
                               510 King Street, Suite 416
                               Alexandria VA 22314

                               John J. Brennan, III, Esq.
                               Brennan Law LLC
                               510 King Street
                               Suite 416
                               Alexandria, VA 22314

Item Served:                Reply to Guyant's Opposition to Debtor's Objection to
                            Proof of Claim

                                    _/s/ James P. Campbell_
                                    James P. Campbell

8

**111**

**JEROME O. GUYANT**
1214 Confederate Avenue
Richmond, Virginia 23227-4402
(804) 359-8006
Jerryg392@gmail.com

November 30, 2012

BY E-MAIL
BY FIRST CLASS MAIL
AND BY UPS SECOND DAY AIR

Foothills, LLC
c/o Graymalkin, Inc.
c/o David Thompson, Registered Agent
9305 Veridan Drive
Manassas, VA 20110
pinkcadillac47@msn.com

Foothills, LLC
c/o Ronald G. Doucette, Esq.
908 Trailview Blvd. Suite 300
Leesburg, VA  20175
doucette@doucettelawfirm.com

Andrew Garrett
c/o The Garrett Companies
85 Mine Road Suite 115
Stafford, VA 22554
AGarrett@garrettdevelopment.com
(also by certified mail, return receipt requested)

Miriam Cutler
c/o Cutler Development
2501 Gallows Road, Suite 230
Dunn Loring, VA 22027
Mcutler500@aol.com

MJC Ventures
c/o Stephanie Cutler, Manager
Manelli Selter, PLLC
2000 M Street, N.W., Suite 700
Washington, DC 20036
scutler@mdslaw.com



**112**

Colorado Coronado, LLC
c/o Christian G. Waller
701 Cobblestone Boulevard, #305
Fredericksburg, VA 22401
cgwaller40@aol.com

Christian G. Waller
701 Cobblestone Boulevard, #305
Fredericksburg, VA 22401
cgwaller40@aol.com
(also by certified by mail, return receipt requested)

Ladies and Gentlemen:

I am writing to you in your capacities as members and/or managers of Sanford, LLC.
Pursuant to a Security Agreement dated December 22, 2005, as amended by an Amendment to
Security Agreement dated October 13, 2006, Highland Construction Management, LLC
("HCMS") granted to the Jerome Guyant IRA (the "IRA") a security interest in 50% of HCMS's
membership interest in Sanford, LLC ("Sanford"), which includes 50% of Highland's interest in
Foothills, LLC's interest in Sanford. HCMS and the IRA agreed that the security interest
encumbered 16% of the total membership interests in Sanford. In a Judgment Order entered
October 5, 2010 in the case captioned Wells Fargo Bank, N.A. f/b/o Jerome Guyant IRA, Case
No. 60287, the Circuit Court of Loudoun County, Virginia awarded a declaratory judgment that
the IRA "has a perfected security interest in: (i) 50% of HCMS's membership interest in Sanford,
LLC. a Virginia limited liability company..."

As I believe you know, HCMS filed a voluntary petition in Bankruptcy on February 28,
2011. HCMS has recently filed papers in the Bankruptcy Court asserting that the IRA did not
file a UCC continuation statement as to its security interest. While that is correct, HCMS and the
IRA disagree as to the legal effect of such lack of filing. This letter is to notify you that the IRA
asserts a security interest in HCMS's interest Sanford, equal to 16% of the total membership
interests in Sanford. It is the IRA's position that any transfer of HCMS's membership interests in
Sanford and/or Foothills would be subject to the security interest of the IRA arising under the
Security Agreement, the UCC financing statements filed, and the Judgment Order entered in
Case No. 60287.

Very truly yours,

Jerome O. Guyant

cc:   Neil D. Goldman, Esq.
      John J. Brennan, III, Esq.
      James P. Campbell, Esq.

**113**

1

```
 1              UNITED STATES BANKRUPTCY COURT
 2           FOR THE EASTERN DISTRICT OF VIRGINIA
 3                    ALEXANDRIA DIVISION
 4   ------------------------------------
 5   In Re:                         )
 6       HIGHLAND CONSTRUCTION        )      Case Number:
 7   MANAGEMENT SERVICES, L.P., )       11-11-413
 8                     Debtor. )
 9   ------------------------------------
10              TRANSCRIPT OF PROCEEDINGS
11   HEARD BEFORE THE HONORABLE ROBERT G. MAYER
12                    Courtroom 2
13            Tuesday, December 18, 2012
14                    Pages 1 - 41
15        Reported by:  Donna K. Soutter
16
17
18
19
20
21
22
23
24
25
```

**114**

2

```
 1              A P P E A R A N C E S
 2    ON BEHALF OF THE DEBTOR:
 3        JAMES P. CAMPBELL, ESQUIRE
 4        Campbell Flannery
 5        1602 Village Market Boulevard
 6        Suite 220
 7        Leesburg, Virginia  20175
 8        (703) 771-8344
 9        JCampbell@CampbellFlannery.com
10
11    ON BEHALF OF WELLS FARGO:
12        NEIL D. GOLDMAN, ESQUIRE
13        Young, Goldman & Van Beek, P.C.
14        510 King Street
15        Suite 416
16        Alexandria, Virginia  22314
17        (703) 684-3260
18
19        JOHN J. BRENNAN, III, ESQUIRE
20        510 King Street
21        Alexandria, Virginia  22314
22        (703) 548-1620
23
24
25
```

**115**

3

PROCEEDINGS

1    (Case was called at 2:59 p.m.)

2    THE CLERK:  Items 46 and 47 are Highland

3    Construction Management Services, Case Number 11-11413.

4    (Discussion off the record.)

5    THE COURT:  All right.  Introduce yourselves

6    again.  I believe we have two matters on the docket.

7    MR. CAMPBELL:  Jim Campbell for the debtor.

8    Also with me is Joseph Bane, the representative for

9    Highland.

10   MR. GOLDMAN:  Good afternoon, Your Honor,

11   Neil Goldman for Wells Fargo Bank NA FBO Jerome

12   Guyant IRA.  To my right is Mr. Guyant, and to my

13   further right is John Brennan, who is co-counsel.

14   Mr. Brennan will be handling the matter with respect to

15   the fees, and I'll be handling the matter with respect

16   to the security interests.

17   THE COURT:  All right.  Now, with respect to

18   the Wells Fargo, they're the custodians of Mr. Guyant's

19   IRA?

20   MR. GOLDMAN:  Correct.

21   THE COURT:  All right.  Then Mr. Guyant is

22   the owner of the IRA as the party and then --

23   MR. GOLDMAN:  The beneficiary.

24   THE COURT:  The beneficiary.  All right.

**116**

4

```
 1              Very good.  Go ahead.
 2              MR. CAMPBELL:  Which one would you like to
 3    take on first, Your Honor?
 4              THE COURT:  Which one do you want?  We have
 5    to do them both.  Does it matter?
 6              MR. CAMPBELL:  I think the fee application
 7    is more straightforward and easier.
 8              THE COURT:  Well, then, let's --
 9              MR. CAMPBELL:  Why don't we take on that
10    first.
11              If it please the Court, this is Campbell
12    Flannery's second fee application, second interim.  The
13    last order was entered in January of 2012.  Most of the
14    dispute, most of the time, trouble and effort and
15    100 percent of the cost in this $5,891 relate to
16    litigation with Mr. Guyant.  Principally -- mostly, the
17    case that you remanded to the State Court under the
18    mandate of Stern v. Marshall on the eve of -- on the day
19    of our argument on summary judgment, we have been in
20    trial in that case in the State Court.  Most of their
21    argument against our fees seems to go to the merits of
22    that position, and the status of that case is that
23    Judge Chamblin, the State Court Judge, announced from
24    the Bench last June a finding against the estate.  There
25    was subsequently filed a motion to reopen the evidence
```

**117**

5

based on fraud and misconduct, which motion was granted
in part. The evidence was reopened, and we're awaiting
the presentation of that evidence to the State Court and
further disposition of that case.

The essence here is that the case that is --
the majority of the fees and all of the costs has been
litigated over about the recovery to the estate where we
took prevail is $1.3 million dollars plus prejudgment
interests up to the date of recovery. That case was
pending when the case was filed. In fact, the case was
filed in the State Court more than a year prior to the
bankruptcy. This is an asset that we must administer.
We think that the claim is viable. We disagree with the
State Court thus far. We wish -- we've tried the case
here in the Bankruptcy Court, but that is the case.
Obviously, the Court will look at the entire outcome of
the case at the end of the case to determine whether the
fees that were charged and paid were appropriate or not,
but I guess the essence of Mr. Brennan's opposition or
Mr. Guyant's opposition is that he thinks we should not
be paid until we have proved success on parts of the
litigation in the State Court.

Our view is that the fees there were
certainly necessary. We had an obligation to take that
case to conclusion and seek to be successful in that

**118**

6

```
 1   case.  The fees are reasonable.  The fees are
 2   comparable.  In fact, they're exactly the same fees that
 3   were found to be appropriate when the January, 2012
 4   order was entered.
 5              Accordingly, we ask you to overrule their
 6   objection and award of $83,312.50 and costs of $5,891.
 7              MR. BRENNAN:  Thank you, Your Honor.
 8              Our objection is not so much that they are
 9   not -- that they're required to show success.  Our
10   objection is that after having had an opportunity to
11   fully litigate the matter before Judge Chamblin,
12   post-trial motions began, which in our view will prove
13   to be completely unfounded.  Mr. Campbell said that it
14   was based on fraud and misconduct.  Let me -- since he
15   threw that down, let me explain what he claims.  In that
16   motion, he said that a non-consulting expert of ours,
17   Ms. McCoy, they allege as a fact prepared Mr. Guyant's
18   tax returns and gave him certain advice with respect to
19   tax matters.  And they insisted that this was not
20   disclosed.  The Court granted the right to take a
21   deposition.  They gave a deposition, and their factual
22   predicate, that is that she prepared his tax returns and
23   gave him tax advice, is completely false.  There's --
24   literally argued, there's absolutely no basis for the
25   motion, and we will be back before Judge Chamblin.  I
```

**119**

7

```
 1   know that -- I'm sure that lawyers always come before
 2   you and say, I'm going to win the motion over there.
 3   I'm kind of in that position.  I just would like that
 4   part of it, Your Honor, which in my calculation works
 5   out -- without regard to expenses, Your Honor, works out
 6   to $19,129, not to be approved until that litigation is
 7   resolved.
 8            THE COURT:  When they made those
 9   allegations, what was he basis for those?
10            MR. BRENNAN:  That was interesting, Your
11   Honor.
12            The basis for the allegation was that after
13   the trial was over and after the discovery was done,
14   Mr. Bane discovered, and I'm putting air quotes around
15   discovered, an e-mail in his file that was an e-mail
16   from Mr. Bane -- I'm sorry, between Mr. Bane and
17   Ms. McCoy in which Ms. McCoy was advising not
18   Mr. Guyant, but Mr. Bane.  And that became -- there was
19   no affidavit from Mr. Bane.  There's an affidavit from
20   the attorney who claimed this was found in discovery.
21   And based on that, they took this gigantic leap that
22   McCoy was actually advising Mr. Guyant when she wasn't.
23            THE COURT:  If it's so without foundation,
24   why did the Judge allow further investigation?
25            Mr. BRENNAN:  Because I assume the Judge
```

**120**

8

1    thought, All right, well, I'm going to give them the

2    chance to see if that's the case.  And it's not the

3    case, which we told the Court then.

4            Your Honor, that's the thing that surprised

5    me.  The standard for a motion for a new trial is that

6    the matter could not have been -- the newly discovered

7    evidence could not have been discovered and was not in

8    your possession.  And what did they come up with?  They

9    came up with an e-mail between Ms. McCoy and Mr. Bane --

10   Mr. Bane that had been in his possession for four years.

11           Thank you, Your Honor.

12           THE COURT:  Thank you.

13           MR. CAMPBELL:  Your Honor, if I could close

14   briefly on that issue.

15           We served a subpoena on Ms. McCoy because

16   she was identified at Mr. Guyant's deposition.  In

17   response to the subpoena, counsel for Mr. Guyant

18   asserted that she was not a fact witness.  She possessed

19   no documents, and anything she possessed was privileged

20   as a non-testifying expert.  It is true that she did not

21   prepare tax returns.  It is also true that she advised

22   Mr. Guyant regarding issues related to the deductibility

23   of certain items and tax credits, the precise

24   quasi-estoppel issue before the State Court.

25           Nevertheless, that is hotly contested.  This

**121**

9

1    isn't a fee-shifting case like some of the others we've

2    heard today.  This is a case of whether the work was

3    reasonable and necessary, and when Mr. Robyn (ph.), the

4    attorney he speaks of, found evidence producing

5    documents in Mr. Bane's individual case to Mr. Guyant in

6    discovery and included information that made it clear

7    that when the representation was made that Ms. McCoy

8    wasn't a witness, had no communications and did not know

9    Mr. Guyant, that those representations were not true,

10   and based on that, the case was reopened.

11           Nevertheless, I don't think this changes the

12   play field.  We respectfully ask that you award fees of

13   83,312.50 and costs of $5,891.

14           THE COURT:  Did you want to say something?

15           MR. BRENNAN:  This is part of what's made me

16   kind of crazy about this.

17           I think Mr. Campbell just said that she

18   advised him with respect to basis, which is the exact --

19   she didn't, Your Honor.  He took his deposition, and she

20   said she didn't.  And as to his referring to the

21   subpoena, his subpoena said, Ms. McCoy, give me

22   documents related to Asbury and Mr. Guyant's tax returns

23   regarding Asbury.  Ms. McCoy never had -- never had any

24   documents regarding Asbury.  So for him to claim that

25   there was something concealed the request of the

**122**

10

1  subpoena is to ignore the fact that he drafted the

2  subpoena, said I want X, and four years later when Y

3  turns up, claims fraud.

4          Thank you, Your Honor.

5          THE COURT:  The rule that applies to

6  attorney's fees is that they need to be reasonable and

7  necessary and beneficial to the estate, that is at the

8  time that the services are rendered.  We do not expect

9  every lawyer to get paid only when they are successful.

10 That would put them on contingent fees, and an hourly

11 rate is not geared towards compensating on a contingency

12 basis.  We all know contingency fees are based on a

13 different mechanism than the hourly rate.

14         I don't know the outcome of the argument

15 between counsel.  You all obviously disagree as to what

16 happened and the significance of what happened.  And, of

17 course, that's what a court is there to resolve is those

18 differences.

19         And as long as there's a reasonable basis

20 for going forward, then the counsel ought to be paid for

21 those services.  To date in the State Court, counsel has

22 been successful.  He's obtained the discovery that he's

23 requested.  The Court has allowed further discovery

24 after trial, after judgment has been granted -- I don't

25 know that granted is quite the right word at this point,

**123**

11

1   but a judgment has been indicated, I guess an oral

2   ruling from the Bench at this point. That in itself is,

3   to me, unusual. As Counsel suggests, after discovered

4   evidence is not something that one has or has the

5   ability to find. So I think there's something here.

6   Which side will ultimately be successful and to what

7   extent, I just don't know. But that's not the test.

8   The test is was it reasonable to go forward. I look at

9   the State Court's judgment. It said, I've heard this.

10  Yes, it is reasonable to go forward, to at least do

11  this, which is to take the deposition and get further

12  information, and it sounds like set it down for a

13  hearing. If that's the case before that Judge who tried

14  the case, heard all of the evidence, knows exactly what

15  transpired and why the decisions were made, then, I

16  think that counsel is doing his job to bring that

17  forward and to follow up with it. And I think that

18  that's sufficient to award counsel fees in this case.

19  It may make a difference in the outcome. On the other

20  hand, it may not, but we're not paying counsel based on

21  the ultimate result, but only on the reasonableness and

22  necessities of the actions taken at the time that they

23  were taken. And I think that that has been shown here.

24          I would add further that this is an interim

25  award. I do review the fees at the end of the case

**124**

1    earlier if there's a file application and more

2    information may become available, this may be resolved.

3    It may be an impact at that point, but at this point, I

4    think the fees are appropriate and will be awarded as an

5    interim fee.

6              MR. CAMPBELL:  Thank you, Your Honor.

7              THE COURT:  Now, that leaves one last item,

8    which is the objection.

9              MR. CAMPBELL:  Yes, Your Honor.  May it

10   please the Court, this issue is perhaps more interesting

11   in that we filed this as a claim objection.  Our

12   perception was this is much like the statute of

13   limitations with a claim because the estate perceived

14   that perhaps Judge Chamblin's order declaring the

15   viability of a UCC in November of 2010 perfected that

16   UCC filing.  Our research led us to the Ansley case that

17   we discovered that says that's not the case.  That

18   doesn't enlarge the vitality of the UCC under Virginia

19   law.  We then filed our claim objection because in 2001,

20   the Joint Commission in the most -- all the legislatures

21   that had adopted the revised UCC changed the UCC

22   radically.  And the way they changed it radically is

23   prior to that date, there was an automatic extension of

24   your rights under your UCC filing while a bankruptcy was

25   pending.  And as the commentators have noted, it caused

**125**

1  confusion in filing in offices around the country.  And

2  so they adopted what I will call a bright-line rule.

3  They modified this statute to require specifically the

4  filing of a continuation statement in the six months

5  prior to the fifth-year anniversary of the continuation

6  statement.

7          We noted as we were preparing the case as a

8  whole that Mr. Guyant's initial UCC was filed in October

9  of 2006.  Although there were amendments to the

10  collateral twice, maybe three times, there was no

11  continuation statement filed.  And the significance of

12  the change of the statute as Mr. Goldman, I think, will

13  argue is not just that there's an affirmative obligation

14  to file a continuation statement even if you're in

15  bankruptcy, but it also changed the effect of what

16  happens if there's a lapse because the language in

17  8.9A-515(c), which changed the rules which required --

18  it eliminated the bankruptcy extension, so to speak.  It

19  also says in Subsection C, Upon lapse, a financing

20  statement ceases to be effective.  That's a significant

21  change in the law.

22          Now, surprisingly, around the country,

23  there's not a lot of case law on this issue.  I

24  respectfully submit the reason there's not a lot of case

25  law is because there tend not to be disputes when we

**126**

14

1    have bright-line rules.  In other words, we typically

2    are able to know where the lines are drawn because the

3    rule before was clearly a fuzzy one.

4            In response to our objection in very artful

5    lawyering, Mr. Guyant has come up with authority out of

6    the Northern District in New York in the Wilkinson case.

7    And in Wilkinson in May of this year -- excuse me, April

8    of this year, a bankruptcy judge in a thoughtfully

9    written opinion said, The new UCC doesn't change

10   anything, that if your interests under the UCC was

11   perfected as of the date of the filing of the petition,

12   then the old enlargement system still provides, and she

13   related back to a 1940s case from the United States

14   Supreme Court that talked about the date of filing the

15   petition as kind of fixing the scene.

16           About a week later -- and that was in April

17   of 2012 -- in May of 2012 about a week later, a North

18   Carolina bankruptcy judge addressed the same issue

19   precisely, thoughtfully in a well-written opinion and

20   drew the complete opposite conclusion.  In that case,

21   the Miller Brothers case, the Bankruptcy Court in the

22   Middle District of North Carolina found that you had to

23   synthesize a couple of changes in the law, the statutory

24   arrangement that we're navigating, to come to the right

25   conclusion.  And he found two situations to be notable.

**127**

15

1   The first is the clear unequivocal plain language of the
2   UCC saying the bankruptcy continuation is gone.   Thou
3   shalt file a continuation statement.   The other thing he
4   found to be significant is the decision of the Congress
5   to exclude UCC continuation statements from the
6   protections of the automatic stay, meaning that no
7   creditor need come before a Court and get permission to
8   file a continuation statement.   And Judge Waldrep in
9   that case decided on all fours that -- and the
10  situations were a little bit different.   The New York
11  case was a Chapter 13 case where, I think, 67 cows were
12  the collateral.   The North Carolina case was a
13  Chapter 11 case where there was equipment.   I think
14  there was a lave, a lift and a hoist were subject to a
15  UCC, and the circumstances were a bit different.   In
16  North Carolina we had -- in New York, we had competing
17  creditors.   In North Carolina, we had the secured
18  creditor seeking to get relief from the automatic stay
19  to foreclose their rights, to seize their collateral,
20  the equipment itself.   And in the North Carolina case,
21  synthesizing the changes in the bankruptcy code, the
22  changes in the UCC, which, by the way, the North
23  Carolina UCC Amendments are identical to the Virginia
24  UCC Amendments, he said on all fours that the UCC
25  affirmative obligation to file the continuation

**128**

16

```
 1   statement exists, and in the absence of that filing,
 2   just as it said in 8.9A-515(c), the financing statement
 3   ceases to be effective, and there's no more force.
 4            I wish I could tell you that this was a
 5   Circuit Split.  It really isn't a Circuit Split because
 6   really all we have here is most of the authority cited
 7   ably by Mr. Guyant is authority analyzing the rules
 8   prior to 2001 and a couple of circumstances analyzing
 9   different cases by way of example.  One of their cases
10   is a situation there was an approved plan.  A plan was
11   confirmed identifying the secured creditor as a secured
12   creditor, and then later the issue was raised as to
13   whether or not their UCC continuation was filed or not.
14   And in that circumstance, the Court found amongst other
15   things that there's a new contract with the confirmation
16   of a plan that fixes the rights of the parties.  That's
17   not our circumstance here.
18            In the New York case, the Chapter 13
19   petition was filed and the UCC interests lapsed three
20   months after the filing of the Chapter 13 petition.  In
21   the North Carolina case, the Chapter 11 filing was made,
22   and the UCC lapsed a mere six weeks after the filing of
23   the Chapter 11 petition.  And in this case, our
24   Chapter 11 petition was filed on February 28th, 2011,
25   and the UCC lapsed, I believe, on October 17th of 2011.
```

**129**

1           We need the Court to make the call.  The

2    other side has said this must be by an adversary

3    proceeding.  Our perception was this was calling balls

4    and strikes.  It would be the same as if somebody

5    asserted they had a deed of trust, and there's no deed

6    of trust of record.  We didn't perceive this as

7    necessitating an adversary proceeding to strip off or

8    reduce or modify an existing lien because we assert,

9    with all due respect, that as a clear matter of Virginia

10   law, given the change in 2001, synthesized with the

11   changes in the Bankruptcy Code no longer requiring

12   relief from the automatic stay to file a continuation

13   statement, that 8.9A-515 is clear on its face, and there

14   simply is no secured interest on the Estate of Guyant.

15           One reason this is important is that this

16   Court through Judge Kenney approved a turnover motion or

17   proceeding on certain tax credits that are going to be

18   disbursed from the entity to which allegedly there's a

19   secured interest, and on Friday of last week, there was

20   a real estate settlement for some real property in

21   Loudoun County, which will also relate in a distribution

22   to the estate.  And there's a hot contest between

23   Mr. Guyant and the estate as to whether his security

24   interests applies to a portion of those proceeds.  And

25   as I said in our papers, we are certainly willing to

**130**

1  file an adversary proceeding if necessary, but the

2  District Court certainly has said, If the parties are

3  fully before the Court and the issues are fully before

4  the Court, the Court does have jurisdiction to decide

5  such an issue.  The reason we believe it's not an issue

6  of striping off or modifying existing collateral is we

7  believe that there is now an expiration date on

8  instruments under the Uniform Commercial Code, and if

9  you do not file the continuation statement within the

10  five-year period, the bright-line rule has been

11  established.  That's the reason there's so little

12  authority, and we ask you to follow the North Carolina

13  Bankruptcy Court in Miller Brothers rather than the

14  Northern District of New York in the Wilkinson case.

15          Thank you, Your Honor.

16          THE COURT:  All right.

17          MR. GOLDMAN:  Good afternoon, Your Honor.

18          It's easier to come up with the answer when

19  you ignore portions of the law.  I'd like to hand up to

20  the Court if I may the entire 8.9A-515.

21          THE MARSHAL:  (Handing documents).

22          MR. GOLDMAN:  There are highlighting marks

23  that are mine.

24          In his argument before the Court,

25  Mr. Campbell cited a portion of 515(c), and it's

**131**

19

1  noteworthy that what he says is the financing statement

2  lapsed, there's no security interest whatsoever.  There

3  just isn't any.  It's just unsecured.  Well, that's not

4  the law, Your Honor.

5            But I'd like to point the Court specifically

6  to (c), which it says, Upon lapse, the financing

7  statement ceases to be effective, and that's where he

8  stopped.  It continues, (reading) And any security

9  interests or agricultural lien that was perfected by the

10 financing statement becomes unperfected -- so we have a

11 security interest, but it's unperfected -- unless the

12 security interest is perfect otherwise.

13           It then goes on to say, If the security

14 interests or agricultural lien becomes unperfected by

15 lapse, it is deemed never to have been perfected as

16 against a purchaser of collateral for value.

17           Your Honor, the next page contains the

18 official comment to -- the relevant official comment,

19 and I'm actually going to start three deals would lapse

20 that four deals with the effect of the debtor's

21 bankruptcy.  There are really two concepts going on here

22 and two theories under which we claim that this should

23 be ruled in our favor.  One is that there is authority,

24 and that includes the Wilkinson case and it includes

25 another case from Tennessee that is cited in our papers,

**132**

20

1   and it's called Great American Insurance Company, again,

2   to the same effect.  And what those cases say is that

3   the parties' positions are frozen upon the filing of the

4   bankruptcy, and there's substantial authority for it

5   both before the 2001 code changes and after.  And, Your

6   Honor, in our papers we cite a Law Journal article,

7   which walks through this clearly, and the older cases

8   that we cited was largely under the 1962 provisions of

9   the code, which were analogous to this, and basically

10  said that the parties' positions are frozen as a matter

11  of Federal Bankruptcy law as of the time that the

12  petition is filed.  Here, the petition was filed

13  February 28th, no question that there was a perfected

14  security interest, the financing statement hadn't

15  lapsed.  July, the proof of claims was filed, it claimed

16  to be secured.  It hadn't lapsed at that point.  It only

17  lapsed later in October of 2011.

18          Comment for -- official comment for at the

19  bottom of the second page of the quote, Mr. Campbell in

20  his papers cites all of the parts that are on that

21  second page up through where it says, See Bankruptcy

22  Code Section 362(b)(3).  He omits the next phrase.  The

23  next phrase is, Of course, if the debtor enters

24  bankruptcy before lapse -- our case here -- the

25  provisions of this article with respect to lapse would

**133**

1   have no effect to the extent that Federal Bankruptcy law

2   dictates a contrary result, e.g., to the extent that the

3   Bankruptcy Code determines rights as of the date of the

4   filing of the bankruptcy petition.

5            Your Honor, under the bankruptcy freeze

6   theory, the cases cited in the Law Journal article that

7   we appended to our memorandum, there is support for the

8   position of a bankruptcy freeze, and we submit that as a

9   matter of Federal Bankruptcy law, this Court could

10  determine that the position for frozen at that time, and

11  the analysis that is suggested in some of the older

12  cases basically is everybody knows when the bankruptcy

13  filed are what the rights are.  The creditors know who

14  the creditors are; the trustee knows who it is; there's

15  no need for any further filing.

16           Mr. Campbell is simply wrong when he says

17  it's required to be filed.  It's not required to be

18  filed.  It says independent of bankruptcy, the effect --

19  the UCC lapses.  It's not that the security interest

20  lapses.  And it's a distinction that he just totally

21  flies past, and in that way, seeks to have this Court

22  reach the wrong result.

23           If I can refer Your Honor back to 8.9A-515,

24  Official Comments 3, it's on the second page of this

25  section, and again, it's the highlighted section.  It

**134**

1  talks about what happens, and it says, The deemed

2  retroactive unperfection (sic) applies only with respect

3  to purchasers for value.   Unlike former Section 94032,

4  it does not apply with respect to lien creditors.   And

5  then it goes on and gives examples about how lien

6  creditors lose, but parties with perfected security

7  interests win.

8           This is significant, Your Honor, for a

9  couple of reasons.   And this is an independent theory on

10 which we could win and should win independent of the

11 bankruptcy freeze.   Your Honor, the trustees'

12 superpowers under 544(a), first, they're measured as of

13 the time of the filing of the petition.   That's explicit

14 in the language of 544(a).   At the time of the filing of

15 the petition, Mr. Guyant was fully perfected.   There's

16 no question about that.   So the 544 powers don't touch

17 it.   But there's even a second reason why the 544 powers

18 don't touch it, and that's because those 544 powers give

19 the trustee, in this case the debtor-in-possession, the

20 rights of a lien creditor.   But the unperfected security

21 interests under the expressed provisions of 515(c) and

22 the change in the law -- and this is the change in the

23 law that he wants to ignore -- the lien creditor loses

24 as against the holder of a lapsed UCC statement, and

25 that's clear and that's in the examples.

**135**

1          Your Honor, I would like to hand up, if I

2    may, two things.  One is the former code section, which

3    is 8.9-403, which has the language about a lien

4    creditor, and that language as referenced in the

5    comments is specifically deleted.  So a lien creditor no

6    longer takes prior to a party holding a lapsed UCC.

7    Your Honor, so it's clear -- it's certainly clear to me,

8    and it should be clear to Mr. Campbell, and it should be

9    to the Court that just walking through the text of

10   8.9A-515 and the comments that Mr. Guyant has a security

11   interest, that it's either perfected because it's frozen

12   at the time, or it is unperfected, it is prior to the

13   interest of the debtor-in-possession and the trustee

14   because they only hold the status of a lien creditor as

15   of the date of the filing of the petition and clear

16   under the expressed language of 544, they do hold the

17   position of a hypothetical bona fide purchaser for value

18   of real estate, but the interests at issue here are not

19   real estate, rather it's a security interest in the

20   membership interest in a LLC, which is personal

21   property.

22          Your Honor, he says there's no authority.

23   There's two cases directly under the bankruptcy freeze.

24   There are other cases, and I'd like to hand up the

25   section of a case called Mostoller versus CitiCapital

**136**

24

1  Commercial Corp.  It's a 2005 case.  It's cited in our
2  papers.  And, Your Honor, Mostoller tracks precisely the
3  second prong of our argument.  It tracks the argument
4  that the clearly correct position, assuming no
5  bankruptcy freeze, that the 544(a) powers exist as of
6  the date of filing, at which time it was perfected, that
7  the change in the law essentially rendered the interests
8  of a party holding last UCC as having priority over a
9  lien creditor.  And that's all that exists, and it's not
10  even a lien creditor as of the date of filing.  So under
11  the language of 8.9A-515, their claim has to fail.
12        The fascinating part about the
13  North Carolina case that he cites, Miller Brothers, is
14  it doesn't address this analysis at all.  He likes the
15  case because it takes the same position he has.  You
16  didn't file a continuation statement, you lose.  There's
17  just simply no analysis that walks through the code,
18  deals with the expressed language of 8.9A-515(c) and
19  deals with the priority rules that are established in
20  the Official Comment, Section 3 -- Comment 3.
21        Example 2 is this case.  SP holds a security
22  interest perfected by filing.  On July 1, lien creditor
23  acquires a judicial lien on the collateral.  Two weeks
24  later, the effectiveness of the financing statement
25  lapses.  Although the security issues becomes

**137**

1   unperfected upon lapse, it was perfected when the lien

2   creditor acquired its lien.  Accordingly,

3   notwithstanding the lapse, the perfected security

4   interests has priority over the rights of lien creditor

5   who is not a purchaser.

6           So, Your Honor, again, our preference would

7   be that the Court adopt the bankruptcy freeze analysis

8   that's suggested in the Wilkinson case and in the Great

9   American case and in the other cases in the Law Journal

10  article that we attached to our pleadings.

11  Alternatively, that the Court follow what is the clear

12  provisions of the new Code 8.9A-515 and find that if you

13  don't adopt the freeze language, what are unperfected,

14  but our unperfected interests takes prior and has

15  priority over the lien creditor status of the trustee,

16  and further because that lien creditor status relates

17  back to the date of the filing of the position and at

18  the time, it was perfected.  So there is a security

19  interest, and the security interest is prior to the

20  interest of the trustee/debtor in possession.  There are

21  no other secured creditors here.  Mr. Guyant's interests

22  in the proceeds that Mr. Campbell described is first,

23  and he should be deemed to be first and secured in those

24  assets.

25          Thank you, Your Honor.

**138**

26

1          MR. CAMPBELL:  Thank you, Your Honor.

2          This same argument was advanced, it seems,

3  in the Miller Brothers case.  Judge Waldrep said

4  American Bank cites substantial case law allegedly in

5  support of a proposition of the automatic stay fixes and

6  protects priorities as they exist on the petition day.

7  The Court is not convinced by this authority.  Isaacs

8  versus Hobbs, which is a 1931 bankruptcy case, for

9  example, considered the jurisdiction of the Bankruptcy

10  Courts in the foreclosure proceedings where State Courts

11  also had jurisdiction.  Contrary to the position

12  advanced by American Bank, the Supreme Court concluded

13  that the State law controlled the valid existence of a

14  lien, while Bankruptcy Courts had exclusive jurisdiction

15  to determine the validity of liens and method of

16  liquidation.  And then he cites two Bankruptcy Courts.

17  He said, The Court stressed the preeminence of State law

18  in determining the validity of liens, although the Court

19  concluded that the time for filing continuation

20  statement is told by the automatic stay, it also noted

21  that its holding was based on State law and the

22  Massachusetts Legislative Goals of Notice to Other

23  Creditors.

24          I can't reconcile where the New York Court

25  went in Wilkinson from where the North Carolina Court

**139**

27

went in Miller.  They cannot be reconciled.  But what is
compelling is Judge Waldrep concluded that when you look
at new Section 515(c), and as he says, "In combination
with Sections 362(b)(3)and Section 546(b) of the
Bankruptcy Code, which allow a creditor to file a
continuation statement without first obtaining relief
from the automatic stay, alters this outcome."

So we have someone within the
Fourth Circuit, a bankruptcy judge, saying in following
a line of cases that 515(c) with 362(b)(3) amendments
and 546(b) amendments alters the prior circumstance.
And I guess the issue here is whether you find what
Judge Davis did in New York to be more compelling than
what Judge Waldrep did in North Carolina.

But I still disagree with my colleague
because I believe the reason -- the Law Review article
that he speaks of isn't a Law Review article.  It's a
seminar predicting what would happen after the adoption
of these amendments.  It doesn't reflect what had
happened, and most of the authority in their brief comes
from that seminar synthesizing what the law had been
before 2001.

But on the precise points here, we find just
two cases on point, and they cannot be reconciled, and I
guess it's up to this Court to decide which you would

**140**

28

```
 1   like to follow.
 2            THE COURT:  Well, one issue that Mr. Goldman
 3   raises is the use of the term "unperfected" in the
 4   statute and the trailing language after that, which
 5   draws the distinction between a lien creditor and a BFP,
 6   bona fide purchaser for value.  How do you address that?
 7            MR. CAMPBELL:  If I might, the language he
 8   points to in -- I'm sorry, this the old statute.
 9            One moment, Your Honor.  I've shuffled my
10   papers.
11            The first sentence of the statute and the
12   second sentence of the statute are the ones that are
13   difficult to reconcile because it does say, Upon lapse,
14   a financing statement ceases to be effective.  Then I
15   guess, we talk about --
16            THE COURT:  But a financing statement has a
17   purpose, and that is to perfect the security interests.
18            MR. CAMPBELL:  Correct.
19            THE COURT:  It doesn't create the security
20   interests.
21            MR. CAMPBELL:  Correct.
22            The third parties, I guess, we're concerned
23   about here in theory are the other unsecured creditors
24   in the case.  Basically, what we see here is that
25   Mr. Guyant should be treated -- if we follow the theory
```

**141**

29

```
 1   in Miller Brothers, Mr. Guyant would be treated just
 2   like the remaining unsecured creditors in this case.  I
 3   guess the strong-arm powers of the Bankruptcy Code are
 4   designed to protect the bankruptcy estate, but I'm not
 5   sure if they're designed to protect the unsecured
 6   creditors.  So I'm not sure how to synthesize that
 7   language.  I need to think about that a bit more, and I
 8   guess, that's bad news because it's today that we're
 9   arguing the case.  But I guess what he is saying, in
10   essence, is that he believes that the Northern District
11   of New York is correct and that the Middle District of
12   North Carolina is wrong.
13            THE COURT:  At least to the extent that
14   these issues were raised.
15            MR. CAMPBELL:  Well, I can't tell from the
16   New York decision where they were raised, but in
17   Footnote 1 -- in Footnote 2 of Miller Brothers, it
18   appears that they were because it looks like
19   Judge Waldrep is addressing those issues in his opinion
20   because he seemed to be concerned about them.  And he
21   believes that in 2001, unlike what Judge Davis concluded
22   in the Northern District, the rules did change after
23   2001.
24            THE COURT:  All right.
25            MR. GOLDMAN:  Your Honor, if I may, just
```

**142**

```
 1   very briefly.
 2          Mr. Campbell is complaining two different
 3   concepts.  The Wilkinson case was decided on the
 4   bankruptcy freeze analysis.  The Miller Brothers case
 5   was wrongly decided on the basis of the 515 analysis.
 6   And I quote that it's on -- (reading) The debtor,
 7   therefore, may avoid American Bank security interests
 8   pursuant to Section 544 of the Bankruptcy Code.
 9          Those powers exist as of the date of the
10   filing of the petition.  The lapse was later, and under
11   the clear language of 515, and, again, under the
12   Mostoller case, the trustee doesn't have the authority
13   to essentially invalidate something that was good as of
14   that date.
15          THE COURT:  Well, if I follow your argument,
16   and if it had lapsed two days before the filing, the
17   bankruptcy estate would not be able to avoid the
18   security interest --
19          MR. GOLDMAN:  That --
20          THE COURT:  -- even though it is
21   unperfected.
22          MR. GOLDMAN:  That's exactly correct because
23   it would still only have the status of a lien creditor.
24   We would not have the freeze argument, but, Your Honor,
25   their independent arguments, if you decide on the
```

**143**

1    freeze, you don't need to decide the code --

2          THE COURT:  I understand that there are two

3    arguments.

4          MR. GOLDMAN:  Okay, and thank you.

5          THE COURT:  Now, tell me about the money.

6          MR. GOLDMAN:  Okay.

7          THE COURT:  The closing is coming up and --

8          MR. CAMPBELL:  The closing on a parcel of

9    real estate in Lucketts, Virginia happened on Friday,

10   and the estate's distribution through Stanford -- or

11   Sanford -- excuse me -- is going to be approximately

12   $150,000, we believe.

13         The disposition of the proceeds on tax

14   credits is going to be roughly somewhere between 680 and

15   perhaps as much as $700,000.  And so we think that

16   between 6 and $800,000 in proceeds will be received by

17   the estate before year's end.

18         Mr. Guyant -- and this would be a separate

19   issue for this Court -- if the Court declares there's no

20   security interest, the litigation on this issue ends.

21   Their security interests grant -- unequivocally grants

22   rights in Sanford, LLC.  This is where it gets a little

23   bit complicated.  You might remember from the turnover

24   motion that there was an entity called Foothills that

25   has an interest -- has a 24 percent interest in Sanford.

**144**

```
1   Foothills has separate obligations of its own, but
2   Highland is a member of Foothills.  And I believe the
3   other dispute that we'll have is that Highland has a
4   direct interest of 20 percent in Sanford.  And so the
5   UCC at issue grants Mr. Guyant 50 percent interest in
6   Highland's interest in Sanford or 10 percent.  The
7   remaining interest that Highland has in Sanford is
8   derivative through something called Foothills, and
9   Highland's interest in Foothills is 50 percent, so the
10  resulting equitable interest is 12 percent.  So the
11  question is whether or not if there is an existence of
12  security interest, we contend that it only applies to
13  Highland's direct 20 percent interest in Sanford, and
14  thus, would apply to something on the magnitude of
15  $200,000, perhaps.
16           THE COURT:  If there is money that is going
17  to be available, is it necessary to distribute that, or
18  can it be held?
19           MR. CAMPBELL:  It's going to be held, and
20  what I've agreed with Mr. Brennan because there was a
21  letter sent by Mr. Guyant to all the members of Sanford
22  sort of demanding that the proceeds come to him.  What
23  we have agreed, Mr. Brennan and I, or communicated in my
24  agreement that any proceeds that come to Highland shall
25  be -- and I've also agree with this with the U. S.
```

**145**

1   Trustee's Office shall be held in my firm's trust

2   account pending adjudication by this Court of proper

3   disposition, plus we intend to do a plan sometime in the

4   next quarter, as Your Honor knows.  There will be no

5   distributions without Court approval, if that's your

6   question.

7           THE COURT:  So the proceeds that are at

8   issue here between Highland and Mr. Guyant will be held

9   by agreement or are being held by you and your trust

10  account?

11          MR. CAMPBELL:  That's my proposal.  I

12  believe Mr. Brennan accepts that.

13          THE COURT:  Is that correct?

14          MR. CAMPBELL:  And we've agreed not to

15  disburse anything to anybody without the approval of the

16  Court.

17          MR. GOLDMAN:  I thought we were talking --

18  that's certainly correct.  I did not think that

19  Mr. Campbell was talking about that happening until some

20  great time in the future.  I thought that we were

21  talking about doing that until we had the Court's

22  resolutions --

23          THE COURT:  Well, that would be an order of

24  the Court.

25          MR. GOLDMAN:  Right.

**146**

34

```
1              THE COURT:  Right.  So that would resolve
2    the issue at that point.
3              MR. CAMPBELL:  If the Court determined that
4    200,000 of what I held belonged to Mr. Guyant, we would
5    disburse accordingly.
6              MR. GOLDMAN:  Absolutely.
7              THE COURT:  All right.
8              Now, it's coming out of an IRA.  Does it
9    have to be rolled over?  How is that going to --
10             MR. CAMPBELL:  Well, actually, that's
11   different.  His -- that would be paid to an IRA.
12             THE COURT:  It will be paid --
13             MR. CAMPBELL:  The proceeds --
14             THE COURT:  Wells Fargo is custodian for the
15   IRA?
16             MR. CAMPBELL:  Correct.
17             Basically, the IRA invested --
18             THE COURT:  There's no tax issue on a
19   rollover or anything?
20             MR. CAMPBELL:  Not at all.
21             THE COURT:  So the payee will be Wells Fargo
22   for benefit of?
23             MR. CAMPBELL:  Correct.
24             The underlying obligation is created because
25   there was a loan between the IRA and Highland.  That's
```

**147**

1    how the whole dispute in State Court began.

2              THE COURT:  Now, the papers I have are

3    attached to the objection to claim.  They are various

4    UCC filings, and there's an order from the Circuit

5    Court, Judge Chamblin --

6              MR. CAMPBELL:  Correct.

7              THE COURT:  -- on the 5th of October,

8    November.  What was it?

9              MR. GOLDMAN:  I think October.

10             MR. CAMPBELL:  I think it was October of

11   2010.

12             THE COURT:  All right.  Which is

13   prepetition.

14             Are those all of the papers that are

15   critical?

16             MR. GOLDMAN:  Yes, Your Honor.  They're

17   attached to our opposition.  We have the second

18   amendment to the security agreement.  There was -- we

19   did not attach the security agreement itself and the

20   first amendment, and in response to something

21   Mr. Campbell said, I do want to note that in the

22   recitals, it specifically refers to the security

23   interest being 16 percent of the total membership

24   interest of Sanford, which you get to by adding

25   Highland's direct interest in Sanford and half of

**148**

36

```
1   Highland's interest --
2                THE COURT:  Well, that goes to the
3   calculation of --
4                MR. GOLDMAN:  Correct.
5                THE COURT:  -- the dollar amount, and Judge
6   Chamblin issued an order which had a declaration of what
7   was subject to the trust -- well, not trust -- but
8   subject to a --
9                MR. CAMPBELL:  The difficulty is that, as
10  best I can tell, in the State Court litigation, the
11  presence of Foothills wasn't litigated.  The Foothills
12  interest held by Highland is not specifically identified
13  in any of the UCC instruments.  And before Foothills
14  will ever make a distribution to Highland, Foothills has
15  obligations to pay.  I know of at least one $300,000
16  obligation that needs to be satisfied before there will
17  be any distribution.  And for a later day, we believe
18  that it's a matter of dispute as to whether or not the
19  Guyant -- if the Guyant IRA continues to have vitality,
20  it will be for a different day as to whether that
21  security instrument applies to the Foothills interest or
22  not.
23               THE COURT:  All right.
24               So I accede to the opposition their various
25  amendments to the security agreement, various other
```

**149**

37

1    exhibits.  Is there any objection to considering those?

2              MR. CAMPBELL:  No, I --

3              THE COURT:  All right.

4              MR. CAMPBELL:  -- I will review them and

5    confirm, Your Honor, but I believe they're all

6    appropriate.  I think they would be -- it could be

7    easily authenticated, and since they're a request for

8    admission, we'd admit to them, but I'd like to look at

9    them one last time.

10             THE COURT:  It seems to me that the issue to

11   be addressed is the security interest issue.  If there's

12   a dispute as to how the calculation has been done,

13   that's not really here today.

14             MR. GOLDMAN:  That's correct.

15             THE COURT:  Am I correct?

16             MR. CAMPBELL:  Correct.

17             MR. GOLDMAN:  That's correct.

18             THE COURT:  All right.  So I can make a

19   ruling as to whether there is or is not a security

20   interest --

21             MR. CAMPBELL:  And that's all we're seeking

22   today.

23             THE COURT:  -- and if there is no agreement

24   as to an amount, we'll have to work through these

25   various issues as to who has how much and what and what

**150**

1  is subject --

2              MR. CAMPBELL:  That is correct, Your Honor.

3              THE COURT:  All right.  Well, then, I will

4  address that one issue.

5              I'm glad you waited until the end.  You got

6  your 30 minutes plus, and I think you needed it.  It was

7  beneficial.  But I hate to keep people after --

8              MR. CAMPBELL:  Your Honor, do you intend to

9  do that today, or can I supplement trying to answer the

10  questions that I fumbled on ten minutes ago at a later

11  date?

12             THE COURT:  If it's not critical to disburse

13  the money, then I will have some time to reflect, and if

14  you want a day or two, both of you, to file any

15  supplement, I'll give you reasonable time to do that.

16             Next week is, of course, we're running into

17  Christmas, and I'm not going to promise you that I'm

18  going to do anything, particularly if you file anything.

19             MR. CAMPBELL:  Say, perhaps within ten days

20  since --

21             MR. GOLDMAN:  That's fine with me,

22  Your Honor.

23             MR. CAMPBELL:  Two weeks?

24             THE COURT:  You tell me.  I'm going to be

25  here.  I'll receive them when they come.  As long as

**151**

39

```
 1   it's within a reasonable time, I'm happy to do it.
 2              MR. CAMPBELL:  If it were two weeks, my wife
 3   and family would probably thank you, Your Honor, if I'm
 4   not working so much over the holiday.
 5              THE COURT:  Today is the 18th.  Two weeks
 6   would be the 1st of January.
 7              MR. GOLDMAN:  January 4, perhaps.
 8              THE COURT:  Why don't we make it January the
 9   7th, which is a Monday.  And they will be simultaneous,
10   so there will be no need for a reply.
11              MR. CAMPBELL:  Very well.
12              THE COURT:  And then I will take it under
13   advisement and decide as quickly as I can.
14              MR. CAMPBELL:  Very well.
15              THE COURT:  The closing can still go forward
16   and disbursements except for this --
17              MR. GOLDMAN:  Subject to being put in
18   Mr. Campbell's trust account, they're not going
19   anywhere.
20              MR. CAMPBELL:  And that's our agreement with
21   the United States Trustee as well, Your Honor.
22              THE COURT:  Get your papers in by the 7th,
23   and I will review it as soon thereafter as I can.
24              MR. CAMPBELL:  Your Honor, you and your
25   staff, happy holidays.
```

**152**

40

```
 1          THE COURT:  Well, thank you.
 2       And we will adjourn for the day.
 3          MR. GOLDMAN:  Thank you, Your Honor.
 4          THE CLERK:  All rise.
 5          This Court is now adjourned.
 6       (Proceedings concluded at 3:50 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**153**

41

```
 1                    CERTIFICATE OF COURT REPORTER
 2
 3           I, Donna K. Soutter, do hereby certify that
 4   I stenographically recorded the proceedings heard in the
 5   United States Bankruptcy Court for the Eastern District
 6   of Virginia, in the captioned cause, heard by the
 7   Honorable Robert G. Mayer, Judge of said Court, on
 8   Wednesday, December 18, 2012.
 9           I further certify that the foregoing
10   transcript of said proceedings constitutes a true,
11   accurate, and complete transcript of said proceedings to
12   the best of my knowledge and ability.
13           Given under my hand and notarial seal at
14   Culpeper, Virginia, this 31st day of December, 2012.
15
16
17                       /s/
18        _____
19                Donna K. Soutter,
20           Notary Public No. 357093
21        Commonwealth of Virginia at Large
22
23
24
25
```

**154**

## UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

In Re:

**HIGHLAND CONSTRUCTION
MANAGEMENT SERVICES, LP**            **Case No. 11-11413-RGM**
                                     **Chapter 11**
       Debtor.

## MEMORANDUM IN SUPPORT OF
## DEBTOR'S OBJECTION TO PROOF OF CLAIM

COMES NOW Highland Construction Management Services, LP

("Debtor" or "Highland"), by counsel, and files this Memorandum in further

support of its Objection to Proof of Claim 4-1 filed on behalf of Wells Fargo f/b/o

Jerome Guyant IRA ("Guyant") as follows:

I.      **Summary of the Case.**

Oral argument in the case was held on December 18, 2012 with the

central argument being the effect, if any, of the lapse of a UCC in

accordance with Virginia law.  On page 30 of the transcript of the

December 18, 2012 hearing, counsel for Mr. Guyant argued that a lapse of

his client's UCC would be of no consequence, even if the lapse occurred

prior to bankruptcy, rather than after bankruptcy, as in this case.

Highland respectfully asserts that the effect of a lapse is almost

entirely a question of state law.  Stated otherwise, there is no mandate in the

Bankruptcy Code that allows the result that Mr. Guyant seeks.

1

**155**

In 2001, when the amendments to the UCC were adopted by the General Assembly in Virginia, state law changed in significant ways in relation to UCCs against assets owned by parties in bankruptcy. The requirement that continuation statements be filed, even during bankruptcy, is a clear mandate of state law. The amendments to the Bankruptcy Code allowing the filing of continuation statements, without relief from the automatic stay, is the only relevant "bankruptcy law" to guide this Court.

## II.    The Debtor in Possession is a Hypothetical Perfected Lien Creditor.

A trustee in bankruptcy stands as a hypothetical judgment lien creditor, which becomes effective on the date a Debtor files a bankruptcy petition. *See* 11 USCS§ 544(a)(1). Thus, a bankruptcy trustee is entitled to priority over unperfected liens. See *In re Wuerzberger*, 284 B.R. 814 (Bankr.W.D.Va. 2002). The status that 11 USCS § 544 confers upon a trustee in bankruptcy is that of ideal creditor, irreproachable and without notice, armed cap-a-pie with every right and power which is conferred by the law of the state upon its most favored creditor who has acquired lien by legal or equitable proceedings; thus a trustee is empowered with the right of judicial lien creditor, creditor holding execution returned unsatisfied, and bona fide purchaser of real property from the debtor. *In re Hurst,* 27 B.R. 740 (Bankr.E.D.Tenn. 1983).

2

**156**

### III.    The Effect of Lapse is a Question of State Law.

Whether a lien creditor has priority over another claimant is determined by looking at state law. *See Commercial Credit Co. v. Davidson*, 112 F.2d 54 (5th Cir.1940).  Virginia Code §8.9A-515 specifically states that, "upon lapse, a financing statement ceases to be effective and any security interest or agricultural lien that was perfected by the financing statement becomes unperfected, unless the security interest is perfected otherwise." See §8.9A-515.  The 2001 amendments to the Bankruptcy Code make it clear that a continuation statement is required. The parties' rights are, therefore, not frozen in time, otherwise the requirement of a continuation statement would be unnecessary.

Section 544 of the Bankruptcy Code acts to perfect the Trustee's rights on the date of the filing of the petition.  Upon lapse of a financing statement, the Virginia statute, §8.9A-515, informs that the security interest that was previously perfected becomes unperfected.  Accordingly, application of the plain reading of the statute provides that the bankruptcy trustee is bumped up in priority status in relation to the previously perfected interest that lapsed.

The conclusion follows from a simple application of the plain language of Virginia UCC law.  Under the UCC priority system, "a perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien."  Virginia Code §8.9A-

3

**157**

322(a)(2). Therefore, the trustee's interest becomes superior to Guyant's unperfected interest, and Guyant will not be treated as a secured creditor.

## IV.    The Bankruptcy Freeze Relating to UCC Filings is a Matter of State Law.

Prior to the 2001 amendments to the UCC, the interest of a secured claimant was frozen based upon state law, because the lapse was frozen during any pending bankruptcy. While Guyant argues that the priorities are frozen as of the bankruptcy filing date, the 2001 Amendments make it abundantly clear that the prior freezing provision was abolished. *Miller Brothers Lumbar Company*, 2012 Bankr. Lexis 2031 (2012), considered and rejected the argument in a footnote. The court remarked that the cases cited for the freezing theory were not persuasive because they depended on the application of state law. The court also said that the position ignored the plain language of §9-515 (identical to Virginia's §8.9A-515), which unambiguously states that lapse of a filing statement renders it ineffective and imposes the burden of filing continuation statements. "Thus, parties which fail to file UCC-3 continuation statements will lose their secured status, even when the lapse occurs post-petition." *Id.*

*Miller Bros.* is not the only case that follows this reasoning. In *GE Capital Corp. v. Dial Bus. Forms Inc.*, 273 B.R. 594 (Bankr.W.D.Mo. 2002), Class 3 unsecured creditors were elevated in priority when a previously perfected security interest lapsed. The issue was whether the

4

**158**

lapsed security interest, which remained attached to the equipment even

though it became unperfected, retained its priority against the junior lien

held by the Trustee.  The court reasoned that, "when the drafters of the

UCC amended Article 9 in 1972, they added a sentence to section 9-403(2)

that made it clear that a junior creditor who filed its financing statement

before the lapse will move up in priority, even though it had actual

knowledge of the prior lien." *GE Capital Corp.* at 597.

Additionally, in *In re Chattanooga Choo-Choo Co.*, 98 B.R. 792

(Bankr.E.D.Tenn. 1989), the Tennessee bankruptcy court held that a lapsed

financing statement is ineffective against other financing statements filed

before the lapse. This is partly because a rule that lapse affects only

transactions after the lapse would create too much confusion and too many

factual disputes among secured creditors.

**V.    The Comments to the Virginia Code Cannot Be
Reconciled With Mr. Guyant's Argument.**

Mr. Guyant relies upon Official Comment #4 to Virginia Code

§8.9A-515 which states as follows:

> *Effect of Debtor's Bankruptcy.* Under former section 9-403(2),
> lapse was tolled if the debtor entered bankruptcy or another
> insolvency proceeding. Nevertheless, being unaware that
> insolvency proceedings had been commenced, filing offices
> routinely removed records from the files as if lapse had not been
> tolled. **Subsection (c) deletes the former tolling provision and
> thereby imposes a new burden on the secured party: To be sure
> that a financing statement does not lapse during the debtor's
> bankruptcy. The secured party can prevent lapse by filing a
> continuation statement, even without first obtaining relief from**

5

**159**

**the automatic stay. See Bankruptcy Code section 362(b)(3). Of
course, if the debtor enters bankruptcy before lapse, the provisions
of this article with respect to lapse would be of no effect to the
extent that federal bankruptcy law dictates a contrary result
(e.g., to the extent that the Bankruptcy Code determines rights
as of the date of the filing of the bankruptcy petition).**

The Bankruptcy Code, other than §362(b)(3), does not address the UCC.

The long citation of cases relied upon by Mr. Guyant on page 5 of his December

11, 2012 Opposition all relate to the UCC prior to the 2001 amendments. Here is

a string site of the authority before 2001 which Mr. Guyant cites and which cannot

support Mr. Guyant's position on the lapse issue: *In the Matter of Funding System

Asset Management Corporation* 38 B.R. 351 (Bkrtcy. W.D. Pa. 1984); *In Re Delia

Brothers, Inc.*, 29 U.C.C. Rep. Ser. 1446 (Bkrtcy. S.D. N.Y. 1980); *In Re

Chaseley's Foods, Inc.*, 30 B.R. 452 (Bkrtcy N.D. Ind. 1983); *In Re Paul H.

Steigerwald*, 35 B.R. 254 (Bkrtcy. E.D. Pa. 1983); *In Re South County Motel

Corp.*, 19 U.C.C. Rep. Serv. 1254 (Bkrtcy. D. R.I. 1976)." In Re Catamount

Dyers, Inc., 50 B.R. 788, 790 (Bankr. D. Vt. 1985); Issacs v. Hobbs Tie & Timber

Co., 282 U.S. 734, 738 (1930); Lockhart v. Garden City Bank & Trust Co., 116

F.2d 658 (2d Cir. 1940).

A number of the reported cases do explain that approved Plans of

Reorganization established pursuant to the Bankruptcy Code are a basis to prevent

a lapse of a security interest. However, such an analysis is not appropriate in this

pre-confirmation case.

6

**160**

## VI.    Conclusion

Bright line rules customarily result in the near absence of guidance from appellate courts.  The bright line rule adopted in 2001 in Virginia, clearly and unequivocally requires the filing of a continuation statement, even when a debtor is in bankruptcy.  The bright line rule adopted by the Congress in the Bankruptcy Code, allowing the filing of a continuation statements, without first obtaining relief from the automatic stay is a similar bright line rule.

By operation of state law, the Wells Fargo f/b/o Jerome Guyant IRA is no longer a secured creditor in relation to the specific assets identified in the UCC recorded on October 11, 2006.  Accordingly, Highland's claim objection should be sustained and Wells Fargo f/b/o Jerome Guyant IRA should be treated as an unsecured creditor.

HIGHLAND CONSTRUCTION
MANAGEMENT SERVICES, LP
By Counsel

/s/ James P. Campbell
James P. Campbell, Esquire
*Campbell Flannery, P.C.*
1602 Village Market Boulevard, Suite 220
Leesburg, Virginia  20175
(703) 771-8344/Telephone
(703) 777-1485/Facsimile

7

**161**

## CERTIFICATE OF SERVICE

I hereby certify that service of a true copy of the foregoing has been made as follows:

Type of Service:                Electronic Mail via the United States Bankruptcy Court
                                to all parties requesting notice and First-Class, U.S.
                                Mail to the parties listed below

Date of Service:                January 14, 2013

Persons served and address:     Neil D. Goldman, Esq.
                                Goldman & Van Beek, PC
                                510 King Street, Suite 416
                                Alexandria VA 22314

                                John J. Brennan, III, Esq.
                                Brennan Law LLC
                                510 King Street
                                Suite 416
                                Alexandria, VA 22314

Item Served:                    Memorandum in Support of Debtor's Objection to
                                Guyant's Proof of Claim

                                                /s/ James P. Campbell
                                                James P. Campbell

8

**162**

Neil D Goldman, Esq (VSB No 18352)
John P Van Beek, Esq (VSB No 30897)
Goldman & Van Beek, P C
510 King St , Suite 416
Alexandria, Virginia 22314
(703) 684-3260
(703) 548-4742 (facsimile)
ngoldman@goldmanvanbeek com
jvanbeek@goldmanvanbeek com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 11-11413-RGM |
| HIGHLAND CONSTRUCTION | ) | Chapter 11 |
| MANAGEMENT SERVICES LP | ) | |
| Debtor. | ) | |
| _____ | ) | |

## THE JEROME GUYANT IRA'S AMENDED SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP'S OBJECTION TO PROOF OF CLAIM

At the hearing on Highland's objection, the Court permitted the parties to file, simultaneously, supplemental memoranda addressing issues raised and arguments made at the hearing. Wells Fargo Bank, N.A. f/b/o Jerome Guyant IRA (the "Guyant IRA") respectfully submits this Amended Memorandum as a supplement to the Guyant IRA's Memorandum in Opposition to Highland's Objection to its Proof of Claim [Docket No. 109 filed December 12, 2012](the "Initial Memorandum"). A careful review of the facts of this case and the applicable law make clear beyond dispute that the Guyant IRA retains a first priority security interest in the distributions that the Debtor, Highland Construction Management Services LP ("Highland") is to receive from Sanford, LLC ("Sanford"), and from Foothills, LLC, ("Foothills") based on the distributions that Foothills is to receive from Sanford (both such distributions are referred to as the "Sanford Distributions"). This conclusion is supported by either: (i) deciding that under

**163**

bankruptcy law, the security interest of a creditor whose financing statement lapsed post-petition remains perfected following the lapse because perfected status is determined as of the date of filing, as held in In re: Wilkinson, 2012 Bankr. LEXIS 1539 (Bankr. N.D.N.Y. 2012); or (ii) assuming, *arguendo*, that the Court rejects the Wilkinson approach and deems the Guyant IRA's security interest to be unperfected, under Va. Code §8.9A-515(c) that the security interest nevertheless has priority over the claims of all other creditors in this case, including the Debtor holding the strong arm powers contained in Section 544. *See, e.g.*, Mosteller v. Citicapital Commercial Corporation, 330 B.R. 613, 623-624 (Bankr. E.D. Tenn. 2005).

This Court need not in this case choose one approach or the other. It is sufficient that the result is the same under either analysis: the Guyant IRA has a first priority security interest in the Sanford Distributions.

1. **The Guyant IRA has a Security Interest in 50% of Highland's Interest in Sanford, consisting of 16% of the total Interests in Sanford.**

Attached as Exhibits 1-3 are the December 20, 2005 Security Agreement and the two (2) amendments made to that agreement (collectively, the "SecurityAgreement"). Highland is the owner of a 20% interest in Sanford LLC ("Sanford"). Highland also is the owner of a 50% interest in Foothills, LLC ("Foothills"). Foothills, in turn, owns 24% of Sanford. The total interests in Sanford owned by Highland is thus 32%. Highland pledged 50% of those interests, or 16%, to the Guyant IRA as security for the loan. This is reflected in the fifth "WHEREAS" clause of the Second Amendment to Security Agreement, Exhibit 3, page 1.

The security interest was perfected by the filing of a financing statement on October 11, 2006 (Exhibit A to Highland's objection). The financing statement was later twice amended, but those amendments did not operate to extend the period during which the financing statement was effective. In a Judgment Order entered October 5, 2011 by the Circuit Court of Loudoun County

2

**164**

in <u>Wells Fargo Bank, N.A. FBO Jerome Guyant IRA v. Highland Construction Management
Services, Inc.</u>, Case No. 60287, the Guyant IRA was awarded a declaratory judgment that it had
a perfected security interest in, among other assets, 50% of Highland's interest in Sanford.  The
petition in this case was filed February 28, 2011, prior to the lapse of the financing statement on
October 11, 2011.

2.  *<u>Wilkinson</u> Holds That A Security Interest Perfected By A Financing Statement
    In Effect At The Time Of The Filing Of The Petition Remains Perfected Despite
    The Failure To File A Continuation Statement.*

In a well-reasoned opinion in <u>Wilkinson</u>,[1] Judge Davis of the United States Bankruptcy
Court for the Northern District of New York held that a security interest that was perfected as of
the time of the filing of a Bankruptcy petition, but as to which the financing statement lapsed
because no continuation statement was filed, remained perfected during the pendency of
bankruptcy proceedings despite such lapse.  Judge Davis noted that changes to the Bankruptcy
Code permitted the filing of UCC-3 continuation statements without the need for stay relief, and
further noted that changes to the UCC deleted provisions which specifically provided that
financing statements remained effective until sixty (60) days after the termination of bankruptcy
proceedings.  Judge Davis referenced a line of cases, many of which are cited in the Guyant
IRA's Initial Memorandum, for the proposition that secured status is determined as of the date of
the filing of the Petition.  She recognized that the Section 362(c)(3) was modified so that
secured creditors "are now permitted—but not required to—file continuation statements
notwithstanding the pendency of a bankruptcy proceeding."  2012 Bankr. LEXIS 1539, *12.

Judge Davis made special mention of official comment 4 to UCC section 9-515 which
provides in pertinent part: **"Of course, if the debtor enters bankruptcy before lapse, the**

---

[1] In <u>Wilkinson</u>, unlike this case, there was another perfected secured creditor whose financing statement was
filed after the filing of the lapsed financing statement at issue, and whose interest would have been superior to that
of the creditor holding the challenged financing statement if the prior creditor were deemed unperfected.

3

**165**

provisions of this article with respect to lapse would be of no effect to the extent that

federal bankruptcy law dictates a contrary result (e.g., to the extent that the Bankruptcy

Code determines rights as of the date of the filing of the bankruptcy petition)." (emphasis

supplied).

> [the challenging creditor's] reading of the Legislature's act, however, ignores the remainder of the Comment which nods to entrenched bankruptcy law and policy traditionally freezing parties' interests at the time of filing and tolling a post-petition affirmative obligation to file a continuation statement or lapse in perfection. As the court in *In re Bond Enterprises, Inc.* observed, "the critical time for determining the respective rights of a debtor and its creditors is the date of the filing of a petition in bankruptcy." *In re Bond Enterprises, Inc.*, 54 B.R. at 369 (citing *Lockhart v. Garden City Bank & Trust Co.*, 116 F.2d 658 (2d Cir. 1940)). The court therein continued to quote Supreme Court precedent holding that "'valid liens existing at the time of the commencement of a bankruptcy proceeding are preserved.'" Id. (quoting *Isaacs v. Hobbs Tie & Timber Co.*, 282 U.S. 734, 738, 51 S. Ct. 270, 75 L. Ed. 645 (1930)). **Applying these principles, the majority of courts that have considered the issue of post-petition lapsing of a security interest during the pendency of a bankruptcy proceeding in the context of state statutes without a bankruptcy tolling provision, as is the case here, have held that a properly filed financing statement does not lapse on the expiration of the original statement.** *Id.* (collecting cases). While a creditor's priority, vis-à-vis other creditors, is determined by state law, as [the challenging creditor] correctly asserts, the relevant question in light of an intervening bankruptcy is one of timing--at what temporal period should the bankruptcy court determine the parties' respective interests? **As did the court in *In re Bond Enterprises, Inc.*, this Court unequivocally finds itself in agreement with the majority position, which freezes the parties' position as of the date of filing, believing that to conclude otherwise would upset a fundamental tenet of bankruptcy that property interests are determined as of the petition date.**

2012 Bankr. LEXIS 1539, **10-12. (emphasis supplied).

The approach adopted by the <u>Wilkinson</u> court was suggested in a journal article

published at the time of the amendments to the UCC effective in 2001, and attached to the

Guyant IRA's Opposition.  WARNER, CONTINUING PERFECTION DURING

4

**166**

BANKRUPTCY UNDER REVISED ARTICLE 9, 20 APR Am. Bankr. Inst. J. 22 (2001).[2] At

least one other case decided following the 2001 amendments to the UCC has recognized this

approach. Great Am. Ins. Co. v. Merchs. & Planters Bank, 2008 U.S. Dist. LEXIS 23006, 32-34

(W.D. Tenn. Mar. 21, 2008).

   If this Court follows the Wilkinson analysis, the Guyant IRA has a perfected first priority

security interest in 50% of the Sanford Distributions due to Highland.

   3. **Even If The Court Does Not Adopt The *Wilkinson* Analysis, It Must Nevertheless**
      **Find That The Guyant IRA Has A First Priority Security Interest In The**
      **Sanford Distributions Under The Priority Rules Established In Va. Code §8.9A-**
      **515(c).**

   Va. Code §8.9A-515(c) states that "[i]f the security interest ...becomes unperfected upon

lapse, it is deemed never to have been perfected as against a purchaser of the collateral for

value." Official Comment 3 states clearly that "[t]he deemed retroactive unperfection applies

only with respect to purchasers for value; unlike former section 9-403(2), it does not apply with

respect to lien creditors." Comment 3 also provides examples of priority following lapse. Those

examples detail that upon lapse, the lapsed security interest retains priority over all interests

except those of an intervening "purchaser." The term "purchaser" includes a secured creditor,

but not a lien creditor.[3]

   Further, the trustee's status under Section 544 as a hypothetical lien creditor and a

hypothetical bona fide purchaser of real property applies only "as of the commencement of the

---

[2] A copy of the article is attached as Exhibit 6 to the Initial Memorandum. At the hearing held December 17, 2012, counsel for Highland stated that the cited article was not a law journal article at all, but a CLE publication. This statement is simply wrong. "The ABI Journal is the flagship publication of the American Bankruptcy Institute. This periodical is published 11 times a year, with a combined issue for December/January. Established in 1982, the Journal covers the entire range of insolvency issues, featuring timely articles written by some of the most knowledgeable professionals in the field." http://journal.abi.org.

[3] In Wilkinson, there was junior secured creditor with a financing statement that had not lapsed. The UCC analysis outlined here would not have protected the creditor whose financing statement had lapsed. To find for that creditor, the Wilkinson court had to decide that perfected status was irrevocably fixed at the time of the filing of the petition. As noted, such a finding is not required here, where there are no other secured creditors, and the priority rules established in Va. Code §8.9A-515(c) establish that the Guyant IRA has a first priority security interest in the Sanford Distributions.

5

**167**

case." So, in this case, not only does the Highland's attack as debtor-in-possession fail because it has the status of a lien creditor whose interest would remain subordinate upon lapse under §8.9A-515(c), but also lien creditor status under Section 544(a)is measured as of the date of the commencement of the case, when the Guyant IRA was perfected. Further, the collateral at issue (distributions on the membership interest in Sanford, LLC) is not real property, so Highland does not have the status of a bona fide purchaser for value under Section 544(a)(3) . "Since the §544 strong-arm power gives the trustee the status of a lien creditor with respect to debtor's personal property, the 9-515(c) limitation should prevent the trustee from avoiding a personal property security interest based on a post-petition lapse of perfection." Warner, p. 2.  See also, Mostoller v. CitiCapital Commer. Corp. (In re Stetson & Assocs.), 330 B.R. 613, 623 (Bankr. E.D. Tenn. 2005); GE Capital Corp. v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.), 273 B.R. 594, 597 fn. 10 (Bankr. W.D. Mo. 2002); Official Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank, FSB (In re Toy King Distribs.), 256 B.R. 1, 189 (Bankr. M.D. Fla. 2000); In re Provident Hospital & Training Asso., 79 B.R. 374, 378, fn. 10 (Bankr. N.D. Ill. 1987)..

     The facts of Mosteller are indistinguishable from the facts presented here.  The original financing statements had lapsed as to personal property owned by the debtor, there were no other secured creditors, and the trustee sought to avoid the lien of the secured creditor under Section 544(a).  The court rejected the trustee's claims.

> The Plaintiff's rights and powers as Chapter 7 Trustee were established as of the date of filing, but defined under state law. See 11 U.S.C.A. § 544(a). Because trustees in bankruptcy are armed with the rights of lien creditors under § 544(a) and are not purchasers for value, [10] the fact that three of the Defendant's UCC-1 Financing Statements lapsed during the pendency of the bankruptcy case does not change the priority scheme as between the Defendant and the Plaintiff. [11]

6

**168**

[10]  Section 544(a)(3) does provide the trustee with the rights of a bona fide purchase of real property, but not of personal property. See 11 U.S.C.A. § 544(a)(3). This subsection does not, therefore, have application to the present matters.

[11]  The lapse is of no consequence to the Defendant with respect to its priority as against the Plaintiff because, "under the 'strong arm' provisions of 11 U.S.C. § 544(a)(1), the Trustee stands in the shoes of a lien creditor whose liens arose as of the petition date." *In re Hurst*, 308 B.R. 298, 301 (Bankr. S.D. Ohio 2004). As of the petition date, all of the Defendant's liens were perfected, and it enjoyed a superior priority over the Plain-tiff with respect to the Equipment. Accordingly, the Plaintiff's priority was set as of December 2, 2002, and, as exemplified in the Official Comments, even upon lapse of the UCC-1 Financing Statements, her priority is subordinate to the Defendant:

3. Lapse. When the period of effectiveness under subsection (a) or (b) expires, the effectiveness of the financing statement lapses. The last sentence of subsection (c) addresses the effect of lapse. The deemed retroactive unperfection applies only with respect to pur-chasers' for value, unlike former section 9-403(2) [§ 47-9-403(2)], it does not apply with respect to lien creditors.
. . . .
Example 2: SP holds a secu-rity interest perfected by filing. On July 1, LC acquires a judicial lien on the collateral. Two weeks later, the effectiveness of the financing statement lapses. Although the security interest becomes unperfected upon lapse, it was perfected when LC acquired its lien. Accordingly, notwithstanding the lapse, the perfected security interest has priority over the rights of LC, who is not a purchaser. See section 9-317(a)(2) [§ 47-9-317(a)(2)].

330 B.R. at 623-624, including notes 10 and 11.

Highland's schedules reflect that there are no other parties having a security interest in Highland's membership interests in Sanford.  Accordingly, under the rules of priority established in Va. Code §8.9A-317(a), explained in Official Comment 3, and followed in Mosteller, the Guyant IRA retains a first priority security interest in Highland's 16% interest in Sanford, even if that interest would be deemed unperfected under Virginia law.

7

**169**

4.  **Highland's Assertion that the Guyant IRA's Claim Is Unsecured Is Untenable.**

In its Objection to the Guyant IRA's proof of claim, Highland seeks to have this Court "enter an Order declaring Proof of Claim 4-1 to be an unsecured claim." As detailed above, that relief is clearly not supported by the applicable provisions of the UCC, Va. Code §8.9A-515(c).[4] At worst, the Guyant IRA's claim is secured, but unperfected.

Highland now also relies on In Re: Miller Brothers Lumber Company, Inc. , 2012 Bankr. LEXIS 2031 (Bankr. M.D.N.C. 2012), and states that the holding in Miller Brothers cannot be reconciled with Wilkinson. First, the Guyant IRA acknowledges that the Miller Brothers court considered and rejected the "Bankruptcy Freeze" argument adopted by the Wilkinson court. 2012 Bankr. LEXIS 2031, *7, n.1. In this sense, Highland is correct that Miller Brothers cannot be reconciled with Wilkinson. Wilkinson and Miller Brothers simply come to a different conclusion about the effect of a lapsed financing statement under Bankruptcy law. But the inquiry does not end there.

The Miller Brothers court then concluded, without even a passing analysis of Section 9-515(c) of the UCC and its relationship with Section 544(a), that the security interest became unperfected by the lapse of the financing statement, and could be avoided by the Debtor "pursuant to its strong arm powers under Section 544." 2012 Bankr. LEXIS 2031, *10. But as is clear from the express language of 9-515(c), as well as the official commentary, the Debtor had only the powers of a lien creditor as of the petition date. As detailed previously, and as explained by the Mosteller court, the new priority rules set forth in 9-515(c) clearly establish that a party whose security interest in personal property becomes unperfected by lapse of a financing

---

[4] In its Objection, Highland relied on a Virginia case, Ainslie v. Inman, 265 Va. 347 (2003), which held that under the prior provisions of the Virginia UCC, a lien creditor had priority over a party whose financing statement had lapsed. Va. Code §8.9A-515(c) expressly modified these rules of priority such that under the current UCC, a party whose financing statement has lapsed has priority over a lien creditor. Under current law, Ainsley would be decided differently. Since Ainsley was decided under a now repealed provision of the UCC which has been replaced with new rules of priority, it is no longer good law.

8

statement nevertheless retains an unperfected security interest that has priority over a trustee or a debtor armed with the strong arm powers granted by Section 544(a).  With respect to personal property such as an interest in a limited liability company, Section 544(a) grants the trustee only the status of a hypothetical lien creditor as of the date of the filing of the petition, when the Guyant IRA, and the creditor in Miller Brothers held perfected security interests.   Va. Code §8.9A-515(c) provides that a creditor whose financing statement has lapsed enjoy priority over such a lien creditor.  For this reason, <u>Miller Brothers</u> is wrongly decided, and should not be followed by this Court.

**Conclusion**

The Judgment Order of the Circuit Court determined that the Guyant IRA had a perfected security interest in Highland's collateral, including the Sanford membership interest.  At the time of the bankruptcy petition, the Guyant IRA had a perfected security interest in that collateral which had been confirmed by the judgment.  No other party has a security interest in Highland's interest in Sanford.  Under both bankruptcy law and Virginia law without regard to bankruptcy law, the Guyant IRA remains a secured creditor holding a first priority security interest in 50% of Highland's share of the Sanford Distributions.  Accordingly, Highland's objection to the Guyant IRA's proof of claim should be overruled.

9

**171**

Dated: Alexandria, Virginia                Respectfully submitted,

January 15, 2013

                               /s/ John P. Van Beek

Neil D. Goldman, Esq. (VSB No. 18352)
John P. Van Beek, Esq. (VSB No. 30897)
Goldman & Van Beek, P.C.
510 King St., Suite 416
Alexandria, Virginia 22314
Voice:       (703) 684-3260
Facsimile:   (703) 548-4742
ngoldman@goldmanvanbeek.com
jvanbeek@goldmanvanbeek.com

Counsel for Guyant IRA


/s/John J. Brennan, III
John J. Brennan, III
VSB No. 18297
510 King Street
Suite 416
Alexandria, VA 22314
Telephone:   (703) 548-1620
Facsimile:   (703) 548-4742

Co-Counsel for Guyant.IRA

10

**172**

### CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of January, 2013, a true and correct copy of the foregoing Supplemental Memorandum has been served electronically using the ECF system on all registered users of the CM/ECF system who have filed notices of appearance in this matter, and by first class mail, postage prepaid to:

James P. Campbell, Esq.
Campbell Flannery P.C.
1602 Village Market Boulevard, #220
Leesburg, VA 20175
(703) 777-1485


And

United States Trustee, Region 4
115 South Union Street, Suite 210
Alexandria, VA 22314


/s/Neil D. Goldman

11

**173**

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| In re: | |
| HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP, | Case No.  11-11413-RGM (Chapter 11) |
| Debtor. | |
| HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP, | |
| Plaintiff, | |
| vs. | Contested Matter (Objection to Proof of Claim) |
| WELLS FARGO, N.A. f/b/o JEROME GUYANT IRA, | |
| Respondent.. | |

### MEMORANDUM OPINION

THE ISSUE presented is the effect of a financing statement that lapses after the filing of a petition in bankruptcy. Wells Fargo, N.A. f/b/o Jerome Guyant IRA ("Guyant") filed Proof of Claim 4 asserting that it held a claim secured by the debtor's interests in two Virginia limited liability companies. The debtor objected, not to the amount of the claim, but to the asserted secured status.

The facts are not disputed. Guyant loaned the debtor more than a million dollars starting on December 22, 2005. The loan was secured by the debtor's interest in two Virginia limited liability companies. The initial financing statement was filed on October 11, 2006. When the note became in default, Guyant sued the debtor and obtained a judgment on October 5, 2010, for $1,082,000.00 and a declaration that he held a perfected security interest in the debtor's interest in the two limited

1

**174**

liability companies. A writ of *fieri facias* was issued the same day.[1]   Other than the issuance of the

writ, no execution was commenced by Guyant on his judgment.[2]  The debtor filed a petition in

bankruptcy pursuant to chapter 11 of the Bankruptcy Code on February 28, 2011.  On October 10,

2011, the financing statement lapsed because no continuation statement was filed.

The parties are in agreement that on the day the petition in bankruptcy was filed, Guyant had

a first lien on the two membership interests pursuant to his security agreement which was properly

perfected by the October 11, 2006 financing statement.

The parties did not stipulate, but the court finds, that Guyant held a second priority lien

arising from the writ of *fieri facias* on October 5, 2010.  This lien related back to the date of the

original financing statement, October 11, 2006. Va.Code (1950) §8.9A-311(b); UCC §9-311(b).

The third priority is the debtor-in-possession as a hypothetical lien creditor pursuant to

§544(a)(1) of the Bankruptcy Code. The relevant portion of this section states as follows:

> The trustee shall have, as of the commencement of the case, and without regard to
> any knowledge of the trustee or of any creditor, the rights and powers of . . .
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of
> the case, and that obtains, at such time and with respect to such credit, a judicial lien
> on all property on which a creditor on a simple contract could have obtained such a

---

[1] Guyant's Proof of Claim is not clear that he claims a judicial lien arising from a writ of *fieri facias*. He states in his Proof of Claim that he "issued a Writ of Fieri Facias, and as a result, under Virginia law, has a lien on *other property* of the Debtor, the value of which is unknown." Supplement to Proof of Claim at ¶4 (emphasis added). The court assumes that he asserts a judicial lien arising from a writ of *fieri facias* in the debtor's interests in the two limited liability companies. The mere entry of a judgment does not create a lien.

The record is not clear when the writ of *fieri facias* was issued or whether is was delivered to the sheriff a necessary act to create the lien. Va.Code (1950) §8.01-501. In Virginia, they are typically issued by the Clerk of the Circuit Court shortly after a judgment is entered. In this case, it would have been issued on or after October 5, 2010 but before the filing of the petition in bankruptcy on February 28, 2011. The precise date within that time frame is not critical to the this court's analysis in this case. Unless one of the parties requests that further evidence be taken on this issue, the court will treat it as conceded that the writ of *fieri facias* was issued on and delivered to the sheriff on October 5, 2010.

[2]

2

**175**

judicial lien, whether or not such a creditor exists.

The fourth priority is Guyant with an unperfected lien created by the security agreement. The only difference between his first and fourth priority liens is that the first priority claim is the perfected UCC lien which is itself the fourth priority lien.

Prior to the 2001 amendments to the Virginia Uniform Commercial Code, the liens in effect on the date of the filing of a bankruptcy petition continued throughout the pendency of the bankruptcy case. Va.Code (1950) §8.9-403(2) previously provided, in part, that

> If a security interest perfected by filing exists at the time solvency proceedings are commenced by or against the debtor, the security interest remains perfected until termination of the insolvency proceedings and thereafter for a period of sixty days or until the expiration of the five-year period whichever occurs later.

This provision was deleted in 2001 when Virginia Code §8.9-403 (repealed by Acts 2000, c. 1007, effective July 1, 2001) was re-codified as Va.Code (1950) §8.9A-515. This was a deliberate change. It was thought, prior to the 2001 amendment, that the filing of a continuation statement after a bankruptcy case was commenced violated the automatic stay. 11 U.S.C. §362(a). In 1994, Congress amended §362 by making explicit that the automatic stay did not apply to acts to continue the perfection of an interest in property. 11 U.S.C. §362(b)(3). This change in the Bankruptcy Code eliminated the fear that filing a continuation statement would violate the automatic stay. After the amendment, there was no further impediment to filing a continuation statement or taking any other act to continue the perfection of a lien.

Section §8.9-403(2) had its own unfortunate consequences. The Uniform Commercial Code permitted the state office where financing statements were filed to destroy them five years after they were filed, the time when they would ordinarily lapse if not continued. Under the pre-2001 law, the

3

**176**

old financing statements were destroyed. However, the financing statement continued to be effective under the Virginia Code while a debtor was in bankruptcy. A subsequent search of the financing statements would not reveal the financing statement because the original financing statement would was destroyed and no continuation statement was filed.[3] The amendments to the Bankruptcy Code and to the Uniform Commercial Code resolved the issues. A financing statement lapses five years after it is filed even if a bankruptcy is commenced. It is now incumbent upon the creditor to file a continuation statement notwithstanding the pendency of a bankruptcy case, just as he would be required to do if no bankruptcy case was filed.

Guyant did not file a continuation statement and consequently, the October 11, 2006 financing statement lapsed after the filing of the bankruptcy. The question is the effect of the lapsed financing statement. The debtor argues that the debt is now unsecured.

The debtor relies on the 2001 amendment to Virginia Code §8.9-515(c). It argues that the

---

[3]Comments 2 and 3 to the prior provision explained the rationale and the effect. It stated:

2. Prior statutes have usually limited the effectiveness of a filing to a specified period of time after which refiling is necessary. Subsection (2) follows the same policy, establishing five years as the filing period . . . . Subsection (3) provides for the filing of one or more continuation statements (which need be signed only by the secured party) if it is desired to continue the effectiveness of the original filing.

The theory of this Article is that the public files of financing statements are self-clearing, because the filing officer may automatically discard each financing statement after a period of five years plus the year after lapse required by subsection (3), unless a continuation statement is filed, or the financing statement is still effective under subsection (6). This theory materially lessens the tension that would otherwise exist to have the files cleared by termination statements under Section 9-404. Similarly, a person searching the files need not go back past this five years plus one year; and if the indices are arranged by years, he has a limited and defined search problem. The section asks the filing officer to attach financing statements whose life has been continued by continuation statements to the latter statements, so that anything contained in the files of old years can be discarded.

3. Under subsection (2) the security interest becomes unperfected when filing lapses. Thereafter, the interest of the secured party is subject to defeat by purchasers and lienors even though before lapse the conflicting interest may have been junior. . .

4

**177**

statutory change is plain on its face and should be given its obvious meaning. Outside bankruptcy, there would be no doubt that Guyant would lose his perfected status. The lien of the writ of *fieri facias* does not assist Guyant. A writ of *fieri facias* expires one year after it is delivered to the sheriff. Va. Code §8.01-501 and 505. Consequently, the writ of *fieri facias* expired on October 5, 2011.[4] The next creditor in line is the debtor as a hypothetical lien creditor under §544(a)(1) who now has a first lien on the membership interests. There is case law to support this. *In re Miller Brothers Lumber Co., Inc.*, 212 Bankr. Lexis 2031 (Bankr.M.D.N.C. May 8, 2012); 2012 WL 1601316 (Bankr.M.D.N.C. May 8, 2012); 56 BCD 128 (Bankr.M.D.N.C. 2012); 77 UCC Rep.Serv.2d 525 (Bankr.M.D.N.C. 2012).

Guyant recognizes these issues, but argues that the lien status of a creditor is determined as of the date of filing; that his status is "frozen" at that point in time; and that a subsequent lapse is of no effect. There is case authority for this proposition. *In re Wilkinson*, 212 Bankr. Lexis 1539 (Bankr.N.D.N.Y. April 10, 2012); 2012 WL 1192780 (Bankr.N.D.N.Y. April 10, 2012); 77 UCC Rep.Serv.2d 363 (Bankr.N.D.N.Y. 2012).

The court recognizes the split of opinion with respect to the effect of the changes to the Bankruptcy Code and the Uniform Commercial Code. In considering both lines of cases, this court finds *In re Miller Brothers Lumber Co., Inc.* more persuasive. The plain meaning of the statutes should be given effect in the absence of countervailing considerations. Here, the Bankruptcy Code was amended to make clear that filing a continuation statement did not violate the automatic stay. The Uniform Commercial Code was then revised – and enacted in Virginia – to eliminate the tolling

---

[4]If it was issued later, but before the filing of the petition in bankruptcy, it would have expired no later than February 28, 2012.

5

**178**

period for the lapse of financing statements. The amendments addressed two specific concerns: the extent of the automatic stay and the problem of destroyed financing statements which remained effective because a bankruptcy petition was filed even though no continuation statement was filed. Prior to these changes, the secured creditor faced difficulties in maintaining his secured status. The creditor had to obtain relief from the automatic stay. This took time and incurred expense. There was no requirement that relief be granted. The effect was to prevent or limit the ability of a secured creditor to maintain his secured status. The freeze doctrine easily overcame these problems and provided a tolling provision of its own. Of course, if the financing statement lapsed during the bankruptcy, the lien continued in effect, but only until the conclusion of the case when it would be lost. The UCC codified the freeze doctrine and added a period after the conclusion of the bankruptcy case to file a continuation statement. The 2001 amendments made all of this unnecessary. This put the secured creditor in the same position in bankruptcy as he had been before bankruptcy. The application of the freeze doctrine – in essence an equitable remedy to the situation – was superceded by a legal resolution.

The intents of both Congress and the General Assembly are clear. The statutes provide a plain remedy to an unfortunate situation, making the prior equitable remedy unnecessary. There is no other provision in the Bankruptcy Code that preserves a financing statement in these circumstances. The statutes should be given effect as written.

To the extent that the cases Guyant cites predate the 2001 statutory change or rely on the prior statute, they are of limited utility because the UCC and Virginia law provided for this result.[5]

---

[5]The Bankruptcy Code was enacted in 1978 and became effective October 1, 1979, replacing the Bankruptcy Act of 1898. The Bankruptcy Code was intended to be a comprehensive revision of the Bankruptcy Act.

6

**179**

There is discussion of the principle that liens survive bankruptcy. This principle is undoubtedly correct. But, it is the wrong question. While liens survive, they do not necessarily emerge from bankruptcy as they entered bankruptcy. They accrue no greater right, strength or duration for having been through a bankruptcy proceeding. The question is not whether a lien survives bankruptcy, but whether a lien that terminates by its own terms during the pendency of a bankruptcy is given any greater right because of the filing of the bankruptcy than it would have had at state law if no bankruptcy had been filed. The Virginia General Assembly examined the issue and felt there should be no difference between the situations. In both instances, the creditor is required to file a continuation statement, which is a minor undertaking. In the process, the integrity of the state records is maintained.

Guyant relies not on the statute but on a comment to the statute:

Effect of Debtor's Bankruptcy. Under former Section 9-403(2), lapse was tolled if the debtor entered bankruptcy or another insolvency proceeding. Nevertheless, being unaware that insolvency proceedings had been commenced, filing offices routinely removed records from the files as if lapse had not been tolled. Subsection (c) deletes the former tolling provision and thereby imposes a new burden on the secured party: to be sure that a financing statement does not lapse during the debtor's bankruptcy. The secured party can prevent lapse by filing a continuation statement, even without first obtaining relief from the automatic stay. See Bankruptcy Code Section 362(b)(3). Of course, if the debtor enters bankruptcy before lapse, the provisions of this Article with respect to lapse would be of no effect to the extent that federal bankruptcy law dictates a contrary result (e.g., to the extent that the Bankruptcy Code determines rights as of the date of the filing of the bankruptcy petition).

Va.Code (1950) §8.9A-515, Comment 4; *see also* UCC §9-515, Comment 4. In particular, Guyant relies on the last sentence which refers to "rights as of the date of the filing of the bankruptcy petition." He asserts that this refers to the bankruptcy doctrine of freezing the status as of the date of the filing. It is difficult to interpret the comment as Guyant interprets it. It does not seem

7

**180**

reasonable that the General Assembly would expressly repeal a provision in the text of the statute and then reinstate it through an oblique comment. It would simply have left the statute as it was. The comment is a recognition that the Bankruptcy Code may treat matters differently. There is, however, nothing in the Bankruptcy Code itself that establishes the practice suggested. The practice was an equitable response that now has a legislative remedy.

Guyant presents a further argument. He asserts that even if the financing statement lapsed, he still retained an unperfected security interest. The argument has appeal where there is no intervening creditor. Perfection is only necessary when there is a competing creditor. In this case, there is an intervening creditor. As between the debtor and the creditor, the creditor retains a lien albeit unperfected. The difficulty with Guyant's argument is that the Bankruptcy Code gives a debtor-in-possession the rights of a judicial lien creditor as of the date of the filing of the petition in bankruptcy. 11 U.S.C. §544(a)(1). As of the date of the filing of the petition, debtor-in-possession held a third position as a result of §544(a)(1). With the lapse of the financing statement, however, Guyant had an unperfected security interest subject to the debtor-in-possession's lien right under §544(a)(1). With the termination of the lien created by the writ of *fieri facias,* the second position lien was terminated leaving the trustee in first position.[6] As between a lien creditor and an unperfected security interest, the lien creditor has priority. Va.Code (1950) §8.9A-317(a); *See also In re Johnson,* 179 B.R. 800 (Bankr.E.D.Va. 1995).

This is not an action to avoid a lien. It is simply an action to determine the priority of the

---

[6]The court is aware that there is case authority to the contrary. It, too, relies on the "freeze" approach although there is no such provision in the Bankruptcy Code and an equitable remedy to maintain the lien is unnecessary. *See In re Andrews,* 210 B.R. 719 (Bankr.E.D.Va.1997) (payments due under noncompete agreement); *Homeowner's Finance Corp v. Pennington (In re Pennington),* 47 B.R. 322, 326 (Bankr.E.D Va. 1985).

8

existing liens. The avoidance language which is contained in the ellipsis of §544(a) quoted above relates to the avoidance issues. It does not, however, relate to the existence or non-existence of the hypothetical judicial lien rights of the trustee or debtor-in-possession.[7]

Conclusion

The court recognizes the split of opinion with respect to the effect of the lapse of a financing statement following a filing of a petition in bankruptcy. The reasoning of *Miller Brothers* more effectively captures the plain meaning of the state statute and gives full effect to the creation and termination of liens under state law. The financing statement lapsed. Guyant has a lien by virtue of a security agreement, but it is unperfected and subordinate to the debtor-in-possession under §544(a)(1). The lien arising from the writ of *fieri facias* expired of its own course. The debtor-in-possession's rights as a hypothetical lien creditor under §544(a)(1) became the first priority lien.

Alexandria, Virginia
March 29, 2013

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

James P. Campbell
John P. Van Beek

18412

---

[7]Guyant also asserts that this is a proceeding to determine the validity, priority or extend of a lien in property and should have been brought as an adversary proceeding. Fed.R.Bankr.P. 7001(2). Be that as it may, the point was not pursued. This is essentially an issue of law and neither party was helped or hindered by the form of the proceeding.

9

**182**

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP, | Case No.  11-11413-RGM (Chapter 11) |
| Debtor. | |
| HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP, | |
| Plaintiff, | |
| vs. | Contested Matter (Objection to Proof of Claim) |
| WELLS FARGO, N.A. f/b/o JEROME GUYANT IRA, | |
| Respondent.. | |

### ORDER

This case is before the court on the objection of Highland Construction Management Services, LP to Proof of Claim 4 filed by Wells Fargo, N.A. f/b/o Jerome Guyant IRA.  (Docket Entry 92).  For the reasons set out in the accompanying Memorandum Opinion, it is

ORDERED that the objection of Highland Construction Management Services, LP to Proof of Claim 4 filed by Wells Fargo, N.A. f/b/o Jerome Guyant IRA is sustained and Proof of Claim 4 is allowed in the amount of $1,396,657.52 as an unsecured claim without priority.

Alexandria, Virginia
March 29, 2013

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

**183**

Copy electronically to:

James P. Campbell
John P. Van Beek

**184**

Neil D. Goldman, Esq. (VSB No 18352)
John P. Van Beek, Esq. (VSB No 30897)
Goldman & Van Beek, P C
510 King St., Suite 416
Alexandria, Virginia 22314
(703) 684-3260
(703) 548-4742 (facsimile)
ngoldman@goldmanvanbeek.com
jvanbeek@goldmanvanbeek.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 11-11413-RGM |
| HIGHLAND CONSTRUCTION | ) | Chapter 11 |
| MANAGEMENT SERVICES LP | ) | |
|     Debtor. | ) | |
| | ) | |

### THE JEROME GUYANT IRA'S MOTION FOR RECONSIDERATION OF ORDER SUSTAINING HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP'S OBJECTION TO PROOF OF CLAIM

Comes now Wells Fargo Bank, N.A. f/b/o Jerome Guyant IRA (the "Guyant IRA" or "Claimant"), by and through counsel, and pursuant to Rule 3008 of the Rules of Bankruptcy Procedure[1], requests this Court to reconsider its March 29, 2013 order sustaining the objection of Highland Construction Management Services, L.P. to its proof of claim in this matter, and for grounds therefor states as follows:

1.    On March 29, 2013 this Court sustained the objection of Highland Construction Management Services, L.P. ("Highland") to the Guyant IRA's proof of claim. On reviewing the Memorandum Opinion that accompanied the Order, it became apparent to the Claimant that something was lost in translation with regard to the argument pertaining to the relative priorities

---

[1] The filing of this motion for reconsideration stays the time within which an appeal from the March 29, 2013 order must be filed, although under Rule 3008, this type of motion does not have to be filed within 14 days of the entry of the order.

**185**

of the claims of the Guyant IRA as opposed to that of the debtor-in-possession under Va. Code
§9-515(c)[2]. This motion seeks to provide clarification of those portions of Guyant's
Supplemental Memorandum filed on January 14, 2013 (the "Supplemental Memorandum")[3] that
address this issue, and to thereby persuade the Court to reverse its decision.

The Court did not directly address the arguments made or authorities cited by the Guyant
IRA in the Supplemental Memorandum with respect to Virginia Code §9-515(c), but found that
the debtor-in-possession's status as a judicial lien creditor under 11 U.S.C. §544(a) as of the date
of the filing of the Petition gives it priority over the Guyant IRA's claim. This ruling is
inconsistent with the language of Va. Code §9-515(c), the comments to that section, the leading
law review article on the subject, WARNER, CONTINUING PERFECTION DURING
BANKRUPTCY UNDER REVISED ARTICLE 9, 20 APR Am. Bankr. Inst. J. 22 (2001), and
Mostoller v. CitiCapital Commer. Corp. (In re Stetson & Assocs.), 330 B.R. 613, 623 (Bankr.
E.D. Tenn. 2005), the only reported case that explicitly analyzes this issue.

The relevant portion of the Memorandum Opinion is found on page 8, where the Court
states as follows:

> Guyant presents a further argument. He asserts that even if the
> financing statement lapsed, he still retained an unperfected security
> interest. The argument has appeal where there is no intervening
> creditor. In this case, there is an intervening creditor. As between
> the debtor and the creditor, the creditor retains a lien, albeit
> unperfected. The difficulty with Guyant's argument is that the
> Bankruptcy Code gives a debtor-in-possession the rights of a judicial

---

[2] The first prong of the argument contained in the Guyant IRA's Supplemental Memorandum argued that the parties' positions as to perfection are fixed as of the date of the Petition. The argument to which this Motion refers is the second prong of the Claimant's argument, and is independent of the first. The Guyant IRA does not concede that the Court's decision on the first prong is correct, but understands that, unlike the second argument, it is an issue on which there is conflicting authority.

[3] In this regard, Guyant wishes to acknowledge an erroneous citation on page 7 of the Supplemental Memorandum, in which it referenced Va. Code §8.9-317(a) instead of the correct Va. Code §8.9-515(c) which governs priority in this situation.

2

**186**

> lien creditor as of the date of the filing of the petition in bankruptcy
> (emphasis supplied).

2.    Prior to 2000, former UCC §9-403(2) set forth the law as to lapsed financing

statements:

> If the security interest becomes unperfected upon lapse, it is
> deemed to have been unperfected as against a person who became
> a purchaser or lien creditor before lapse.

The 2000 Amendments to the UCC that were adopted in Virginia and throughout the

United States specifically changed this provision by deleting lien creditors from the category of

persons against whom a lapsed financing statement is ineffective.  The successor to §9-403(2),

Va. Code §8.9A-515(c), states that "[i]f the security interest …becomes unperfected upon lapse,

it is deemed never to have been perfected as against a purchaser of the collateral for value".

Official Comment 3 states clearly that "[t]he deemed retroactive unperfection **applies only with**

**respect to purchasers for value**; unlike former section 9-403(2), **it does not apply with respect**

**to lien creditors**" (emphasis supplied).   Comment 3 also provides examples of the priorities

between different types of creditors following lapse.  Those examples detail that upon lapse, the

lapsed security interest retains priority over all interests except those of an intervening

"purchaser."  The term "purchaser" includes a secured creditor, but not a lien creditor.

3.    In order to prevail in the priority contest, the debtor-in-possession would

necessarily have to be a "purchaser of the collateral for value", which no one suggests is the

case.  As a judicial lien creditor, it cannot obtain priority over the Guyant IRA.  The case of In re

Johnson, 179 B.R. 800 (Bankr. E.D. Va. 1995), cited by the Court in its Memorandum Opinion,

is inapposite to the legal situation here,  because a) the creditor in that case never had an interest

that was perfected at the time of the bankruptcy filing, b) it predates the 2000 UCC amendments,

3

**187**

and the applicable iteration of Va. Code §8.9-515(c), and (c) it did not involve a lapsed financing statement.

In re Miller Brothers Lumber Company, Inc., 2012 Bankr. LEXIS 2013 (Bankr. M.D.N.C. 2012), which is relied upon by this Court in its Memorandum Opinion, while acknowledging the primacy of state law in determining the validity of liens, does not even mention the distinction between a lien creditor and a "purchaser of the collateral for value" that is embodied in Va. Code 8-9A-515(c) and emphasized in Official Comment 3. This is particularly curious given the fact that Official Comment 3 is identical in both North Carolina General Statutes 25-9-515 and Va. Code §8.9A-515.

In Miller, the Court held that the debtor-in-possession's unspecified strong-arm powers that arise under 11 U.S.C. §544(a) as of the date of the filing of the Petition allowed it to avoid the lien of a creditor whose financing statement lapsed post-petition. The Court did not discuss the nature and extent of those strong-arm powers, or address the priorities between the creditor and the debtor-in possession under North Carolina General Statutes 25-9-515(c). If it had done so, the outcome of the case before it would necessarily have been in favor of the creditor, whose rights were superior to those of the debtor-in possession. The failure of the North Carolina court to properly analyze the impact of North Carolina General Statutes 25-9-515(c) on the case before it renders it of no value as a precedent for the issue under discussion.

4.    While there is not yet an abundance of authority on the relationship of Va. Code §8.9A-515(c) as amended or its equivalents in the other states of this country to the Bankruptcy Code, the authority that does exist uniformly holds that a lapsed secured interest takes priority over that of a lien creditor. "Since the §544 strong-arm power gives the trustee the status of a lien creditor with respect to debtor's personal property, the 9-515(c) limitation should prevent the

4

**188**

trustee from avoiding a personal property security interest **based on a post-petition lapse of perfection.**" Warner, p. 2. (emphasis supplied). See Mosteller v. CitiCapital Commer. Corp. (In re Stetson & Assocs.), 330 B.R. 613, 623 (Bankr. E.D. Tenn. 2005). There is no reported opinion that considers this issue (as noted above, Miller does not do so) that holds to the contrary.

5.    The facts of Mosteller are indistinguishable from those presented here. The original financing statements had lapsed post-petition as to personal property owned by the debtor-in -possession, there were no other secured creditors, and the trustee sought to avoid the lien of the secured creditor under Section 544(a). The court rejected the trustee's claims.

> The Plaintiff's rights and powers as Chapter 7 Trustee were established as of the date of filing, but defined under state law. See 11 U.S.C.A. § 544(a). Because trustees in bankruptcy are armed with the rights of lien creditors under §544(a) and are not purchasers for value, the fact that three of the Defendant's UCC-1 Financing Statements lapsed during the pendency of the bankruptcy case does not change the priority scheme as between the Defendant and the Plaintiff. id., 330 B.R. at 623-624.

Here, the Court and the Claimant agree with Mosteller that the debtor-in-possession's rights under 11 U.S.C.A. § 544(a) were established as of the date of filing, are defined by state law, and that it is armed with the rights of a lien/judicial creditor under §544(a). It is failure of this Court, as with the bankruptcy court in Miller, to take the next step, which is to recognize the distinction between a lien creditor and a purchaser for value in conjunction with a post-petition lapse of a financing statement that renders the March 29, 2013 opinion reversible.

## Conclusion

This Court's decision did not properly analyze the priority rules established by the clear language of Va. Code §8.9A-515(c) and its comments, which establish that the hypothetical

5

**189**

judgment lien creditor status granted to a debtor-in-possession under §544(a) is subordinate to
the security interest held by a secured creditor whose financing statement lapsed post-petition.

For these reasons, the Court should reconsider its decision, and find that the Guyant IRA
has a first priority security interest in the Sanford distributions at issue here.


Dated: April 12, 2013                          Respectfully submitted,


                                              /s/ John P. Van Beek
                                              Neil D. Goldman, Esq. (VSB No. 18352)
                                              John P. Van Beek, Esq. (VSB No. 30897)
                                              Goldman & Van Beek, P.C.
                                              510 King St., Suite 416
                                              Alexandria, Virginia 22314
                                              Voice:       (703) 684-3260
                                              Facsimile:   (703) 548-4742
                                              ngoldman@goldmanvanbeek.com
                                              jvanbeek@goldmanvanbeek.com

                                              Counsel for the Guyant IRA


                                              /s/John J. Brennan, III
                                              John J. Brennan, III
                                              VSB No. 18297
                                              510 King Street, Suite 416
                                              Alexandria, Virginia 22314
                                              Telephone:   (703) 548-1620
                                              Facsimile:   (703) 548-4742

                                              Co-Counsel for the Guyant IRA


6


**190**

### CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of April, 2013, a true and correct copy of the foregoing Supplemental Memorandum has been served electronically using the ECF system on all registered users of the CM/ECF system who have filed notices of appearance in this matter, and by first class mail, postage prepaid to:

James P. Campbell, Esq.
Campbell Flannery P.C.
1602 Village Market Boulevard, #220
Leesburg, VA 20175
(703) 777-1485

And

United States Trustee, Region 4
115 South Union Street, Suite 210
Alexandria, VA 22314


/s/ John P. Van Beek_____

7

**191**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:

HIGHLAND CONSTRUCTION
MANAGEMENT SERVICES LP

    Debtor

## OBJECTION TO JEROME GUYANT IRA'S MOTION FOR RECONSIDERATION OF ORDER SUSTAINING HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP'S OBJECTION TO PROOF OF CLAIM

COMES NOW, Highland Construction Management, by and through

counsel, and objects to Jerome Guyant IRA's Motion for Reconsideration, and in

support thereof states as follows:

I.    **Summary of Argument**

In the March 29, 2013 Memorandum Opinion this Honorable Court

thoroughly examined the plain language of the Uniform Commercial Code

("UCC") regarding the lapse of the financing statement filed by Guyant.  This

Court applied the plain and unambiguous language of the UCC and Bankruptcy

Code.  The Court concluded appropriately that a lapsed UCC is subordinate to the

claims of the bankruptcy estate, in the estate's capacity as the hypothetical

perfected lien creditor.

Highland respectfully asserts that Guyant has not even attempted to satisfy

the standard for reconsideration pursuant to Rule 59 of the Federal Rules of Civil

Procedure.  The essence of the Motion is that this Court failed to follow clear

1

**192**

mandates of law when, in fact, the only clear mandate is the plain language of the UCC. Accordingly, the Motion for Reconsideration must be denied as a matter of law.

## II.    Argument

### A.    Standard for Motion for Reconsideration

A motion for reconsideration in Bankruptcy Court is made pursuant to Bankruptcy Rule 9023, which states that Fed. R. Civ. P. 59 applies in bankruptcy cases, and pursuant to Bankruptcy Rule 3008, which specifically recognizes motions to reconsider. *See, e.g., In re Enron Corp.*, 352 B.R. 363, 367 (Bankr. S.D.N.Y. 2006). Reconsideration motions are proper in only three circumstances: (1) an intervening change in controlling law; (2) the emergence of previously unavailable evidence; or (3) to correct a clear error of law or prevent manifest injustice. *First Cmty. Bank v. E.M. Williams & Sons*, 2010 U.S.Dist.Lexis 30709 (E.D.Va. 2010)(quoting *Hutchinson v. Staton*, 994 F.2d 1076 (4th Cir. 1993)).

Guyant fails to meet any standard for reconsideration; and requests reconsideration of the same arguments addressed at length in his January 14, 2013 Supplemental Memorandum. There has been no change in law and no emergence of previously unavailable evidence. Guyant cannot assert that this Court has ignored clear mandates of law and committed manifest injustice as Guyant concedes on page 4 of his Motion to Reconsider that there is not yet "an abundance of authority on the relationship of Va. Code Section 8.9A-515(c)…and the Bankruptcy Code."

2

**193**

In other words, Guyant fully briefed this Court on his position, which the Court considered and rejected. Guyant has failed to raise any additional issue that can properly satisfy the Fourth Circuit's standard for reconsideration.

**B. Virginia Law Dictates First Priority to Debtor over an Unperfected Security Interest**

In disallowing Guyant's claim, this Court followed Virginia law, as informed by the Bankruptcy Code. In this Court's March 29, 2013 Memorandum Opinion, it was correctly noted that the trustee in bankruptcy is entitled to priority over unperfected liens, and that 11 USC Section 544(a)(1) confers upon the bankruptcy court the ideal creditor status. *See In re Wuerzberger*, 284 B.R. 814 (Bankr.W.D.Va. 2002); *see also In re Hurst*, 27 B.R. 740 (Bankr.E.D.Tenn. 1983). This ideal creditor status is not subordinated to an unperfected interest.

**i. Guyant Misreads Virginia Code Section 8.9A-515**

The essence of Guyant's Motion is that this Honorable Court, in its thorough nine page Memorandum, did not consider the meaning and effect of the final sentence of Virginia Code Section 8.9A-515(c) which states as follows:

> If the security interest or agricultural lien becomes unperfected upon lapse, it is deemed never to have been perfected as against the purchaser of the collateral for value.

Guyant seeks to inflate this language to stand for the proposition that a lapsed security interest only becomes ineffective with regard to "purchasers for value" and has no other meaning in the universe of priorities of claims. This conclusion is simply not supported by Section 8.9A-515(c).

3

**194**

As set forth in detail in this Court's Memorandum Opinion and in Highland's previous submissions to this Court, "lapse" and "ceases to be effective" means something. In fact, the second sentence of Section 8.9A-515(c) is exceptionally clear as enforced by the Court in its Memorandum Opinion:

> Upon lapse, a financing statement ceases to be effective and any security interest or agricultural lien that was perfected by the financing statement becomes unperfected, unless the security interest is perfected otherwise.

The essence of Guyant's argument is that the words "ceases to be effective" only apply in limited circumstances. This reading cannot be reconciled with the plain language of Virginia Code Section 8.9A-515(c). The Motion for Reconsideration simply revisits an argument made at the time of Guyant's January 14, 2013 Supplemental Memorandum, which this Court has properly and thoughtfully rejected.

### ii.    Guyant Fails to Read Virginia Code Section 8.9A-322

Virginia's UCC Section 8.9A-322(a)(2), determines priorities between creditors and dictates that a perfected interest as a hypothetical lien creditor takes precedent over **any** conflicting **unperfected security interest**. The interest of bankruptcy estate becomes perfected on the date of the filing of the petition. "A perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien." Virginia Code 8.9A-322(a)(2).

This Court correctly noted that priority is only an issue when there are competing creditors and that the bankruptcy estate is an intervening hypothetical

4

**195**

creditor. As between the Debtor and Guyant, the unperfected lien maintained its viability although unperfected. However, Guyant has not challenged this Court's correct conclusion that 11 USC Section 544(a)(1) gives the Debtor-in-Possession the rights of a judicial lien creditor as of the date of the petition. Upon the lapse of the security interest, and without the bankruptcy freeze in effect prior to the amendments of the UCC, the rights of the judicial lien creditors are prior in right to Guyant's unperfected lien.

The Bankruptcy Court for the Middle District Court of North Carolina came to the same conclusion, but without the thorough explanation provided for in the Memorandum Opinion. See *In re Miller Brothers Lumber Company, Inc.*, 2012 Bankr.Lexis 2031 (Bankr.M.D.N.C. 2012). Applying North Carolina's Section 25-9-515 (which is precisely the same as Virginia Code §8.9A-515), the court held that the statute "and the accompanying official comments" allowed the Debtor to avoid the creditor's lapsed security interest pursuant to its strong arm powers under 11 USC Section 544(a)(1). Accordingly, the North Carolina court reviewed and considered the official comments, yet did not reach the same conclusion urged by Guyant.

Guyant concedes that there is little law applying the amended version of the UCC and Bankruptcy Code, and thus cannot satisfy the manifest injustice or clear error standard for reconsideration. On the other hand, this Court found *Miller Brothers* to be the most compelling case among those considering priorities between a debtor and a creditor whose financing statement had lapsed. The

5

**196**

touchstone here and in *Miller* is that the plain and simple language of the revised

UCC and Bankruptcy Code, considered together, mean that a lapsed financing

statement ceases to be effective and will not protect a secured party who fails to

record a continuation statement.

WHEREFORE, for the reasons stated herein, the Debtor, Highland

Construction Management Services, LP, respectfully requests that this Honorable

Court deny the Motion for Reconsideration and for such further relief as this Court

deems appropriate.

**HIGHLAND CONSTRUCTION
MANAGEMENT SERVICES, LP**
**By Counsel**

_____ /s/ James P. Campbell _____
James P. Campbell, Esquire
*Campbell Flannery, P.C.*
1602 Village Market Boulevard, Suite 220
Leesburg, Virginia  20175
(703) 771-8344/Telephone
(703) 777-1485/Facsimile

6

**197**

## CERTIFICATE OF SERVICE

I hereby certify that service of a true copy of the foregoing has been made as follows:

| | |
|---|---|
| Type of Service: | ECF via the United States Bankruptcy Court to all parties requesting notice and Electronic Mail and First-Class, U.S. Mail to the parties listed below |
| Date of Service: | May 21, 2013 |
| Persons served and address: | Neil D. Goldman, Esq.<br>Goldman & Van Beek, PC<br>510 King Street, Suite 416<br>Alexandria VA 22314 |
| | John J. Brennan, III, Esq.<br>Brennan Law LLC<br>510 King Street<br>Suite 416<br>Alexandria, VA 22314 |
| Item Served: | Opposition to Motion for Reconsideration |

/s/ James P. Campbell
James P. Campbell

7

**198**

Case 11-11413-RGM    Doc 150    Filed 05/26/13    Entered 05/26/13 18:26:03    Desc Main
Document    Page 1 of 6

Neil D. Goldman, Esq. (VSB No. 18352)
John P. Van Beek, Esq (VSB No 30897)
Goldman & Van Beek, P.C.
510 King St , Suite 416
Alexandria, Virginia 22314
(703) 684-3260
(703) 548-4742 (facsimile)
ngoldman@goldmanvanbeek.com
jvanbeek@goldmanvanbeek.com

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case No. 11-11413-RGM |
| HIGHLAND CONSTRUCTION | ) | Chapter 11 |
| MANAGEMENT SERVICES LP | ) | |
| Debtor. | ) | Hearing Scheduled: |
| | ) | May 28, 2013 at 11:00 AM |

**THE JEROME GUYANT IRA'S REPLY TO DEBTOR'S OBJECTION [Docket No. 148]
TO MOTION FOR RECONSIDERATION OF ORDER SUSTAINING HIGHLAND
CONSTRUCTION MANAGEMENT SERVICES, LP'S OBJECTION TO PROOF OF
CLAIM [Docket No. 144]**

Wells Fargo Bank, N.A. f/b/o Jerome Guyant IRA (the "Guyant IRA" or "Claimant")
respectfully submits this Reply to the Objection of Debtor (the "Objection") to Claimant's
Motion for Reconsideration (the "Motion") of this Court's Order (the "Order") dated March 29,
2013 [Docket No. 138] sustaining the objection of Highland Construction Management Services,
L.P. to the proof of claim filed by Claimant.[1]

**11 U.S.C. §502(j) and Fed. R. Bankr. P. 3008 Authorize Reconsideration
of An Order Disallowing a Claim "For Cause"**

11 U.S.C. §502(j) provides in pertinent part:

A claim that has been allowed or disallowed may be reconsidered **for cause**. A
reconsidered claim may be allowed or disallowed according to the equities of the
case. (emphasis supplied)

---
[1] Claim No. 4.

**199**

The Advisory Committee Note to Rule 3008 reflects that the Rule is intended to provide a procedure for reconsideration under Section 502(j), which is "discretionary with the court." There can be no mistake that it is proper for this Court to reconsider the Order.

Despite the plain statutory language and the provisions of Rule 3008, Highland argues that reconsideration is "proper in only three circumstances: (1) an intervening change in the law; (2) the emergence of previously unavailable evidence; or (3) to correct a clear error of law or to prevent manifest injustice." Although the Court's discretion is far broader than asserted by Highland, the Order is based on a clear error of law, and reconsideration is necessary to prevent manifest injustice. As detailed in the Motion, the Court failed to properly apply the controlling priority rules laid out in Va. Code §8.9A-515(c).[2]

### The Financing Statement Filed By Claimant Lapsed on October 10, 2011, More Than Seven Months After The Commencement of This Case

Claimant does not dispute the Court's conclusion that the Financing Statement lapsed on October 10, 2011, well after the filing of the Petition on February 28, 2011. The court erred, however, in concluding in the face of §8.9A-515(c), that the Debtor's strongarm powers under Section 544(a), which are fixed as of the date of the commencement of the case, permit the Debtor to have priority over Claimant.

The last sentence of §8.9A-515(c) states: "[i]f the security interest or agricultural lien becomes unperfected, it is deemed never to have been perfected **as against a purchaser for value.**" (Emphasis supplied). This sentence must be given meaning. And that meaning, as explained in the Official Comment of the authors of the UCC, is that "[t]he deemed retroactive

---

[2] Claimant is not seeking reconsideration of the Court's rejection of the "Bankruptcy Freeze" argument recognized in In re: Wilkinson, 2012 Bankr. LEXIS 1539, 2012 WL 1192780, 77 UCC Rep.Serv.2d 363 (Bankr. N.D.N.Y 2012), but reserves reliance on that argument should there be an appeal.

2

**200**

unperfection applies only with respect to purchasers for value; unlike former section 9-403(2), **it does not apply with respect to lien creditors.**" Va. Code §8.9A-515, Official Comment 3 (emphasis supplied). And lest there be any doubt, Example 2 to Official Comment 3 details precisely the fact pattern presented here. It concludes that a security interest which is the subject of a lapsed financing statement nevertheless retains priority over a lien creditor whose interest is acquired prior to lapse, while the security interest was perfected:

> **Example 2**: SP [here, Claimant] holds a security interest perfected by filing. On July 1, [here, February 28, 2011] LC [here, Debtor] acquires a judicial lien on the collateral. Two weeks later [here, October 10, 2011], the effectiveness of the financing statement lapses. Although the security interest becomes unperfected on lapse, it was perfected when LC acquired its lien. Accordingly, notwithstanding the lapse, the perfected security interest has priority over the rights of LC, who is not a purchaser. See section 9-317(a)(2).

It is thus clear that under the applicable provisions of the UCC, the priorities in this case are to be measured as of the date that the Debtor acquired its status as lien creditor. That was February 28, 2011, when the Claimant's security interest was unquestionably perfected.[3] Contrary to the language of §8.9A-515(c) and the Official Comments including Example 2, this Court applied the "deemed retroactive unperfection" to the Debtor despite its status as a mere lien creditor. That is the clear error of law.

The Fourth Circuit regards the Official Comments to the UCC "as instructive." Wells Fargo Financial Acceptance v. Price, 562 F.3d 618, 626 (4th Cir. 2009),*citing* Buettner v. R.W. Martin & Sons, Inc., 47 F.3d 116, 118 (4th Cir. 1995), *citing* In re Varney Wood Products, Inc., 458 F.2d 435, 437 (4th Cir. 1972) (although the Official Comments of the Uniform Commercial Code are not binding upon the court, they nonetheless "represent powerful dicta," *citing* In re

---

[3] Claimant recognizes that had there been a junior secured creditor at the time of the lapse, Claimant's unperfected security interest would have lost priority to that junior creditor.as long as its interest was perfected. That is detailed in Example 1 to Official Comment 3. However, in this case, there is no such junior secured creditor, so Claimant's interest holds first priority.

3

**201**

<u>Yale Express System, Inc.</u>, 370 F.2d 433, 437 (2nd Cir. 1966)).  The Cornell University School

of Law Legal Information Institute, which publishes the online version of the UCC, states:

> Each section of the U.C.C. is the subject of an "Official     Comment."     While
> these comments have not been enacted by state legislatures, they are heavily
> relied on by lawyers and courts. They are, by far, the most important source of
> assistance in interpreting the Code.

(http://www.law.cornell.edu/ucc/context.html).

The fact pattern presented by this case is explicitly addressed in the Official Comments,

and no extrapolation or interpretation is required to properly analyze this case.  This Court's

opinion is squarely at odds with the result required by the language of §8.9A-515(c), and the

Official Comments to the UCC.  They cannot be reconciled.

### Debtor's Citation to §8.9A-322(a)(2) Is Inapposite and Unavailing

On page 4 of its Objection, the Debtor asserts that Claimant's argument must fail because

the Debtor, as a hypothetical lien creditor under Section 544, is deemed to be the holder of a

perfected security interest under §8.9A-322(a)(2)!  However, the Debtor is merely a lien creditor

as defined in §8.9A-102(52), a far different status that that of a secured party under §8.9A-

102(72).  There is no provision in the UCC for "perfection" of the interest held by a lien creditor.

### The <u>Miller Brothers</u> Court Did Not Consider The Relative Priority of Creditor's Security Interest Upon Lapse of the Financing Statement Post-Petition As Against the Debtor's Lien Creditor Status as of the Date of the Commencement of the Case

The <u>Miller Brothers</u> court simply did not consider or apply the rules of priority applicable

to lapsed financing statements set forth in §8.9-515(c) of the UCC.  Rather, the Court leaped to

the conclusion, without any analysis, that "parties which fail to file UCC-3 continuation

statements will lose their secured status, even when the lapse occurs post petition."   2012

Bankr. Lexis2031 *6.  This statement is wrong.  While the Claimant's security interest became

unperfected on lapse, under §8.9-515(c), it was perfected as against a lien creditor until lapse.  It

4

**202**

is deemed never to have been perfected only as against a purchaser for value. And it remains a security interest.

The entire focus of the Miller Brothers Court was on the lapse of the financing statement, and the change from the prior law which had not required the filing of a continuation statement to maintain perfection after commencement of a bankruptcy proceeding. No mention was made of the concurrent change in the priority rules which modified the "deemed retroactive unperfection" rules that existed under prior law. Under current law, "deemed retroactive unperfection" expressly applies only to purchasers for value, and not to lien creditors such as the Debtor.

<u>Conclusion</u>

This Court should follow §8.9A-515(c), including the Official Comments, as well as the authorities cited by Claimant and provided to the Court: WARNER, CONTINUING PERFECTION DURING BANKRUPTCY UNDER REVISED ARTICLE 9, 20 APR Am. Bankr. Inst. J. 22 (2001), and Mosteller v. CitiCapital Commer. Corp. (In re Stetson & Assocs.), 330 B.R. 613, 623 (Bankr. E.D. Tenn. 2005). The only "contrary" authority is Miller Brothers, which failed to undertake the necessary analysis under applicable law. This Court should vacate the prior Order, and enter an order overruling the Debtor's objection to Claimants' first priority secured status in the Sanford proceeds, and any other collateral subject to Claimant's security interest.

5

**203**

Dated: May 26, 2013                           Respectfully submitted,


                                              /s/ Neil D. Goldman
                                              Neil D. Goldman, Esq. (VSB No. 18352)
                                              John P. Van Beek, Esq. (VSB No. 30897)
                                              Goldman & Van Beek, P.C.
                                              510 King St., Suite 416
                                              Alexandria, Virginia 22314
                                              Voice:      (703) 684-3260
                                              Facsimile:  (703) 548-4742
                                              ngoldman@goldmanvanbeek.com
                                              jvanbeek@goldmanvanbeek.com


                                              /s/John J. Brennan, III
                                              John J. Brennan, III
                                              VSB No. 18297
                                              510 King Street, Suite 416
                                              Alexandria, Virginia 22314
                                              Telephone:  (703) 548-1620
                                              Facsimile:  (703) 548-4742

                                              Co-Counsel for the Guyant IRA

## CERTIFICATE OF SERVICE

    I hereby certify that on the 26th day of May, 2013, a true and correct copy of the
foregoing has been served electronically using the ECF system on all registered users of the
CM/ECF system who have filed notices of appearance in this matter, and by first class mail,
postage prepaid, to:

James P. Campbell, Esq.
Campbell Flannery P.C.
1602 Village Market Boulevard, #220
Leesburg, VA 20175
Facsimile: (703) 777-1485

And

United States Trustee, Region 4
115 South Union Street, Suite 210
Alexandria, VA 22314


                                              /s/ Neil D. Goldman

                                              6

**204**

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| In re:<br><br>HIGHLAND CONSTRUCTION<br>MANAGEMENT SERVICES, LP,<br><br>    Debtor. | Case No.  11-11413-RGM<br>(Chapter 11) |
| HIGHLAND CONSTRUCTION<br>MANAGEMENT SERVICES, LP,<br><br>      Plaintiff,<br><br>vs.<br><br>WELLS FARGO, N.A. f/b/o JEROME<br>GUYANT IRA,<br><br>      Respondent. | Contested Matter<br>(Objection to Proof of Claim 4) |

## MEMORANDUM OPINION

When is a financing statement that is no longer effective, still effective? When it lapses, of course! The sole issue presented in this case is the effect of a post-petition lapse of a secured creditor's financing statement. Highland argues that the lapse renders the claim unsecured. Guyant argues that the lapse has no effect and his claim continues to be secured.

This case is before the court on the motion of Wells Fargo, N.A. f/b/o Jerome Guyant IRA ("Guyant") for reconsideration of the court's order sustaining the objection of Highland Construction Management Services, L.P., the chapter 11 debtor in possession, to the secured status of Guyant's proof of claim. Upon further consideration, the court will vacate its prior order and allow Guyant's proof of claim as a secured claim.

1

**205**

## Factual Background

The facts are not disputed. Guyant loaned the debtor more than a million dollars starting on December 22, 2005. The loan was secured by the debtor's interest in two Virginia limited liability companies. The initial financing statement was filed on October 11, 2006. The debtor filed a petition in bankruptcy under chapter 11 of the Bankruptcy Code on February 28, 2011. Guyant did not file a continuation statement and on October 10, 2011, the financing statement lapsed. Va.Code (1950) §8.9A-515(a) and (c). There are no other liens on the collateral.

The applicable statute is Va.Code (1950) §8.9A-515. It states, in relevant part:

> (a) *Five-year effectiveness.* . . . [A] filed financing statement is effective for a period of five years after the date of filing.

> . . .

> (c) *Lapse and continuation of financing statement.* The effectiveness of a filed financing statement lapses on the expiration of the period of its effectiveness unless before the lapse a continuation statement is filed pursuant to subsection (d). Upon lapse, a financing statement ceases to be effective and any security interest . . . that was perfected by the financing statement becomes unperfected, unless the security interest is perfected otherwise. If the security interest . . . becomes unperfected upon lapse, it is deemed never to have been perfected as against a purchaser of the collateral for value.

## Positions of the Parties

The debtor argues that when the financing statement lapsed and "cease[d] to be effective," Guyant's lien terminated and his claim became an unsecured claim. Va.Code (1950) §8.9A-515(c). The debtor recognizes that a security agreement is effective as between the debtor and a creditor even if not perfected. Va.Code (1950) §8.9A-203. However, it is subordinate to "a person that becomes a lien creditor before . . . the security interest . . . is perfected." Va.Code (1950)

2

**206**

§8.9A-317(a)(2)(A). A trustee in bankruptcy[1] takes priority over a creditor with an unperfected security interest when the bankruptcy petition is filed. *Virginia Nat'l Bank v. Yale Mining Corp. (In re Yale Mining Corp.)*, 39 B.R. 201 (Bankr.W.D.Va. 1984). The debtor concludes that when a financing statement lapses after a bankruptcy petition is filed, the security interest in the collateral becomes unperfected and the trustee (or in a chapter 11 proceeding, the debtor in possession) succeeds to first priority because of its rights as a hypothetical lien creditor as of the date of the filing of the petition.[2]

Guyant construes Va.Code (1950) §8.9A-515(c) differently. Relying on Comment 3, particularly Example 2, in the Official Comment to §8.9A-515, he argues that his lapsed financing statement does not affect his first priority lien on the collateral. Comment 3 states:

> 3. **Lapse.** When the period of effectiveness under subsection (a) or (b) expires, the effectiveness of the financing statement lapses. The last sentence of subsection (c) addresses the effect of lapse. The deemed retroactive unperfection applies only with respect to purchasers for value; unlike former Section 9-403(2), it does not apply with respect to lien creditors.
>
> **Example 1:** SP-1 [Secured Party-1] and SP-2 [Secured Party-2] both hold security interests in the same collateral. Both security interests are perfected by filing. SP-1 filed first and has priority under Section 9-322(a)(1). The effectiveness of SP-1's filing lapses. As long as SP-2's security interest remains perfected thereafter, SP-2 is entitled to priority over SP-1's security interest, which is deemed never to have been perfected as against a purchaser for value (SP-2). See Section 9-322(a)(2).
>
> **Example 2:** SP [Secured Party] holds a security interest perfected by filing. On July 1, LC [Lien Creditor] acquires a judicial lien on the collateral. Two weeks later, the effectiveness of the financing statement lapses. Although the security interest becomes unperfected upon lapse, it was perfected when LC acquired its lien. Accordingly, notwithstanding the lapse, the perfected security interest has priority over the rights of LC, who is not a purchaser. See Section 9-317(a)(2).

---

[1] A chapter 11 debtor in possession has the rights of a trustee in bankruptcy. 11 U.S.C. §1107(a).

[2] Va Code (1950) §8.9A-102(52)(c) defines "lien creditor" to include "a trustee in bankruptcy from the date of the filing of the petition."

3

**207**

The debtor replies by citing Comment 4, "Effect of Debtor's Bankruptcy," in the same

Official Comment.  It states:

> **4. Effect of Debtor's Bankruptcy.** Under former Section 9-403(2), lapse was tolled
> if the debtor entered bankruptcy or another insolvency proceeding.  Nevertheless,
> being unaware that insolvency proceedings had been commenced, filing offices
> routinely removed records from the files as if lapse had not been tolled.  Subsection
> (c) deletes the former tolling provision and thereby imposes a new burden on the
> secured party: to be sure that a financing statement does not lapse during the debtor's
> bankruptcy.  The secured party can prevent lapse by filing a continuation statement,
> even without first obtaining relief from the automatic stay.  See Bankruptcy Code
> Section 362(b)(3).  Of course, if the debtor enters bankruptcy before lapse, the
> provisions of this Article with respect to lapse would be of no effect to the extent that
> federal bankruptcy law dictates a contrary result (e.g., to the extent that the
> Bankruptcy Code determines rights as of the date of the filing of the bankruptcy
> petition).

The predecessor provision referred to in Comment 4, Va.Code (1950) §8.9-403 stated:

> **What constitutes filing; duration of filing; effect of lapsed filing; duties of filing
> officer** . . .
>
> (2) [A] filed financing statement is effective for a period of five years from the date
> of filing.  The effectiveness of a filed financing statement lapses on the expiration of
> the five-year period unless a continuation statement is filed prior to the lapse.  If a
> security interest perfected by filing exists at the time insolvency proceedings are
> commenced by or against the debtor, the security interest remains perfected until
> termination of the insolvency proceedings and thereafter for a period of sixty days
> or until expiration of the five-year period, whichever occurs later.  Upon lapse the
> security interest becomes unperfected, unless it is perfected without filing.  If the
> security interest becomes unperfected upon lapse, it is deemed to have been
> unperfected as against a person who became a purchaser or lien creditor before lapse.

## Discussion

The starting point for statutory construction is the statute itself.  *Hubbard v. Henrico Ltd.*

*Partnership,* 255 Va. 335, 339, 497 S.E.2d 335, 337 (1998) (When a statute is clear and

unambiguous "a court may look only to the words of the statue to determine its meaning" unless a

"literal construction would result in a manifest absurdity.").  The Official Comments are not part

4

**208**

Appeal: 14-1259    Doc: 12    Filed: 05/05/2014    Pg: 212 of 241

of the statute that the General Assembly enacted into law. The court should not consider them unless the statute is ambiguous. Va.Code (1950) §8.9A-515(c) is ambiguous. Reasonable people can come to different understandings of the statute. *See, e.g. In re Miller Brothers Lumber Co., Inc.*, 212 Bankr. Lexis 203, 2012 WL 1601316, 56 BCD 128, 77 UCC Rep.Serv.2d 525 (Bankr.M.D.N.C. May 8, 2012) (trustee in bankruptcy had priority over secured party with pre-petition perfected security interest where the financing statement lapsed post-petition); *Mostoller v. CitiCapital Commercial Corp. (In re Stetson & Assoc., Inc.)*, 330 B.R. 613, 619-620 (Bankr.E.D.Tenn. 2005) (secured party with pre-petition perfected security interest had priority over trustee in bankruptcy even though secured lender's financing statement lapsed post-petition); *In re Wilkinson*, 212 Bankr. Lexis 1539; 2012 WL 1192780, 77 UCC Rep.Serv.2d 363 (Bankr.N.D.N.Y. April 10, 2012) (secured party with pre-petition first priority perfected security interest prevailed over secured party with pre-petition second priority perfected security interest even though senior secured creditor's financing statement lapsed post-petition); and *In re Chattanooga Choo-Choo Co.*, 98 B.R. 792, 8 UCC Rep.Serv.2d 795 (Bankr.E.D.Tenn. 1989) (second priority perfected secured creditor prevailed over first priority perfected secured creditor whose financing statement lapsed pre-petition).

The Official Comments are useful tools in construing the Uniform Commercial Code. *Leake v. Meredith*, 221 Va. 14, 17, 267 S.E.2d 95 (1980); *See also Halifax Corp. v. First Union Nat. Bank*, 262 Va. 91, 101-102, 546 S.E.2d 696, 703 (2001) (discussing rules of statutory interpretation and role of Official Comments); *See also Mostoller*, 330 B.R. at 619-620.

Professor G. Ray Warner's 2001 article, *The Anti-Bankruptcy Act: Revised Article 9 and Bankruptcy*, 9 Am.Bankr.Inst.L.Rev. 3, 16-19 (April 2001), is also helpful. He makes clear that secured parties had considerable input in writing Revised Article 9 and that they incorporated the maximum protections for themselves possible, particularly with respect to bankruptcy. Viewing

5

**209**

Revised Article 9 through the eyes of secured parties assists in better understanding it. In doing so, two matters not mentioned in Article 9, but discussed in the Official Comments, should be addressed because they form the foundation for understanding the effect of the lapse of a financing statement in bankruptcy. They are the retrospective and prospective effectiveness of filed financing statements and the significance of the filing date of a petition in bankruptcy on lien priorities during the pendency of the bankruptcy case. The first – the creation, duration and effect of security interests – arises under state law. The second – the effect of the filing of a petition in bankruptcy – arises under federal law.[3]

### Retrospective and Prospective Effect of Financing Statements

The basic UCC concept is that once a security interest is perfected by filing a financing statement, it remains perfected notwithstanding the lapse of the financing statement that perfected the security interest in the first instance as to parties who held liens as of the date the financing

---

[3] *See Butner v. United States*, 440 U.S. 48, 54-55, 99 S.Ct. 914, 917-918 (1979) where the Supreme Court stated:

> The constitutional authority of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States" would clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankrupt estate. But Congress has not chosen to exercise its power to fashion any such rule. The Bankruptcy Act does include provisions invalidating certain security interests as fraudulent, or as improper preferences over general creditors. Apart from these provisions, however, Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.' *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323. The justifications for application of state law are not limited to ownership interests, they apply with equal force to security interests, including the interest of a mortgagee in rents earned by mortgaged property.

*Butner*, 440 U.S. at 54-55, 99 S.Ct. at 917-918 (footnotes omitted).

6

**210**

statement lapsed.[4]  This is the retrospective rule.  The prospective rule is that once a financing

statement lapses, the security interest becomes unperfected as to all parties who obtain a lien

subsequent to the lapse.  They are treated in the same manner as if the original financing statement

had never been filed.

Does the statute support this concept?  The prospective rule is plainly set out in the second

sentence of Va.Code (1950) §8.9A-515(c): "Upon lapse, a financing statement ceases to be effective

and any security interest . . . that was perfected by the financing statement becomes unperfected."

This is the commonsense answer.  The purpose of filing a financing statement is to give notice to

the world that the collateral is subject to a lien.  Once it expires, it may, literally, not give any notice

to anyone because the filing office is only required to maintain a record of the information for one

year after the lapse.  Va.Code (1950) §8.9A-522(a).

The support for the retrospective rule is more opaque.  The Official Comments to Va.Code

(1950) §8.9A-316 and §8.9A-515 contain references to the retrospective effect of a lapsed financing

statement.  Va.Code (1950) §8.9A-316 addresses a similar problem to the lapsing of financing

statements by the passage of time addressed in Va.Code (1950) §8.9A-515(c).  The former addresses

changes in governing law arising from a debtor's relocation from one state to another.  It is necessary

for the creditor to file a financing statement in the new state.  Subsection (b) addresses the effect of

the original financing statement when a financing statement is not filed in the new jurisdiction.[5]  The

---

[4]The last sentence of Va.Code §8.9A-515(c) provides an except for secured parties, but not lien creditors.

[5]Va.Code (1950) §8.9A-316(b) provides that

**Security interest perfected or unperfected under law of new jurisdiction.**  If a security interest
described in subsection (a) becomes perfected under the law of the other jurisdiction before the earliest
time or event described in that subsection, it remains perfected thereafter.  If the security interest does
not become perfected under the law of the other jurisdiction before the earliest time or event, it
(continued...)

7

**211**

effect is the same as under Va.Code (1950) §8.9A-515(c). Official Comment 3 to Va.Code (1950) §8.9A-316 states:

> **3. Retroactive Unperfection.** Subsection (b) sets forth the consequences of the failure to reperfect before perfection ceases under subsection (a): the security interest becomes unperfected prospectively and, as against purchasers for value, including buyers and secured parties, but not as against donees or lien creditors, retroactively. . . . See also Section 9-515 (taking the same approach with respect to lapse). Although this approach creates the potential for circular priorities, the alternative – retroactive unperfection against lien creditors – would create substantial and unjustifiable preference risks.

Similarly, Official Comment 3 to Va.Code (1950) §8.9A-515 refers to retroactive unperfection. What can easily slip by or be conflated in this Official Comment is the differing references to the financing statement, which is what lapses, and unperfection which, although not expressly stated, refers to the security interest. The financing statement lapses; the security interest becomes unperfected.

The unperfection is referred to as "[t]he *deemed* retroactive unperfection." Official Comment 3 to Va Code (1950) §8.9-515. "Deemed" is a legal word of art. The first definition of "deem" in Black's Law Dictionary (9th ed. 2009) is "To treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have." Black's Law Dictionary then quotes G.C. Thornton, *Legislative Drafting* 99 (4th ed. 1996):

> 'Deem' has been traditionally considered to be a useful word when it is necessary to establish a legal fiction either positively by 'deeming' something to be what it is not or negatively by 'deeming' something not to be what it is. . . . All other uses of the word should be avoided. . . . 'Deeming' creates an artificiality and artificiality should not be resorted to if it can be avoided.

---

[5](...continued)
becomes unperfected and is deemed never to have been perfected as against a purchaser of the collateral for value

The use of the word "deemed" in Official Comment 3 means that there is no actual retroactive unperfection. It is a fictional substitute for actual retroactive unperfection for purchasers for value. For lien creditors the real rule applies, that is, there is no retroactive unperfection. The reality is that the security interest of the secured party whose financing statement lapsed remains perfected.

Is there support in the statute for the construction provided in the Official Comments? While the Official Comments are helpful, the Virginia Supreme Court cautions that "they should not become devices for expanding the scope of Code sections where language within the sections themselves defies such an expansive interpretation." *Leake v. Meredith*, 221 Va. at 17, 267 S.E.2d at 95; *See Paugh v. Henrico Area Mental Health & Dev. Serv.*, 286 Va. 85, 743 S.E.2d 277 (2013). The last sentence of Va.Code (1950) §8.9A-515(c) provides the nexus. It states that "[i]f the security interest . . . becomes unperfected upon lapse, it is deemed never to have been perfected as against a purchaser . . . for value." This sentence must have some meaning. It is a "settled principle of statutory construction that every part of a statute is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." *Hubbard v. Henrico Ltd. P'ship*, 255 Va. 335, 340, 497 S.E.2d 335, 337 (1998). *See Brown v. Commonwealth*, 284 Va. 538, 733 S.E.2d 638 (2012). There would be no purpose for including this sentence in §8.9A-515(c) if unperfection were to put a previously perfected security interest in the same position as if the financing statement had never been perfected. That is what this sentence is intended to accomplish. If it would not have been accomplished in the absence of this sentence, then unperfection – the lapse of a financing statement – cannot be the same as if the previously perfected security agreement had never been perfected. It follows that, although the financing statement has lapsed, the security interest remains perfected. This is supported by the statute's use of the word "deemed." As to an existing junior secured party when the senior secured party's financing statement lapses, the senior secured party's

9

**213**

security interest is "deemed never to have been perfected" even though, in reality, it has been. It is simply treated as if it had not been perfected as to the junior secured creditor. As to all others, the reality prevails – it was and continues to be perfected on a retrospective basis.

The final consideration is the adoption of the Revised Article 9. The prior version of Va.Code (1950) §8.9A-515(c), Va.Code (1950) §8.9-403, contained the same last sentence, but also included lien creditors as well as purchasers for value. Lien creditors and secured parties are treated separately in various provisions of both Revised Article 9 and its predecessor. The deletion of lien creditors from the last sentence must have meaning and that was to remove them from the deemed never perfected status of secured parties. It, again, supports the retrospective/prospective interpretation.

The application can be shown by a hypothetical in which there are three secured creditors. If all three security interests are perfected when the most senior creditor's financing statement lapses, then without the application of the last sentence of Va.Code (1950) §8.9A-515(c), the resulting post-lapse priorities would be Secured Party 1 (with the lapsed financing statement), Secured Party 2 and then Secured Party 3. If Secured Party 1's financing statement lapses after Secured Party 2 files its financing statement but before Secured Party 3 files its financing statement, the resulting post-lapse priorities are Secured Party 3, Secured Party 1 (with the lapsed financing statement) and Secured Party 2. Secured Party 1 (with the lapsed financing statement) retains priority over Secured Party 2, but Secured Party 3 has priority over the unperfected security interest of Secured Party 1.[6] That, however, is not the result because the last sentence of Va.Code (1950) §8.9A-515(c) alters the result. It provides that if a security interest becomes unperfected upon lapse, "it is deemed never to have

_____

[6]This would appear to create a circular set of priorities when the priorities of Secured Party 2 and Secured Party 3 are considered with respect to each other.

10

**214**

been perfected as against" a subsequent secured party. Va.Code (1950) §8.9A-515(c). The new

priorities are Secured Party 2, Secured Party 3 and then Secured Party 1 (with the lapsed financing

statement). Secured Party 2 has priority over Secured Party 1 (with the lapsed financing statement)

by virtue of the last sentence of Va.Code (1950) §8.9A-515(c) because the lapsed financing

statement is "deemed" never to have been perfected as to it. This is an exception to the retrospective

rule that a financing statement once perfected remains perfected as to existing junior perfected

security interests. Secured Party 3 has priority over Secured Party 1 (with the lapsed financing

statement) without regard to when it perfects its security interest. If it perfects its security interest

before the lapse, the lapsed financing statement is unperfected as to Secured Party 3. If it perfects

its security interest after the lapse (but before Secured Party 1 files a new financing statement),

Secured Party 3 has priority over Secured Party 1. Va.Code (1950) §8.9A-322(a)(1). Secured Party

2 always retains its priority over Secured Party 3 because its financing statement was filed before

Secured Party 3's financing statement. Va.Code (1950) §8.9A-322(a)(1).

Lien creditors must also be considered. The priority of parties secured by a perfected security

interest is governed by Va.Code (1950) §8.9A-322 and is generally a first in time standard. The

rights of secured parties and lien creditors are governed by Va.Code (1950) §8.9A-317(a).

Generally, as between a lien creditor and a secured party, the first in time prevails. Lien creditors

do not benefit from the last sentence in Va.Code (1950) §8.9A-515(c). The last sentence speaks only

to purchasers for value. It says nothing about lien creditors. Lien creditors are not purchasers for

value. The definition of a "purchaser" is "a person who takes by purchase." Va.Code (1950) §8.1A-

201(30). The definition of "purchase" is:

> *"Purchase"* means taking by sale, lease, discount, negotiation, mortgage, pledge,
> lien, security interest, issue or reissue, gift, or any other *voluntary* transaction
> creating an interest in property.

11

**215**

Va.Code (1950) §8.1A-201(29) (emphasis added). A lien creditor is not a purchaser because he has not purchased anything. The creation of a judicial lien is not a *voluntary* transaction. The resulting priorities between a secured party and a subsequent lien creditor will be Secured Party and then Lien Creditor, both before and after lapse of Secured Party's financing statement. The last sentence of Va.Code (1950) §8.9A-515(c) does nothing for the lien creditor. Only a purchaser of the collateral for value is included in the exception. It is different if the financing statement lapses before the lien creditor's lien attaches to the collateral, the lien creditor will have priority over the secured party because the financing statement was unperfected when the judicial lien attached and the lien creditor was first in time. Va.Code (1950) §8.9A-317(a).

In short, under the Uniform Commercial Code, a secured party whose financing statement lapses loses his position to all parties with perfected security interests when the financing statement lapses. However, he retains his priority as to all lien creditors who obtained a judicial lien prior to the lapse of the financing statement.[7]

### Bankruptcy Freeze Rule

Up to this point, bankruptcy has not been a consideration in analyzing the effect of a lapsed financing statement. It is solely a matter of state law. Bankruptcy affects the application of state law. While the lien priorities among creditors are determined by state law, for example, Article 9 of the UCC, the Bankruptcy Code may alter those priorities through the application of preference,

---

[7]Although not relevant in this case, after the lapse and until the creditor with the lapsed financing statement files a new financing statement, all purchasers for value and lien creditors have priority over the creditor with the lapsed financing statement.

12

**216**

fraudulent conveyance and other Bankruptcy Code provisions and doctrines.[8] *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917 (1979); *See. e.g.,* 11 U.S.C. §544 *et seq.*

The first question is the point in time when the priorities are determined by state law and the second is whether they change during the course of the bankruptcy case. One resolution is the "freeze" rule, that is, lien priorities are determined as of the filing of the petition in bankruptcy and are not altered during the pendency of the case (unless avoided under the Bankruptcy Code, principally, the chapter 5 avoidance powers). *In re Chaseley's Foods, Inc.,* 726 F.2d 303 (7th Cir. 1983). This line of cases dates back to at least *Lockhart v. Garden City Bank & Trust Co.,* 116 F.2d 658 (2nd Cir. 1940). In *Lockhart,* New York law required chattel mortgages to be refiled annually. The one-year period expired after the debtor filed a petition in bankruptcy and the bank failed to refile the chattel mortgage. The trustee unsuccessfully sought to have the bank's lien declared invalid. The Court of Appeals held that:

> [A] bankruptcy trustee, as to all property in possession of the bankrupt at the time of adjudication, is vested 'as of the date of bankruptcy with all rights, remedies, and powers of a creditor then holding a lien thereon by legal or equitable proceedings.' Sec. 70, sub. c, 11 U.S.C.A. §110, sub. c. Thus the critical time at which the trustee's rights are to be determined is the date of bankruptcy. Hence in general no creditors' liens acquire validity after the filing of the petition; this is emphasized by the exceptional cases otherwise – liens for property transferred for a present consideration actually paid to the amount thereof, Sec. 70, sub. d(1), and statutory liens for employees, contractors, mechanics, landlords and others, and for taxes, though not perfected until after bankruptcy .    .   *It should equally follow, we believe, that liens good at this time do not lose their validity as against the trustee, unless the statute so expressly provides.*

---

[8] Distributional priorities are of a different type. *See, e.g.,* 11 U.S.C. §507 and 510.

13

**217**

*Lockhart,* 116 F.2d at 661 (emphasis added and citations omitted).[9]  In *Flebotte v. Northern (In re Fletcher Woods, Inc.),* 887 F.2d 1079, 1989 WL 117728 (4th Cir. October 2, 1989) (unpublished opinion), the Court of Appeals for the Fourth Circuit also held that the rights of a secured creditor were fixed as of the date of the commencement of the bankruptcy case and that the post-petition unauthorized release did not terminate the creditor's secured position.

The alternative to the freeze rule evaluates the secured status throughout the pendency of the case.  If a financing statement, judgment lien or the lien of a deed of trust expires during the pendency of a bankruptcy case, the secured creditor loses the benefit of its lien and becomes an unsecured creditor at that time.

The Bankruptcy Code is not explicit on when the secured nature of a claim is evaluated although the general scheme appears to favor evaluation at the commencement of the case.  Proofs of claims are determined "as of the date of the filing of the petition."  11 U.S.C. §502(b).  This suggests that a claim, both the amount and the secured status, are determined as of the filing of the petition.  However, §502(b) only states that the court "shall determine the *amount* of such claim."  11 U.S.C. §502(b) (emphasis added).  Secured or unsecured status is different from the amount of a claim.  There is no explicit reference to the secured status in §502(b).  Section 506(a), however, directly addresses the secured status of a claim.  A claim is a secured claim only to the extent of the value of the collateral.

> Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

---

[9] *See In re Willax,* 93 F.2d 293 (2nd Cir. 1937) and *Mast Corp. v. Buckley (In re Long Island Properties, Inc.),* 143 F.2d 349 (2nd Cir. 1944) which address mechanics liens as exceptions to the rule.  *See also Morton v. Nat'l Bank of New York City (In re Morton),* 866 F.2d 561 (2nd Cir. 1989).

14

**218**

11 U.S.C. §506(a)(1). While there is broad language suggesting that the time for the determination can be any time during the bankruptcy case, §506(a)(1) – as does §502(b) – refers to the value of the collateral, not to the validity of the lien itself. Another indication favoring the determination of the secured status of a lien is §544 which gives the trustee certain avoidance powers "as of the commencement of the case." 11 U.S.C. §544(a).

The Supreme Court addressed liens in bankruptcy in several cases. In *Isaacs v. Hobbs Tie & Timber Co.* it stated that:

> [W]hile valid liens existing at the time of the commencement of a bankruptcy proceeding are preserved, it is solely within the power of a court of bankruptcy to ascertain their validity and amount and to decree the method of their liquidation.

282 U.S. 734, 738, 51 S.Ct. 270, 272 (1931); *See also Dewsnup v. Timm,* 502 U.S. 410, 418, 112 S.Ct. 773, 778 (1992) ("Under the Bankruptcy Act of 1898, a lien on real property passed through bankruptcy unaffected."); *Johnson v. Home State Bank,* 501 U.S. 78, 84, 111 S.Ct. 2150, 2154 (1991) ("Rather, a bankruptcy discharge extinguishes only one mode of enforcing a claim – namely, an action against the debtor in personam – while leaving intact another – namely, an action against the debtor in rem"); *Farrey v. Sanderfoot,* 500 U.S. 291, 297, 111 S.Ct. 1825, 1829 (1991) ("Ordinarily, liens and other secured interests survive bankruptcy."). The rule that the filing of a petition in bankruptcy does not of itself alter or modify a pre-petition lien and, unless modified during the bankruptcy, passes through bankruptcy unaffected by the filing is well established.

The Bankruptcy Code expressly provides for modification or termination of liens during bankruptcy. For example, §522(f) permits the avoidance of certain liens impairing the debtor's exemptions. Section 506(d) voids a lien to the extent that the lender is undersecured. Sections 544, 545, 547 and 548 permit certain liens to be avoided. However, neither the Bankruptcy Code nor the freeze rule directly addresses the question presented here, the effect of the termination during the

15

**219**

bankruptcy proceeding itself of a lien by its own terms or by the terms of the statute creating it. It is not necessary in this case to resolve the role of the freeze rule.

## Bankruptcy Decisions

Recognition of the UCC Article 9 retrospective/prospective analysis and of the Bankruptcy Code freeze rule assists in harmonizing the four bankruptcy cases that are ostensibly at odds with each other. *Wilkinson* is the most straightforward analysis. This was a contest between two secured creditors. The debtor in possession was not involved. Melinda Wilkinson – the debtor's mother – held a pre-petition first priority perfected security interest in 69 cows. The Farm Service Agency ("FSA") held a pre-petition second priority perfected security interest. Ms. Wilkinson's financing statement lapsed seven months after the debtor filed bankruptcy and three months before the cows were sold at auction. Both Ms. Wilkinson and FSA asserted a first priority security interest in the proceeds from the sale of the cows. The Bankruptcy Court applied the freeze rule, that is, the priorities in existence on the date the petition was filed controlled. It held that although Ms. Wilkinson's financing statement lapsed post-petition, she remained in first position. *In re Wilkinson*, 2012 WL 1192780 at *5. Outside bankruptcy, FSA would have prevailed. Revised Article 9 §9A-515(c). Ms. Wilkinson's security interest would have been "deemed never to have been perfected as against a purchaser of the collateral for value." UCC §9A-515(c). FSA would have been a purchaser for value and become the holder of the first priority lien. This is an example of the application of the freeze rule.

*Mostoller* was a contest between the chapter 7 trustee and a secured party. The Bankruptcy Court held that the secured party's pre-petition priorities of its financing statements filed before the bankruptcy petition retained their priority over the chapter 7 trustee notwithstanding that three of the

16

**220**

financing statements lapsed post-petition. *Mostoller,* 330 B.R. at 619-620.  The case likely started

as a chapter 11 proceeding that converted to chapter 7. During the pendency of the case, three

financing statements lapsed.  The court held that:

> The [trustee's] rights and powers as Chapter 7 Trustees were established as of the
> date of filing, but defined under state law.  *See* 11 U.S.C.A. §544(a).  Because
> trustees in bankruptcy are armed with the rights of lien creditors under §544(a) and
> are not purchasers for value, the fact that three of the.  .  . Financing Statements
> lapsed during the pendency of the bankruptcy case does not change the priority
> scheme as between the [secured party and the chapter 7 trustee].

*Mostoller,* 330 B.R. at 623-24 (footnotes omitted).  In further explaining its holding, the court stated:

> The lapse is of no consequence to the [secured party] with respect to its priority as
> against the [trustee] because, "[u]nder the 'strong arm' provisions of 11 U.S.C.
> §544(a)(1), the Trustee stands in the shoes of a lien creditor whose liens arose as of
> the petition date." *In re Hurst,* 308 B.R. 298, 301 (Bankr.S.D.Ohio 2004). As of the
> petition date, all of the [secured party's] liens were perfected, and it enjoyed a
> superior priority over the [trustee] with respect to the Equipment.  Accordingly, the
> [trustee's] priority was set as of [the date of filing of the petition], and, as
> exemplified in the Official Comments, even upon lapse of the UCC-1 Financing
> Statements, her priority is subordinate to the [secured party] .  .  .

*Id.* at 624 n 11.

Mostoller quite correctly notes that the trustee's avoidance power as to personal property

under §544(a) is determined as of the date of the filing of the petition.  On that date, the secured

party's liens were properly perfected.  The trustee could not prevail under §544(a).  But §544(a) is

not relevant.  The question is not whether the trustee could *avoid* the lien under §544(a), but the

effect of the *lapse* – which was due only to the passage of time – on the lien.  In this case, it did not

matter whether the court adopted the bankruptcy freeze rule.  In either event, the secured creditor

would prevail.  If the freeze rule were applied, the priorities on the date of the filing of the petition

17

**221**

would not change during the pendency of the case.[10] Lapse during the post-petition period is of no

consequence.[11] The secured creditor would continue to have priority over a subsequent lien creditor.

If the freeze rule were not applied, priority would be determined under Revised Article 9 as of the

date the matter was decided by the court. Again, lapse during the post-petition period is of no

consequence. Notwithstanding the lapse of the financing statement, the secured creditor's lapsed

financing statement remained effective as to existing lien creditors, which includes the chapter 7

trustee. *See* Va. Code (1950) §8.9A-102(52)(C) (definition of lien creditor) and Va.Code (1950)

§8.9A-515(c). The lapse is not retrospective as to the trustee. Lapse would have a consequence for

a junior secured creditor because of the last sentence of §8.9A-515(c). The lien created by a lapsed

financing statement as to a junior secured creditor is deemed never to have been perfected.[12]

 *Chattanooga Choo-Choo Co.* involved a priority dispute between secured creditors.

Equitable Life Assurance Society filed a financing statement in 1976 which lapsed in 1981 because

no continuation statement was filed. American National Bank and First Tennessee Bank filed a

second priority financing statement in 1981, within five years after Equitable filed its first priority

financing statement which was then still effective. Equitable argued that it remained in first position

because the two banks filed their financing statement while Equitable's financing statement was still

effective. The version of the UCC in effect in Tennessee in 1981 "did not specifically say that the

security interest became unperfected against security interests perfected before the lapse."

---

[10]The freeze rule and avoidance under §544(a) are two distinct doctrines. Care should be taken not to conflate them.

[11]Lapse during the pendency of a bankruptcy does have consequences after bankruptcy or when the collateral is no longer property of the estate. Non-bankruptcy rules on the effect of a lapse in perfection would then control and a senior secured creditor may lose its priority to a junior secured creditor.

[12]The same benefit existed as to lien creditors under the prior version of Article 9 but was removed in the revision to UCC §9A-515(c).

18

**222**

*Chattanooga Choo-Choo Co.,* 98 B.R. at 799. The then-current version of the UCC, the version in

force in 1986, contained just such a provision. Tenn.Code Ann. §47-9-403. The Bankruptcy Court

held that the pre-1986 UCC provision made an exception for junior secured parties. They moved

up in priority upon lapse of the senior secured party's financing statement. It stated:

> The court agrees that the better rule is to make a lapsed financing statement
> ineffective against other financing statements filed before the lapse. The rule that
> lapse affects only transactions after the lapse would create too much confusion and
> too many factual disputes among secured creditors.
>
> Under this rule, the junior secured creditor who filed its financing statement
> before the lapse will move up in priority despite having actual notice or knowledge
> of the lapsed financing statement or the security interest. Lack of actual knowledge
> or notice is irrelevant.

*Chattanooga Choo-Choo Co.,* 98 B.R. at 799. Despite the various prior versions of the UCC that

were discussed in the case, the construction is identical to the existing version. *See* Va.Code (1950)

§8.9A-515(c). It illustrates the effect of §8.9A-515(c) as between two secured creditors. It did not

involve a bankruptcy trustee as to these security interests.

The last case is *Miller Brothers Lumber* where the Bankruptcy Court held that the debtor in

possession could avoid the security interest of a secured party whose financing statement lapsed

post-petition. 2012 WL 1601316 at *3. The contest was between the chapter 11 debtor in

possession and the secured lender. It was a case of first impression in North Carolina. *Id.* at *3. The

court gave literal effect to the second sentence of N.C. Gen.Stat. §25-9-515(c) which was buttressed

by the change from the prior version and the Official Comment. The prior version provided that a

financing statement would continue to be effective for the duration of the bankruptcy proceeding and

sixty days afterward. The Official Comment discussed the earliest version of 11 U.S.C. §362 which

enjoined filing continuation statements. A mechanism was needed to preserve properly perfected

security interests in light of the automatic stay. The solution was to add a tolling provision to the

19

**223**

UCC, the equivalence of the bankruptcy freeze rule. Section 362 was later amended to remove filing continuation statements from the protection of the automatic stay. The Official Comment noted the amendment, the consequent lack of necessity for a tolling provision and its removal. It noted that filing a continuation statement was easily accomplished and merely imposed the same requirement on secured lenders in bankruptcy as outside bankruptcy. But it also made an oblique reference to the bankruptcy free rule. The *Miller Brothers Lumber* court applied a straightforward reading to the statute that was ostensibly supported by the Official Comment. It did not discuss the reference to the freeze rule or the UCC analysis of the continuation of a perfected security interest notwithstanding the lapse of the financing statement that perfected it. The court came to the commonsense conclusion that if the instrument that perfected the lien ceased to be effective, perfection of the lien must also cease. It did not need to consider 11 U.S.C. §544(a) because it was not an avoidance action. It was an application of the state statute on priorities. *Miller Brothers Lumber* inferentially rejected the freeze rule and does not give effect to the last sentence of N.C. Gen. Stat. 525-9-515(c). Particularly with the latter, it is at odds with the other three cases.

## Conclusion

Revised Article 9 is somewhat opaque. It assumes that once a security interest is perfected it remains perfected as to existing secured parties and lien creditors, that is, its retrospective effectiveness continues.[13] The last sentence alters this result as to secured parties but not lien creditors or trustees in bankruptcy. In any event, the lapsed financing statement has no prospective

---

[13]*See* Va.Code (1950) §8.9A-515 Comment 3 (referring to retrospective application and giving examples of its effect) and Comment 4 (referring to bankruptcy). *See also* Va.Code (1950) §8.9A-316 Comment 3 (clearer explanation of retrospective/prospective application).

**224**

effectiveness. There is nothing in Va.Code (1950) §8.9A-515(c) that says this expressly, but the last sentence has no meaning without that understanding. Nor does the 1972 change that eliminated lien creditors from the ambit of the last sentence have any meaning without that understanding. If this had been taken into account in *Miller Brothers Lumber*, the court would have been decided the case differently and the result would have been in accord with *Mostoller*.

This is a case where there is a contest between a single secured party and the debtor in possession who has the powers of a trustee. The secured creditor's security interest has priority over the debtor's interest. The debtor cannot avoid the secured creditor's security interest under §544(a) because as of the date of the filing of the petition, his lien was properly perfected. A §544(a) avoidance action looks to that point in time, not a later lapse. If the freeze rule were applicable, the priorities in effect on the date the petition was filed would continue throughout the case and the secured party would again prevail. If the priorities are re-evaluated throughout the case and a lapse in a financing statement were to have consequences, it is necessary to determine what those consequences would be under state law. Here, the applicable provision of the Virginia Code is §8.9A-515(c). With one exception, it continues the effectiveness of the perfected security interest as to all parties as of the date of the lapse as if no lapse had occurred, but not as to new parties who become secured creditors or lien creditors thereafter. That means that the secured party's perfected security interest continues as to the debtor. The one exception would be a pre-petition junior secured creditor. He would take priority over the creditor with the lapsed financing statement but, in this case, there is no such secured creditor.

Wells Fargo, N.A. f/b/o Jerome Guyant IRA continues to have a perfected security interest in this case, prior to the interests of the debtor. The objection to its proof of claim will be overruled. The prior Memorandum Opinion is withdrawn and the prior order will be vacated.

21

**225**

Alexandria, Virginia
July 30, 2013

/s/ Robert G. Mayer _____
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

James P. Campbell
John P. Van Beek
John J. Brennan, III

18606

22

**226**

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re:<br><br>HIGHLAND CONSTRUCTION<br>MANAGEMENT SERVICES, LP,<br><br>    Debtor. | Case No.  11-11413-RGM<br>(Chapter 11) |
| HIGHLAND CONSTRUCTION<br>MANAGEMENT SERVICES, LP,<br><br>       Plaintiff,<br><br>vs.<br><br>WELLS FARGO, N.A. f/b/o JEROME<br>GUYANT IRA,<br><br>      Respondent. | Contested Matter<br>(Objection to Proof of Claim 4) |

## ORDER

THIS CASE is before the court on the Jerome Guyant IRA's Motion for Reconsideration of Order Sustaining Highland Construction Management Services, LP's Objection to Proof of Claim (Docket Entry 144).  For the reasons stated in the accompanying Memorandum Opinion, it is

ORDERED:

    1.  The order entered on the docket on March 29, 2013 (Docket Entry 138) is vacated.

    2.  The objection of Highland Construction Management Services, LP to Proof of Claim 4 filed by Wells Fargo, NA., f/b/o Jerome Guyant IRA is allowed in the amount of $1,396,657.52 as a secured claim.

1

**227**

Alexandria, Virginia
July 30, 2013

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

James P. Campbell
John P. Van Beek
John J. Brennan

18673

2

**228**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:

HIGHLAND CONSTRUCTION                    Case No. 11-11413-RGM
MANAGEMENT SERVICES, LP,                  Chapter 11

    Debtor.

## NOTICE OF APPEAL

COMES NOW Highland Construction Management Services, LP, and hereby notes its appeal to the United States Court of Appeals from the Order of this Court entered on July 30, 2013, vacating its prior Order of March 29, 2013 disallowing Proof of Claim 4.

A transcript or statement of facts, testimony, and other incidents of the case will be designated and filed.

## CERTIFICATE

The undersigned certifies as follows:

(1)    The name(s) and address(es) of appellant(s) are:

        Highland Construction Management Services, LP
        12022 Meadowville Court
        Herndon VA 20170

(2)    The name(s), address(es), and telephone number(s) of counsel for appellant(s) are:

James P. Campbell, Esq. #25097
Campbell Flannery, PC
1602 Village Market Blvd Suite 220
Leesburg, Virginia 20175
(703) 771-8344
jcampbell@campbellflannery.com

**229**

James P. Campbell, Esq.
1602 Village Market Boulevard
Suite 220
Leesburg, Virginia 20175
Telephone: (703) 771-8344

(3)    The name(s) and address(es) of appellee(s) are:

Wells Fargo, NA f/b/o Jerome Guyant IRA
c/o John Brennan, Esq.
Neil D. Goldman, Esq.
John P. Van Beek, Esq.
510 King Street, Suite 416
Alexandra, VA 22314

(4)    The name(s), address(es), and telephone number(s) of counsel for

appellee(s) are:

John Brennan, Esq.
Neil D. Goldman, Esq.
John P. Van Beek, Esq.
510 King Street, Suite 416
Alexandra, VA 22314
(703) 548-1620

(5)    A copy of this Notice of Appeal has been mailed or delivered to all

opposing counsel this 12th day of August, 2013.

Respectfully submitted,

**HIGHLAND CONSTRUCTION
MANAGEMENT SERVICES, LP
By Counsel**

2

**230**

James P. Campbell, Esquire (VSB# 25097)
*CAMPBELL FLANNERY, P.C.*
1602 Village Market Boulevard, Suite 220
Leesburg, Virginia 20175
Telephone: (703) 771-8344
Facsimile: (703) 777-1485

## CERTIFICATE OF SERVICE

I hereby certify that service of a true copy of the foregoing has been made as follows:

| | |
|---|---|
| Type of Service: | ECF via the United States Bankruptcy Court to all parties requesting notice and via First Class, US Mail to the parties listed below |
| Date of Service: | August 12, 2013 |
| Persons served and address: | John Brennan, Esq.<br>Neil D. Goldman, Esq.<br>John P. Van Beek, Esq.<br>510 King Street, Suite 416<br>Alexandra, VA 22314 |
| Item Served: | Notice of Appeal |

James P. Campbell

3

**231**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | |
|---|---|
| HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP, | ) ) ) |
| Appellant, | ) Civil Action No. 1:13-cv-1244 |
| v. | ) ) |
| WELLS FARGO NA F/B/O JEROME GUYANT IRA, | ) ) ) |
| Appellee. | ) |

**ORDER**

THIS MATTER comes before the Court on an appeal from the Bankruptcy Court.

Starting on December 22, 2005, Appellee Wells Fargo Bank NA f/b/o Jerome Guyant IRA ("Wells Fargo" or "Secured Party" or "Appellee") loaned Appellant Highland Construction Management Services, LP ("Highland" or "Debtor" or "Appellant") more than one million dollars. The loan was secured by Highland's interest in two Virginia limited liability companies. The initial financing statement was filed on October 11, 2006. Highland filed a voluntary petition for chapter 11 bankruptcy relief on February 28, 2011 in the Bankruptcy Court for the Eastern District of Virginia, Alexandria Division. On July 5, 2011, Wells Fargo filed Proof of Claim 4-1, in the amount of $1,396,657.52, as a secured claim. This was based on a judgment

in that amount entered by the Circuit Court of Loudoun County, Virginia. Wells Fargo did not file a continuation statement, and on October 10, 2011, the financing statement lapsed. There are no other liens on the collateral.

In a Memorandum Opinion issued on July 30, 2013, the Bankruptcy Court held in Wells Fargo's favor, finding that under Va. Code §8.9A-515(c) a post-petition lapse of a financing statement is deemed never to have been perfected as to a purchaser of the collateral for value, but is still superior to to Debtor's hypothetical status as a judicial lien creditor whose interest arises at the time the bankruptcy petition is filed. Highland appealed from the Bankruptcy Court's Final Opinion on August 12, 2013.

Under Va. Code §8.9A-515(c), a secured creditor whose security interest becomes unperfected by lapse of a financing statement following the filing of a bankruptcy petition nevertheless retains priority over the hypothetical lien creditor status afforded to a bankruptcy trustee or debtor-in-possession. The plain language of the statute is corroborated by the Official Comments to the UCC, which explicitly state: "The deemed retroactive unperfection . . . does not apply with respect to lien creditors." A security interest that becomes unperfected as a result of the lapse of a financing statement is retroactively subordinated only as against a purchaser of the

**233**

collateral for value, and not as to lien creditors. Lien creditors do not benefit from the last sentence in Va. Code § 8.9A-515(c); the last sentence speaks only to purchasers for value. A secured party whose financing statement lapses loses his position to all parties with perfected security interests when the financing statement lapses; however, he retains his priority as to all lien creditors who obtained a judicial lien prior to the lapse of the financing statement. Thus, Wells Fargo continues to have a perfected security interest in this case, prior to the interests of Highland.

For the aforementioned reasons, and it appearing to the Court that the findings of the Bankruptcy Court are neither clearly erroneous nor contrary to law, it is hereby

ORDERED that the decision of the United States Bankruptcy Court is AFFIRMED.

/s/
Claude M. Hilton
United States District Judge

Alexandria, Virginia
February 2ʲ , 2014

**234**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

HIGHLAND CONSTRUCTION MANAGEMENT SERVICES, LP

        Plaintiff,

        v.                            Civil Action No.
                                     1:13-CV-1244

WELLS FARGO NA FBO JEROME GUYANT IRA,

        Defendants.

## NOTICE OF APPEAL

        COMES NOW the Plaintiff, Highland Construction Management Services, LP, and hereby notes its appeal to the United States Court of Appeals from the Order of this Court entered on February 21, 2014, entering judgment in favor of the Defendant.

        A transcript or statement of facts, testimony, and other incidents of the case will be filed.

## CERTIFICATE

The undersigned certifies as follows:

    (1)    The name(s) and address(es) of appellant(s) are:

                Highland Construction Management Services, LP
                12022 Meadowville Court
                Herndon, Virginia 20170

    (2)    The name(s), address(es), and telephone number(s) of counsel for appellant(s) are:

                James P. Campbell, Esq.
                1602 Village Market Boulevard
                Suite 220
                Leesburg, Virginia 20175
                Telephone: (703) 771-8344

James P. Campbell, Esq. #25097
Campbell Flannery, PC
1602 Village Market Blvd. Suite 220
Leesburg, Virginia 20175
(703) 771-8344
jcampbell@campbellflannery.com

**235**

(3)    The name(s) and address(es) of appellee(s) are:

        Wells Fargo NA FBO Jerome Guyant IRA
        1214 Confederate Avenue
        Richmond, VA 23227-4402

(4)    The name(s), address(es), and telephone number(s) of counsel for appellee(s) are:

        John J. Brennan, Esq.
        Neil D. Goldman, Esq.
        John P. Van Beek, Esq.
        510 King Street, Suite 416
        Alexandra, VA 22314
        Telephone: (703) 684-3260

(5)    A copy of this Notice of Appeal has been mailed or delivered to all opposing counsel this 23rd day of March, 2014.

        Respectfully submitted,

        **HIGHLAND CONSTRUCTION**
        **MANAGEMENT SERVICES, LP**
        **By Counsel**

       /s/James P. Campbell
James P. Campbell, Esquire (VSB #25097)
*Campbell Flannery, P.C.*
1602 Village Market Boulevard
Suite 220
Leesburg, Virginia 20175
(703) 771-8344/Telephone
(703) 777-1485/Facsimile
jcampbell@campbellflannery.com

2

**236**

## CERTIFICATE OF SERVICE

| | |
|---|---|
| Type of Service: | First Class U.S. Mail |
| Date of Service: | March 23, 2014 |
| Persons served and address: | John J. Brennan, Esq.<br>Neil D. Goldman, Esq.<br>John P. Van Beek, Esq.<br>510 King Street, Suite 416<br>Alexandria VA 22314 |
| Item Served: | Notice of Appeal |

/s/James P. Campbell
James P. Campbell

**237**